# 21-2531

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

❖

RAFAEL FOX, PAUL D'AURIA, JILL SHWINER,

*Plaintiffs-Appellants,*

—against—

STARBUCKS CORPORATION, DBA STARBUCKS COFFEE COMPANY,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPENDIX
## VOLUME II OF VI
## (Pages A-301 to A-600)

A. MICHAEL WEBER
GARY MOY
LITTLER MENDELSON, P.C.
900 Third Avenue, 8th Floor
New York, New York 10022
(212) 583-9600

*Attorneys for Defendant-Appellee*

ARIEL Y. GRAFF
FILOSA GRAFF LLP
111 John Street, Suite 2510
New York, New York 10038
(212) 256-1780

*Attorneys for Plaintiffs-Appellants*

## TABLE OF CONTENTS

PAGE

District Court Docket Entries ............................................ A-1

Complaint and Demand for Jury Trial, dated May 21, 2019 .............. A-17

    Exhibit 1 to Complaint—
    Color Photograph ................................................. A-46

Defendant Starbucks Corporation d/b/a Starbucks Coffee Company's
    Amended Answer, dated September 16, 2020 ....................... A-74

Affidavit of Carla Ruffin, sworn to January 13, 2021 .................... A-92

Declaration of Rachel Kelly, for Defendant, in Support of Motion
    for Summary Judgment, dated January 13, 2021 .................... A-95

    Exhibit 1 to Kelly Declaration—
    Document from the NYC Consumer Affairs,
    dated January 5, 2018 ............................................ A-96

    Exhibit 2 to Kelly Declaration—
    Document from the NYC Consumer Affairs,
    dated January 5, 2018 ........................................... A-105

    Exhibit 3 to Kelly Declaration—
    Email from Tim Hutchinson, dated January 11, 2018 ............. A-114

    Exhibit 4 to Kelly Declaration—
    Predictability Pay Table......................................... A-133

Declaration of Rami Kranz, for Defendant, in Support of Motion
    for Summary Judgment, dated January 14, 2021 .................. A-138

    Exhibit 1 to Kranz Declaration—
    Proposal of AVP Termite & Pest Control of NY, Inc.,
    dated October 16, 2012 ......................................... A-145

ii

PAGE

Exhibit 2 to Kranz Declaration—
Email Chain, dated August 10, 2016 ............................. A-149

Exhibit 3 to Kranz Declaration—
Email Chain, dated September 29, 2017.......................... A-150

Exhibit 4 to Kranz Declaration—
Email Chain, dated October 26, 2016 ........................... A-152

Exhibit 5 to Kranz Declaration—
Starbucks Food Safety Manual .................................. A-156

Exhibit 6 to Kranz Declaration—
C.A.F.E. Practices Verifier and Inspector Operations Manual ..... A-158

Exhibit 7 to Kranz Declaration—
Email Chain, dated September 29, 2017.......................... A-160

Exhibit 8 to Kranz Declaration—
Email Chain, dated March 12, 2018............................. A-162

Exhibit 9 to Kranz Declaration—
Email Chain, dated September 29, 2017.......................... A-164

Exhibit 10 to Kranz Declaration—
Email Chain, dated October 16, 2017 ........................... A-165

Exhibit 11 to Kranz Declaration—
Email Chain, dated July 27, 2015............................... A-166

Exhibit 12 to Kranz Declaration—
Email Chain, dated August 10, 2016 ........................... A-167

Exhibit 13 to Kranz Declaration—
Email Chain, dated August 10, 2016 ........................... A-168

Exhibit 14 to Kranz Declaration—
Email Chain, dated September 15, 2016.......................... A-170

Exhibit 15 to Kranz Declaration—
Email Chain, dated April 6, 2019 .............................. A-172

iii

PAGE

Exhibit 16 to Kranz Declaration—
Email Chain, dated July 7, 2017 ................................. A-176

Exhibit 17 to Kranz Declaration—
Email Chain, September 29, 2017 .............................. A-181

Exhibit 18 to Kranz Declaration—
Email Chain, dated September 29, 2017......................... A-183

Exhibit 20 to Kranz Declaration—
Email Chain, dated October 16, 2017 ........................... A-186

Exhibit 21 to Kranz Declaration—
Email Chain, dated October 2, 2017 ............................ A-187

Exhibit 22 to Kranz Declaration—
Email Chain, dated January 23, 2018 ........................... A-192

Declaration of A. Michael Weber, for Defendant, in Support
of Motion for Summary Judgment, dated January 14, 2021 ........ A-194

Exhibit A to Weber Declaration—
Excerpts of Deposition Transcript of Carla Ruffin,
dated August 21, 2020 ......................................... A-197

Exhibit B to Weber Declaration—
Excerpts of Deposition Transcript of Rafael Fox,
dated August 12, 2020, with Exhibits ........................... A-232

Exhibit C to Weber Declaration—
Excerpts of Deposition Transcript of Paul D'Auria,
dated September 9, 2020 ....................................... A-278

Exhibit D to Weber Declaration—
Excerpts of Deposition Transcript of Jill Shwiner,
dated September 11, 2020, with Exhibits........................ A-286

Exhibit E to Weber Declaration—
Excerpts of Deposition Transcript of Keith Costello,
dated August 19, 2020 ......................................... A-304

iv

PAGE

Exhibit F to Weber Declaration—
Excerpts of Deposition Transcript of Rami Kranz,
dated September 15, 2020 ........................................ A-309

Exhibit G to Weber Declaration—
Subpoena Response of AVP, dated November 11, 2019 ........... A-339

Exhibit H to Weber Declaration—
Excerpts of Deposition Transcript of Leslie Fable,
dated September 29, 2020 ........................................ A-342

Exhibit I to Weber Declaration—
Excerpts of Deposition Transcript of Timothy Hutchinson,
dated September 1, 2020 ......................................... A-358

Exhibit J to Weber Declaration—
Excerpts of Deposition Transcript of Rachel Kelly,
dated September 2, 2020 ......................................... A-381

Exhibit K to Weber Declaration—
Excerpts of Deposition Transcript of Tina McDonald,
dated August 27, 2020 ........................................... A-446

Exhibit L to Weber Declaration—
Rafael Fox's Email and the New York City Department
of Consumer Affairs' Email Chain, dated January 2, 2019 ........ A-529

Declaration of Ariel Y. Graff, for Plaintiffs, in Opposition
to Motion for Summary Judgment, dated March 1, 2021 .......... A-532

Exhibit 1 to Graff Declaration—
Plaintiffs' Complaint and Demand for Jury Trial
with Photos, dated May 21, 2019 ............................... A-539

Exhibit 2 to Graff Declaration—
Excerpts of Deposition Transcript of Rafael Fox,
dated August 12, 2020 ........................................... A-596

Exhibit 3 to Graff Declaration—
Excerpts of Deposition Transcript of Paul D'Auria,
dated September 9, 2020 ......................................... A-690

v

PAGE

Exhibit 4 to Graff Declaration—
Excerpts of Deposition Transcript of Jill Shwiner,
dated September 11, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-843

Exhibit 5 to Graff Declaration—
Excerpts of Deposition Transcript of Rami Kranz,
dated September 15, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-913

Exhibit 6 to Graff Declaration—
Excerpts of Deposition Transcript of Keith Owen Costello,
dated August 19, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1068

Exhibit 7 to Graff Declaration—
Excerpts of Deposition Transcript of Carla Ruffin,
dated August 21, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1110

Exhibit 8 to Graff Declaration—
Excerpts of Deposition Transcript of Rachel Kelly,
dated September 2, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1154

Exhibit 9 to Graff Declaration—
Excerpts of Deposition Transcript of Tim Hutchinson,
dated September 1, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1228

Exhibit 10 to Graff Declaration—
Excerpts of Deposition Transcript of Leslie Fable,
dated September 29, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1259

Exhibit 11 to Graff Declaration—
Excerpts of Deposition Transcript of Tina McDonald,
dated August 27, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1320

Exhibit 12 to Graff Declaration—
Stipulation, dated October 27, 2020. . . . . . . . . . . . . . . . . . . . . . . . . . . A-1431

Exhibit 13 to Graff Declaration—
Document Bearing Bates Number EF45453, Written Copy
of Starbucks May 21, 2019 Press Statement . . . . . . . . . . . . . . . . . . . . A-1433

Exhibit 14 to Graff Declaration—
Stipulation, dated October 27, 2020. . . . . . . . . . . . . . . . . . . . . . . . . . . A-1434

vi

PAGE

Exhibit 15 to Graff Declaration—
Excerpts of Daily Record Book Purchase Log
for a Starbucks Location in New York City ..................... A-1436

Exhibit 16 to Graff Declaration—
Excerpts of Daily Record Book Purchase Log
for a Starbucks Location in New York City ..................... A-1439

Exhibit 17 to Graff Declaration—
Excerpts of Daily Record Book Purchase Log
for a Starbucks Location in New York City ..................... A-1441

Exhibit 18 to Graff Declaration—
Excerpts of Daily Record Book Purchase Log
for a Starbucks Location in New York City ..................... A-1443

Exhibit 19 to Graff Declaration—
Excerpts of Daily Record Book Purchase Log
for a Starbucks Location in New York City ..................... A-1445

Exhibit 20 to Graff Declaration—
Excerpts of Daily Record Book Purchase Log
for a Starbucks Location in New York City ..................... A-1447

Exhibit 21 to Graff Declaration—
Email Chain, dated February 12, 2018 ......................... A-1449

Exhibit 22 to Graff Declaration—
Email Chain, dated September 11, 2017........................ A-1455

Exhibit 23 to Graff Declaration—
Proposal of AVP Termite & Pest Control of NY, Inc.,
dated October 16, 2012 ......................................... A-1457

Exhibit 24 to Graff Declaration—
Email Chain, dated May 29, 2018.............................. A-1461

Exhibit 25 to Graff Declaration—
Email Chain, dated February 6, 2019 .......................... A-1464

Exhibit 26 to Graff Declaration—
Email Chain, dated November 3, 2017 ......................... A-1467

vii

PAGE

Exhibit 27 to Graff Declaration—
Email Chain, dated October 18, 2017 ........................... A-1472

Exhibit 28 to Graff Declaration—
Email Chain, dated September 26, 2017........................ A-1474

Exhibit 29 to Graff Declaration—
Email Chain, dated February 6, 2019 .......................... A-1476

Exhibit 30 to Graff Declaration—
Email Chain, dated February 6, 2019 .......................... A-1478

Exhibit 31 to Graff Declaration—
Email Chain, dated February 11, 2018 ......................... A-1480

Exhibit 33 to Graff Declaration—
Email Chain, dated December 1, 2017, with Attached Image ..... A-1482

Exhibit 34 to Graff Declaration—
Email Chain, dated November 26, 2017........................ A-1483

Exhibit 35 to Graff Declaration—
Text Message Exchange Between Plaintiff Rafael Fox
and Tina McDonald, Bearing Bates numbers RF_867-868........ A-1485

Exhibit 36 to Graff Declaration—
Declaration of Rafael Fox, Plaintiff, in Opposition
to Defendant's Motion for Summary Judgment,
dated March 1, 2021 .......................................... A-1487

Exhibit 37 to Graff Declaration—
Text Message Exchange Between Plaintiff Rafael Fox
and Tina McDonald, Bearing Bates Number RF_841............. A-1489

Exhibit 38 to Graff Declaration—
Email Chain, dated October 16, 2017 .......................... A-1490

Exhibit 39 to Graff Declaration—
Email Chain, dated February 6, 2019 .......................... A-1492

Exhibit 40 to Graff Declaration—
Email Chain, dated February 6, 2019 .......................... A-1494

viii

PAGE

Exhibit 41 to Graff Declaration—
Email Chain, dated September 15, 2016......................... A-1497

Exhibit 43 to Graff Declaration—
Email Chain, dated February 10, 2018 .......................... A-1499

Exhibit 44 to Graff Declaration—
Starbucks Daily Records Book, Punch Communication Log ...... A-1500

Exhibit 45 to Graff Declaration—
Email Chain, dated January 11, 2018 ........................... A-1501

Exhibit 48 to Graff Declaration—
Interview Log Produced by the New York State Department
of Consumer Affairs in Response to a FOIA Request Bearing
Bates Number RF_0155........................................ A-1502

Exhibit 49 to Graff Declaration—
Activity Log Produced by the New York State Department
of Consumer Affairs in Response to a FOIA Request Bearing
Bates Number RF_0155........................................ A-1503

Exhibit 50 to Graff Declaration—
Email Chain Bearing Bates Numbers: DEF0000463,
DEF0057812, DEF0057813, dated January 16, 2018............. A-1507

Exhibit 51 to Graff Declaration—
Request for Job Descriptions for Jill Shwiner
and Paul D'Auria. ............................................. A-1510

Exhibit 52 to Graff Declaration—
Defendant's Amended Responses and Objections
to Plaintiffs' First Set of Interrogatories (undated)............... A-1511

Reply Declaration of A. Michael Weber, for Defendant,
in Further Support of Motion for Summary Judgment,
dated March 29, 2021 ......................................... A-1515

Exhibit M to Weber Declaration—
Email Chain, dated May 22, 2019............................... A-1517

ix

PAGE

Exhibit N to Weber Declaration—
Excerpts of Deposition Transcript of Rachel Kelly,
dated September 2, 2020 ....................................... A-1520

Exhibit O to Weber Declaration—
Excerpts of Deposition Transcript of Leslie Fable,
dated September 29, 2020 ..................................... A-1525

Exhibit P to Weber Declaration—
Excerpts of Deposition Transcript of Tina McDonald,
dated August 27, 2020 ........................................ A-1529

Exhibit Q to Weber Declaration—
Excerpts of Deposition Transcript of Carla Ruffin,
dated August 21, 2020 ........................................ A-1532

Exhibit R to Weber Declaration—
Corrective Action Form ....................................... A-1535

Declaration of Tina McDonald, for Defendant, in Support
of Motion for Summary Judgment, dated March 29, 2021 ........ A-1537

Exhibit A to McDonald Declaration—
Email Chain, dated November 24, 2017 ......................... A-1542

Exhibit B to McDonald Declaration—
New York Scheduling Rules.................................... A-1544

Exhibit C to McDonald Declaration—
Schedule Change Log ......................................... A-1547

Exhibit D to McDonald Declaration—
Email Chain, dated February 21, 2018 ......................... A-1548

Exhibit E to McDonald Declaration—
Email Chain, dated February 20, 2018 ......................... A-1550

Exhibit F to McDonald Declaration—
Excerpt of 2006 Partner Resources Manual,
Hours of Work Policy......................................... A-1552

x

PAGE

Exhibit G to McDonald Declaration—
Punch Communication Log...................................... A-1560

Reply Declaration of Margaret Kis, for Defendant,
in Further Support of Motion for Summary Judgment,
dated March 29, 2021 ......................................... A-1561

Exhibit 1 to Kis Declaration—
Email Chain, dated September 16, 2016......................... A-1563

Plaintiffs' Notice of Appeal, dated October 8, 2021 .................. A-1565

Page 158

```
 1              JILL SHWINER - 9/11/2020
 2   lot of medication, so self help to talk myself
 3   down and help myself out of any anxiety attack.
 4          Q.  My question is did you see a doctor
 5   in 2018 for anxiety?
 6          A.  Oh, 2018, I'm sorry.  I did not.
 7          Q.  What about 2017?
 8          A.  I did not.
 9          Q.  2016?
10          A.  2016, no, I did not.
11          Q.  What about 2019?
12          A.  No, I did not.  No, you can't get to
13   a doctor.
14          Q.  What about 2020?
15          A.  Oh, 2020.  I'm sorry.  Wrong year.
16   No.
17          Q.  Okay.
18              MR. WEBER:  I don't have any further
19   questions.
20              MR. GRAFF:  I don't have any
21   questions, except just note on the record that we
22   request the right to review and make corrections
23   under Rule 30(b)(1).  Thank you.
24              (Time noted -  2:26 p.m.)
25
```

Shwiner 21
Plaintiff
Jill Shwiner - 183854
09/11/2020(RG)

| | |
|---|---|
| **From**: | Margaret Kis [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=A6CDA3BFE65848D18D36F05E04D6E347-MKIS@STAR |
| **Sent**: | 9/29/2017 12:46:20 PM |
| **To**: | jillavptermite@aol.com |
| **Subject**: | Re: Hot Shots - Pest strips |

Ok good

Sent from my iPhone

On Sep 29, 2017, at 11:42 AM, "jillavptermite@aol.com" <jillavptermite@aol.com> wrote:

> He has been.
> --
> Jill Shwiner
> AVP Termite & Pest Control of NY
> 4313 Arthur Kill Road, S.I. NY
> (O) 718-967-9800
> (C) 732-740-1037
>
>
> Friday, 29 September 2017, 11:35AM -04:00 from Jill Shwiner avptermitesbux@gmail.com:
>
>
> ---------- Forwarded message ----------
> From: "Margaret Kis" < mkis@starbucks.com>
> Date: Sep 29, 2017 10:40 AM
> Subject: FW: Hot Shots - Pest strips
> To: "Jill Shwiner ( avptermitesbux@gmail.com)" < avptermitesbux@gmail.com>
> Cc:
>
>
> IF PAUL FINDS THEM, TOSS THEM OUT,

Confidential

DEF0016012



Confidential

August 19, 2020                                             1

1                          Costello

2     UNITED STATE DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
3     ------------------------------x
      RAFAEL FOX, PAUL D'AURIA and
4     JILL SHWINER,

5                  Plaintiffs,

6        v.    Index No.: 1:19-cv-04650-AJN-SN

7     STARBUCKS CORPORATION d/b/a
      STARBUCKS COFFEE COMPANY,
8
                   Defendant.
9     ------------------------------x

10

11            KEITH OWEN COSTELLO

12            New York, New York

13         Wednesday, August 19, 2020

14

15

16

17

18

19

20

21

22    Reported by:  Steven Neil Cohen, RPR

23    Job No. 315674

24

25

August 19, 2020                              60

```
 1                     Costello

 2     issue in a store the store is to rely on the

 3     pest control company to follow that or to

 4     service the issue.

 5          Q.   Why did you interpret it as a

 6     failure requiring coaching as to the manager

 7     of the store in particular as opposed to any

 8     other responsible party?

 9              MR. MOY:  Objection.

10              THE WITNESS:  Can you rephrase

11          the question?

12   BY MR. GRAFF:

13          Q.   You had mentioned it was --

14     presented a coaching opportunity for the

15     manager of the store.  What information, if

16     any, led you to conclude that the manager of

17     the store was responsible for presence of

18     the Hot Shot Strip?

19          A.   Our stores are required to call in

20     any pest activity in stores.  That is why we

21     hire pest control companies to service our

22     stores.  They are professionally licensed to

23     do that.  And those particular pieces of --

24     those No-Pest Strips are not to be used in

25     stores.
```

August 19, 2020                                    65

                          Costello

 1

 2     stores?

 3          A.    I don't know.

 4          Q.    As far as you know would there be

 5     any policy in effect at Starbucks at any

 6     point during your employment that would have

 7     prohibited any Starbucks personnel from

 8     using company funds to acquire Hot Shots for

 9     stores?

10          A.    That is not something that is part

11     of my department so I wouldn't be able to

12     comment on that.

13          Q.    So you don't have knowledge on

14     whether it is prohibited to use company

15     funds to buy Hot Shots for stores?

16          A.    I know that our policy is if there

17     is activity of pests in stores we have

18     licensed service providers, pest control

19     companies, that we contract to come in and

20     deal with that.

21          Q.    Do you have an understanding of

22     why it is that Hot Shots are not intended to

23     be used, for example, in Starbucks stores?

24          A.    Because we have companies that

25     come in and do that for us so, as I stated,

August 19, 2020                           135

1                        Costello

2          A.     Ecolab, E-C-O-L-A-B.  Rentokil,

3      R-E-N-T-O-K-I-L, and Quality Assurance.

4          Q.     Any others?

5          A.     That's it.

6          Q.     Prior to receiving Mr. D'Auria's

7      statement or complaint did you believe that

8      those four pest suppliers were already

9      removing Hot Shot DDVP strips if they were

10     encountering them in stores?

11         A.     Yes.

12         Q.     As far as you know did any vendor

13     whether these or AVP or any other ever

14     itself place Hot Shot No-Pest Strips in

15     Starbucks stores?

16         A.     Yes.  I am aware of one incident.

17         Q.     Which -- what incident are you

18     referring to specifically please?

19         A.     Where a supplier was trying to

20     install pest strips in stores.

21         Q.     When did that incident happen?

22         A.     I can't recall specifically.

23         Q.     Who was the supplier?

24         A.     Ecolab.

25         Q.     Was that an incident with Ecolab

August 19, 2020                                    136

```
1                        Costello

2      at one location or did it involve multiple

3      store locations?

4           A.    One location.

5           Q.    How did you become aware that

6      Ecolab was placing or seeking to place

7      No-Pest Strips?

8           A.    I was informed by one of my

9      facility service managers.

10          Q.    Who specifically?

11          A.    I believe it was Kim Healy at the

12     time.

13          Q.    What action if any did you take

14     after being informed by Kim Healy that

15     Ecolab was seeking to place No-Pest Strips?

16          A.    I had an immediate investigation

17     with Ecolab to understand if that in fact

18     was happening.  Found that it was and

19     immediately terminated them.  They lost 50

20     stores.

21          Q.    What, if any, justification or

22     explanation did Ecolab for its conduct in

23     placing Hot Shot No-Pest Strips?

24          A.    I don't recall.

25          Q.    As you sit here today to the best
```

September 15, 2020                                              1

```
 1                    - RAMI KRANZ -

 2     UNITED STATES DISTRICT COURT

 3     SOUTHERN DISTRICT OF NEW YORK

 4     -------------------------------X

 5     RAFAEL FOX, ET AL.,

 6                    Plaintiffs,

 7               v.           CIVIL CASE NO.

 8                         1:19-CV-04650-AJN-SN

 9

10     STARBUCKS CORPORATION,

11                    Defendant.

12     -------------------------------X

13     DATE:  September 15, 2020

14     TIME:  10:00 A.M.

15

16               VIDEOCONFERENCE DEPOSITION OF RAMI

17     KRANZ, pursuant to Notice, before Hope Menaker, a

18     Shorthand Reporter and Notary Public of the State

19     of New York.

20

21

22

23

24

25
```

September 15, 2020                          63

```
 1                      - RAMI KRANZ -

 2     stores?

 3          A.     Absolutely.  So in the food safety

 4     manual, it states clearly that the store

 5     manager or our partners are prohibited to use any

 6     pesticides and that only the pest vendors can use

 7     them.

 8          Q.     Are there any exceptions to that

 9     policy?

10          A.     I don't believe so, no.

11          Q.     Is the food safety manual something

12     that's made available to all store employees?

13          A.     Yes, it is.

14          Q.     As to the best of your memory as you

15     sit here today have any pesticides, to your

16     knowledge, been applied in Starbucks stores by

17     Starbucks personnel apart from the one Hot Shot

18     incident that you referred to?

19               MR. MOY:  Objection.

20          A.     So through my duties and my days with

21     the district managers we had seen from time to

22     time different types of products, yes.

23          Q.     What types of products, if you could

24     just name as many as you're aware of, that you are

25     aware have been used by employees in stores?
```

September 15, 2020                                              67

```
 1                    - RAMI KRANZ -

 2     consistent with Starbucks policy?

 3                 MR. MOY:  Objection.

 4         A.    Was I fully aware?  I was aware,

 5     which is why I said I was wrong.

 6         Q.    Well, why did you choose to direct

 7     employees to use CB-80?

 8         A.    Because I was trying to solve the

 9     problem, but I did it in the wrong manner and I

10     learned my lesson from it.

11         Q.    Subsequent to that event, did you

12     ever have any communications with any Starbucks

13     employees about the use of CB-80 in Starbucks

14     stores?

15         A.    I have had communication with

16     Starbucks employees about the use of it and that

17     they shouldn't be using it.

18         Q.    What is the danger -- withdrawn.

19                 To your understanding, what is the

20     reason why CB-80 is not allowed in Starbucks

21     stores?

22                 MR. MOY:  Objection.

23         A.    Because Starbucks employees are not

24     allowed to use any pesticides according to the

25     food safety manual.
```

September 15, 2020                                          72

```
 1                    - RAMI KRANZ -

 2     facilities when it comes to pest issues.

 3          Q.     Was it your understanding that AVP

 4     was contracted to provide pest control services at

 5     certain Starbucks stores in Manhattan?

 6          A.     Yes, it was.

 7          Q.     Do you know during what period of

 8     years within your tenure they provided those

 9     services?

10          A.     I couldn't be -- I couldn't tell you

11     exactly what period.  I don't manage in those

12     facilities.

13          Q.     Who was the -- who do you believe is

14     the most likely person to have been responsible

15     for managing them in facilities, is there an

16     individual?

17                 MR. MOY:  Objection.

18          A.     It would have been the facility

19     manager and the senior facility manager.

20          Q.     In your role as quality assurance

21     director, did you ever provide instructions or

22     directions to AVP concerning how they do their

23     jobs?

24                 MR. MOY:  Objection.

25          A.     So I've -- I spoke with Jill quite a
```

```
 1                    - RAMI KRANZ -

 2      if we -- you know, we see a snap trap that gets

 3      caught in a broom, you know, when you're sweeping

 4      underneath.

 5          Q.    When that happens, is there any

 6      direction or guidance as far as what employees

 7      should due to notify anyone or there's just no

 8      policy there?

 9              MR. MOY:  Objection.

10          A.    So officially, no, there isn't.  What

11      I would coach is that just put it to the side and

12      leave a note for the pest vendors and let them

13      know, you know, where it is; and that's if we're

14      talking snap traps, just to be clear.

15          Q.    With respect to Hot Shots if an

16      employee at a store discovers that a Hot Shot is

17      present, do you know if Starbucks has any rules or

18      guidelines as to what that employee should do?

19          A.    There are no rules or guidelines

20      because we're not allowed to put the pesticide

21      there.

22          Q.    So if an employee sees that it is

23      there --

24          A.    Yes.

25          Q.    -- to your understanding is there a
```

Case 21-2531, Document 27, 01/31/2022, 3248030, Page25 of 311

**A-314**

```
 1                  - RAMI KRANZ -

 2    process they're supposed to initiate?

 3          A.    I haven't seen a process officially

 4    in any of the -- in any of the Starbucks

 5    guidelines, no.

 6          Q.    Have you ever given instructions to

 7    employees as to how they should respond if they

 8    discover such a device in their store?

 9          A.    When asked by operations, my

10    advice has always been grab a rubbish bag, grab

11    the -- you know, the pesticide, put it in, you

12    know, holding the rubbish bag, tie a knot, and

13    dispose of it in the rubbish bin.

14          Q.    Are there any legal or Health

15    Department standards that bear on how to

16    permissibly safely dispose of Hot Shots?

17          A.    There are legal requirements, but not

18    Health Department requirements.  It's the Label

19    law.  So on the label of the product would tell

20    you how to dispose of them.

21          Q.    And you just referred to or used a

22    phrase "label law" and what are you referring to,

23    what is that phrase?

24          A.    On all pesticides, there's a label;

25    and any pest control technician, you know, when
```

```
 1                    - RAMI KRANZ -

 2      from my side of the story what I -- what I saw

 3      when I first started with Starbucks.  I can

 4      explain that, but I can't tell you what Stephen

 5      was writing.

 6           Q.    Of course I'm asking for what your

 7      interpretation was in your own mind as you read

 8      his words.

 9           A.    So facilities went through a change

10      around 2017, and what I mean by "a change" was

11      when I was started with Starbucks they -- they

12      didn't have the -- they didn't have the voice with

13      the operations team like QA did at the time.  So I

14      know that -- I know that, you know, especially

15      when it came to Health Department issues, you

16      know, I had more voice with operations, but that's

17      my side; so what he meant by "more weight" I'm not

18      sure, but I know what I saw when I first started.

19           Q.    Did you understand that Mr. Gallant

20      was asking you to do anything in particular?

21           A.    What I understood was Mr. Gallant

22      just wanted me to emphasize, you know, the point

23      that he made with the operation leadership team.

24      That was my understanding of it.

25           Q.    Did you do that?
```

September 15, 2020                                    89

```
 1                        - RAMI KRANZ -

 2          A.      Absolutely.  I -- I was on the

 3     leadership team every -- every week, so every

 4     Monday I met with the regional vice president and

 5     the four HDs at the time.  I'd -- the assistant

 6     was also there and I brought this up and I

 7     mentioned it; and then Ross also, you know,

 8     emphasized the point where he did not want to see

 9     anything and that's what started, you know,

10     everything.  That's what started me, you know,

11     joining the regional directors huddle with their

12     district managers and emphasizing the point and

13     then the regional director emphasizing it again on

14     top of me.

15                 I also joined, you know, some

16     district manager huddles, not all of them, where

17     we emphasized the point to the store managers; and

18     I also included into the shift safety workshops

19     that I did once a month and we emphasized it there

20     as well.

21                 So, I mean, the minute it was brought

22     to our attention, I mean, we really -- you know,

23     we really took it as very serious and we started

24     speaking to everyone, and I can tell you the

25     leadership team was all onboard about getting the
```

September 15, 2020                                        90

```
 1                    - RAMI KRANZ -

 2      message out and not to use this at all.

 3           Q.    And within what period of time had

 4      those actions resolved the problem of Hot Shots in

 5      stores?

 6                 MR. MOY:  Objection.

 7           A.    I can't tell you.  It says Tuesday,

 8      so it would have already started that following

 9      Monday.  So I would have spoken to them, but the

10      official meeting would have been on Monday and

11      that's -- it just started and then every week,

12      I -- I was bringing it up just to make sure that

13      it was emphasized.

14           Q.    At some point in the course of doing

15      all of that emphasis, did you feel confident that

16      the message had gotten through and that the

17      problem was handled?

18           A.    I felt confident that the message had

19      got through.  That the problem was solved, I

20      can't -- I couldn't answer that because I don't go

21      into -- I'm confident that the message got

22      through.  I can't be confident that the problem

23      was resolved because I wasn't in every store to

24      follow up.  I was only in select          stores

25      with the district managers and some   direct --
```

September 15, 2020                              91

```
 1                    - RAMI KRANZ -

 2     regional directors.

 3           Q.    Did you make any inquiries of anyone

 4     in operations or elsewhere at the company to

 5     ascertain whether --

 6                 MR. GRAFF:  Let's go off the record.

 7                 (Whereupon, a brief discussion was

 8           held off record.)

 9           Q.    Mr. Kranz, before the stretch break I

10     had been asking you whether you ever followed up

11     with operations management to determine whether

12     your efforts to spread the word about Hot Shots

13     had been successful.  Did you make such inquiries?

14           A.    Well, with the district managers I

15     spoke to them about it.  I spoke to -- with the

16     regional directors during our one on ones.

17           Q.    Did they advise you that Hot Shots

18     had been resolved as a going problem?

19                 MR. MOY:  Objection.

20           A.    They advised me that -- that they'd

21     been speaking about it and it was a priority to

22     them and that they'd been speaking about it with

23     their team and advised their team to keep, you

24     know, pushing it down all the way down to the

25     barista level and advised everyone it was not
```

September 15, 2020                                    92

```
 1                    - RAMI KRANZ -

 2     Starbucks standards to use them.

 3          Q.    Was there ever any communication that

 4     you were a part of about whether efforts that were

 5     being made were sufficient to deter the misuse of

 6     Hot Shots in stores?

 7               MR. MOY:  Objection.

 8          A.    I remember one e-mail from Ron

 9     Schuler who was a regional director that confirmed

10     that the message was being handed out; and it was

11     also not an e-mail, but in the leadership team,

12     you know, I also got confirmation that they'd been

13     mentioning it with their team every time the

14     regional directors were out in stores.

15          Q.    Do you have any information from any

16     source as to whether anyone at the company ever

17     conducted an investigation to determine the origin

18     of any particular Hot Shot in the Starbucks store?

19               MR. MOY:  Objection.

20          A.    Can you just repeat that one more

21     time, please; do I have any --

22          Q.    I'll ask something different.  As

23     far as you know, did Starbucks ever identify

24     specifically any individual who had placed a Hot

25     Shot in a store?
```

```
 1                    - RAMI KRANZ -

 2        A.     I don't recall, but it's -- I really

 3    don't recall.  It's possible, but again I may have

 4    been on an e-mail chain; but that's what I don't

 5    recall.

 6        Q.     Turning back into the document, we

 7    had been looking at the e-mail that Jill Shwiner

 8    sent on August 1st, 2016 that's on the second page

 9    of this exhibit.

10        A.     Yes, 2016, here you go.  Yes.

11        Q.     Jill wrote -- in the first long

12    paragraph Ms. Shwiner wrote, "We occasionally find

13    them, Hot Shots, in some stores but recently there

14    has been an increase in the amount of stores we

15    find them in."

16            Mr. Kranz, did you ever reach out to

17    Ms. Shwiner to get any further information about

18    where she was finding Hot Shots?

19        A.     I have spoken to Jill about that and

20    Jill e-mailed me and we've spoken about it, yes.

21        Q.     Okay, and when you were forwarded

22    this e-mail where she said "recently there has

23    been an increase in the amount of stores we find

24    them in," did you discuss that specific statement

25    in her e-mail with her at or around the time you
```

```
1                    - RAMI KRANZ -

2    read it?

3         A.    I don't recall if I had a

4    conversation specifically regarding that with Jill

5    around that time.  I do recall, though, that I did

6    have a specific conversation about that with the

7    operation leadership team.

8         Q.    The next paragraph begins, "We

9    generally find them on top of the cabinets or

10   below the FOH counters."  In this context, do you

11   know what "FOH" refers to?

12        A.    Front of house.

13        Q.    On the occasion that you had been

14   relating when you were present and watched the

15   health inspector conduct an inspection in the

16   store, did the inspector get up on a ladder and

17   look above the tops of cabinets as part of the

18   inspection that you observed?

19        A.    The heath inspector had not gone on

20   top of ladders that I've ever seen.

21        Q.    What about under the front of house

22   sink; was any part of the inspection that you

23   observed focused on that?

24        A.    Absolutely.

25        Q.    After this e-mail, when is the next
```

September 15, 2020                                    99

```
 1                   - RAMI KRANZ -

 2      your tenure where you had encouraged CB-80,

 3      putting that aside --

 4                   MR. MOY:  Objection.

 5                   MR. GRAFF:  That wasn't a question.

 6           Q.      -- did you at any point yourself

 7      observe CB-80 present in any Starbucks store?

 8           A.      No, I haven't.

 9           Q.      Is that something you also check for

10      on your store visits?

11           A.      Part of our store visits and back

12      in -- prior to 2018 we were looking for

13      unauthorized -- like unauthorized chemicals, and

14      that's not just pesticides.  That could also be

15      Ice Melt that wasn't purchased from Starbucks, it

16      could be Apple Cider Vinegar.  Anything we haven't

17      purchased from Starbucks is considered an

18      unauthorized chemical.

19           Q.      Are you familiar with a product

20      called D-Force?

21           A.      Yes.

22           Q.      What is it?

23           A.      D-Force is very similar to CB-80 in

24      that it's an aerosol pesticide.

25           Q.      Did EcoSure ever in its audits make
```

September 15, 2020                                    102

```
1                  - RAMI KRANZ -

2     president.  So again my role was coaching,

3     consulting on anything to do with cleanliness,

4     food safety, Health Department which also included

5     pests.

6                  So, again, I was emphasizing, you

7     know, the point, right, and keeping the

8     communication fresh in everyone's mind to ensure

9     that our team knows this is not a Starbucks

10    protocol, right, and that we should not be using

11    it at all.  If they've got a problem, Starbucks

12    has the resources to fix the problem.  So if it's

13    a pest control problem, we've got vendors.  If

14    it's a facilities issue, we also have vendors and

15    handymen to come in and do that.  If it's a

16    cleanliness issue, you know, they've got that; an

17    HVAC issue, we've got people for that.  You know,

18    the store managers shouldn't be, you know, doing

19    this themselves.

20    Q.     The last thing you just said, "the

21    store managers shouldn't be doing this

22    themselves," what do you mean?

23    A.     Well, I mean the stores themselves,

24    the partners, right, shouldn't be taking this

25    under themselves as -- as per Starbucks' guidance
```

Rami Kranz
September 15, 2020                                106

```
 1                    - RAMI KRANZ -

 2      sending it?

 3           A.    Yes, I brought it up to the

 4      leadership team like I was doing every week.

 5           Q.    To the best of your knowledge and

 6      information was there ever a systematic effort

 7      made to search through stores, locate any Hot

 8      Shots, and remove them in a systematic way all at

 9      once?

10                MR. MOY:  Objection.

11           A.    Systematic way all at once, no, I

12      cannot answer that; but what I can say is that

13      through the communication from the leadership team

14      and through my in-field days with the district

15      managers and the regional directors, there was

16      very high awareness on the Hot Shots and while the

17      operations was in stores they were looking for

18      them.

19           Q.    Again, is it the case that you have

20      no information as to whether operations ever

21      reached any conclusion as to the source of any

22      particular Hot Shots?

23                MR. MOY:  Objection.

24           A.    It's very difficult to answer because

25      for argument sake the Hot Shot that I found two,
```

September 15, 2020                                    110

```
1                   - RAMI KRANZ -

2         Q.    Are there specific individuals who

3    were the regional directors in 2017 for Starbucks?

4         A.    Yes.  So if we look at Exhibit Kranz

5    15, if you look at the e-mail that I sent out to

6    it says it lists the regional directors and the

7    regional vice presidents.

8         Q.    That's very helpful, thank you.

9               Would those be the individuals who

10   you would have had in mind to send this next

11   e-mail to?

12        A.    Yes.

13        Q.    Do you know what, if anything, was

14   actually done in response to your e-mail?

15        A.    Can you clarify that; what was done

16   by who?

17        Q.    By the regional managers in response

18   to your e-mail which was prompted by Jill's report

19   here.  Do you know what happened after you sent

20   your e-mail?

21        A.    Yes.  So, again, I would have

22   mentioned it in the leadership team meeting on

23   Monday, which would have been the following

24   Monday.  They would have mentioned it in their

25   huddles with their district managers and then
```

September 15, 2020                                              113

```
 1                    - RAMI KRANZ -

 2    was going to reiterate the message again with his

 3    district managers, right, and that -- you know,

 4    reiterate the message that it's not going to

 5    be -- that it's not a Starbucks standard, right,

 6    and that we should not be using it at all.

 7         Q.    Are there other Starbucks standards

 8    that are violated without disciplinary

 9    consequences, that you're aware of?

10               MR. MOY:  Objection.

11         A.    No, I don't know anything about

12    disciplinary actions because, again, it's not part

13    of my role and responsibility and I'm not privy to

14    that information.

15         Q.    When we have been talking about the

16    policy and how you've reiterated it that Hot Shots

17    aren't to be used, to be completely clear your

18    understanding was that it was a mandatory policy,

19    not like an advisory guideline; is that fair?

20         A.    Yes, it's a Starbucks standard

21    written in the food safety manual.

22         Q.    I've just posted a document, Kranz

23    Exhibit 44.  It's a one-page document Bates

24    numbered DEF 27788.

25               (Whereupon, Kranz Exhibit 44 was
```

September 15, 2020                                        119

```
 1                   - RAMI KRANZ -

 2              MR. MOY:  Objection.

 3        A.    Without checking the inspection

 4   report, I don't recall.

 5        Q.    Could I ask you to read the last full

 6   sentence.

 7        A.    "Please, I ask again for our

 8   partners' safety, health, and brand (protecting A

 9   grade) pass on this message onto the DM, SM and

10   have them all removed."

11        Q.    To the best of your knowledge, did

12   the message get passed on and lead to all of the

13   Hot Shots being removed?

14        A.    To the best of my knowledge, the

15   communication was -- you know -- cascaded down.  I

16   know that they were looking for Hot Shots; and the

17   district managers and regional directors when they

18   were in stores, I know they were taking it very

19   seriously.

20              Were all of them removed, I can't

21   tell you if all of them were removed because I

22   don't know if they found everything; but I know

23   they were actively looking for it and taking it

24   very seriously.

25        Q.    You had mentioned before that you did
```

```
 1                     - RAMI KRANZ -

 2      or dictionary meaning that it holds for you --

 3                MR. MOY:  Objection.

 4         Q.     -- personally?

 5                MR. MOY:  Objection.

 6         A.     Again, it was just a phrase that I

 7      was using.  It was not meant to -- meant to mean

 8      anything else, you know, no other meaning.  It was

 9      just letting Jill know that I was going to be

10      talking to the leadership team and that we're

11      taking it very seriously.

12         Q.     What, if anything, did you do in

13      connection with this after you sent the e-mail?

14                MR. MOY:  Objection.

15         A.     So again at the leadership team

16      meetings on Monday, you know, I mentioned it to

17      them.  Ross again reiterated the importance of it.

18      The regional directors, you know, again agreed

19      and, you know, understood the importance of it;

20      and also agreed to continue talking to their team

21      and cas -- cascade it all the way down the barista

22      level.

23         Q.     What, if anything, to your

24      understanding was done that had not already been

25      done before by you or the leadership team in
```

September 15, 2020                                    142

```
 1                      - RAMI KRANZ -

 2      connection with this e-mail?

 3              MR. MOY:  Objection.

 4          Q.    I can ask the question differently.

 5      Back to the last sentence that you wrote that

 6      we've been looking at, at the beginning it says "I

 7      can have another talk with the team and stress the

 8      importance of breaking this habit."  Had you

 9      previously had a talk with the team where you

10      stressed the importance of not using Hot Shots?

11          A.    I had previously talked to the team

12      about stressing the importance, right, of not

13      using any pesticides, yes.

14          Q.    How many times prior to this had you

15      had such discussions with the team?

16          A.    I couldn't recall an exact number,

17      but it had been multiple times.

18          Q.    Would you be able to say if it was

19      more or less than ten?

20          A.    I'll be guessing --

21              MR. MOY:  Objection.

22              Rami, give me an opportunity to

23          object.

24              THE WITNESS:  Sorry.

25              MR. MOY:  All right, go on.
```

Rami Kranz
September 15, 2020                                                    144

```
 1                     - RAMI KRANZ -

 2          A.      Nothing different, just reiterating

 3     the importance of it and reiterating the

 4     importance of cascading it down to that their team

 5     and getting the communications down to everyone

 6     and ensuring that everyone understood.

 7          Q.      So on the multiple prior occasions

 8     when you had the discussion, was it your

 9     understanding that the information was pushed down

10     cascading to the teams and understood?

11          A.      Not only was it understood by me, but

12     I'd also personally seen it too.

13          Q.      Other than what's written here, did

14     you have any further followup with Ms. Shwiner

15     about this issue?

16                  MR. MOY:  Objection.

17          A.      Again, it's a possibility because I

18     spoke with Ms. Shwiner numerous times over the

19     phone.  Not just always through e-mail, sometimes

20     even texts as well.  So I can't tell you what

21     followup I had with this, but I'm sure there was

22     some.

23          Q.      Is there anything else beyond what

24     you did that you believe you could have done to

25     address the ongoing recurrence of Hot Shots in the
```

```
 1                    - RAMI KRANZ -

 2     stores?

 3              MR. MOY:  Objection.

 4        A.     So in my role and responsibility I

 5     believe that I was doing everything that I could,

 6     okay, in my power at Starbucks to communicate, to

 7     coach, to consult the operations team.

 8        Q.     Do you believe that the operations

 9     team should have done anything different or

10     additional beyond what it did to address the

11     problem?

12              MR. MOY:  Objection.

13        A.     Again, I can't talk about the

14     operations team because I wasn't privy to

15     everything that they did.

16        Q.     When you had another discussion with

17     the operations team about the subject, did you ask

18     them to look into how it was that Hot Shots were

19     becoming present in their stores, if any were

20     present?

21        A.     So during our conversations we

22     reiterated that AVP and specifically Jill, right,

23     had contacted me, right, and we reiterated the

24     importance of our partners following our

25     standards.
```

September 15, 2020                              148

```
 1                    - RAMI KRANZ -

 2    team meeting.  So it's the weekly meeting that the

 3    leadership team gathers around.

 4         Q.     And I think we've touched on it, but

 5    could you by position identify the participants in

 6    a normal weekly leadership meeting?

 7         A.     Yes.  Back when Ross was in charge

 8    and the regional vice president it was the

 9    regional directors, it was QA, and sometimes

10    facilities.  When Tracy came onboard, she also put

11    in a lot of the other cross-functional teams so

12    there was design, there was construction, there

13    was real estate, facilities was there, QA was

14    there, the PNAP was there; so -- yep.

15         Q.     And the format for these meetings

16    would typically be a conference call or something

17    else?

18         A.     No, it was a in-person meeting, but

19    it could also be -- you could also dial in.

20         Q.     In connection with this specific

21    meeting, were you in person or on the phone?

22         A.     I was on the phone with this.

23         Q.     Did you have a pre-drafted list of

24    points or talking points or notes about what you

25    were going to say on the call on this subject?
```

September 15, 2020                                    149

```
1                    - RAMI KRANZ -

2         A.     I believe I did, yes.

3         Q.     If -- when you refer -- sorry.  On

4    the e-mail on the first page on the second half

5    from you to Tracy Gaven-Bridgeman on January 23rd,

6    2018, when you write "I did elaborate during the

7    call" and then you put these bullet points, is it

8    your testimony these bullet points are a summary

9    of what you communicated orally during the call?

10        A.     My testimony will be that this is a

11   summary of the highlights of some of the things

12   that I mentioned during the call, not everything.

13        Q.     How -- in terms of the organization

14   or that agenda for the meetings do you have a

15   regular speaking slot, is there a particular role

16   that you play in addressing the group?

17        A.     So this is a new -- so this is a

18   leadership team meeting, so they do a business

19   update and then everyone -- they do a round-robin,

20   so everyone gets a chance to talk.

21        Q.     And would this have been -- would

22   this have been something that you communicated to

23   the group during your slot to speak in the

24   rotation?

25        A.     Yes, it would have.
```

September 15, 2020                                    152

```
 1                    - RAMI KRANZ -

 2    regarding the use of pesticides; and obviously at

 3    that time I had not been hearing of the, you know,

 4    Hot Shots or other pesticides being used, so my

 5    opinion was that it was improving.

 6         Q.    During what period of time did you

 7    believe that it was improving versus being

 8    constant or getting worse, like what is the date

 9    range of time that you're referring to, if you're

10    able to express it that way in the sentence?

11              MR. MOY:  Objection.

12         A.    So the date would be the first time

13    Jill brought it to our attention to that

14    particular time.

15         Q.    Do you remember what month or year

16    Jill first brought it to your attention?

17         A.    I remember it being 2016.

18         Q.    So from 2016 until January 23rd,

19    2018, do you believe that the situation with Hot

20    Shot use was improving in stores?

21         A.    From my notes here, yes.

22         Q.    And that's based on reports or

23    information communicated to you about the

24    existence of Hot Shots in stores?

25         A.    What reports are you referring to?
```

September 15, 2020                                176

```
 1                    - RAMI KRANZ -

 2     not what Kim was writing up; but sharing is the

 3     sharing her thoughts on the business from

 4     Rockefeller Center.

 5          Q.     Thank you.  Thank you.  I wasn't sure

 6     if sharing meant something beyond that.

 7          A.     No.

 8          Q.     In the parenthetical at the end of

 9     the sentence that she writes she says, "(Jasmine

10     similar to" I guess the store number and address.

11     Do you have any information about what she's

12     referring to there, is the reference familiar?

13          A.     This reference isn't jogging my

14     memory, but again, you know, it's -- it's over two

15     years ago now.

16          Q.     Apart from what's in this e-mail, did

17     you ever give any direction to Ms. Healy or

18     anybody in facilities about how to handle Hot

19     Shots if they discovered them?

20               MR. MOY:  Objection.

21          A.     So again, you know, I've been asked,

22     you know, by some of the -- again, I can't, you

23     know, remember who exactly, you know, a safe way

24     of disposing of them.  So my personal opinion was

25     to -- like I mentioned prior, was to grab a
```

September 15, 2020                              177

```
 1                    - RAMI KRANZ -

 2     rubbish bag, invert it, grab the Hot Shot, pull it

 3     through, tie a knot and dispose of it in the

 4     rubbish bin.

 5          Q.    It appears that Ms. Healy sent a

 6     followup e-mail on April 13th at 7:40 p.m. and

 7     that you then responded to her followup e-mail; is

 8     that how you're reading the chain?

 9               MR. MOY:  Objection.

10          Q.    Another way to ask it:  Your e-mail

11     at the top of the page to, what e-mail below were

12     you responding?

13          A.    So, yup, I was responding back to

14     Kim, Kim Healy.

15          Q.    What did you write?

16          A.    I wrote "Thank you, Kim.  I'll

17     discuss with leadership team."

18          Q.    Did you discuss it with the

19     leadership team?

20          A.    Yes.  If I said to Kim I'll discuss

21     it then, yes, I would have.

22          Q.    Do you know whether the leadership

23     team or any members of the leadership team decided

24     to take any action based on the information?

25               MR. MOY:  Objection.
```

September 15, 2020                                          215

```
 1                    - RAMI KRANZ -

 2              Mr. Kranz, is it your understanding

 3    that you've been designated by the defendant to

 4    testify about that subject?

 5         A.     Yes.

 6         Q.     Did you do any preparation work in

 7    particular to obtain more information about this

 8    specific subject?

 9              MR. MOY:  Objection.

10         A.     No, I didn't.

11         Q.     The line here refers to your

12    "communications with representatives of AVP"?

13         A.     Uh-huh.

14         Q.     We touched on Jill Shwiner and Paul

15    D'Auria.  Have you had any communications with

16    anyone else at AVP, as far as you know?

17         A.     Not that I know of.  Jill was my main

18    contact at AVP.

19         Q.     And the sentence where it ends it

20    says, "as well as the initiatives and actions

21    undertaken to remediate the same."  What

22    initiatives were undertaken to remediate the use

23    of DDVP or Hot Shots in Starbucks stores?

24         A.     So my initiatives and actions

25    undertaken -- because I can discuss what I did, I
```

September 15, 2020                                    216

```
1                    - RAMI KRANZ -

2     can't discuss what the operations team did; but I

3     brought it to the operations team's attention via

4     e-mails and in-person meetings at the New York

5     Metro leadership team meetings.  I made them aware

6     via the huddles that I joined and mentioned in the

7     huddles, and then had the regional director or the

8     leader of that team reiterate the message and to

9     make -- to emphasize that message; and I also

10    added it to our shift supervisor workshop so that

11    we could get a broader range and get it, you know,

12    to more people as well and more partners within

13    the New York Metro area.

14         Q.    When it refers here to the actions

15    undertaken to remediate DDVP or Hot Shot use in

16    Starbucks stores, is that any different than the

17    initiatives that you were just describing?

18         A.    No, it's one and the same.

19         Q.    You have no information about what

20    operations did with the information that you

21    provided to them, beyond hearing it from you?

22         A.    I only have knowledge of what

23    operations did when I observed it during the

24    huddles and when I observed it in the field.

25    Outside of that I have no -- you know, I had no
```

# A-339

Case 21-2531, Document 27, 01/21/2022, 3248030, Page50 of 311

Laura Mazur

Nov 11 2019

Mr. Joseph E. Field, Esq.
Littler Mendelson, P.C.
900 Third Avenue, 8th Floor
New York, NY    10022

Re:    Fox, D'Auria and Shwiner v. Starbucks Corporation

Dear Mr. Field,

This letter will serve as an acknowledgement of receipt of your subpoena dated 10/25/19, received by process server on 10/29/19, in the matter of Fox, D'Auria and Shwiner v. Starbucks Corporation.

I must inform you that as of 3/29/19, AVP Termite and Pest Control of New York, Inc was sold and has effectively ceased business operations and no longer has any employees, an office or any ongoing business activities.

As AVP closed for business, I disposed of a majority of AVPs files/documents/computers/equipment but am producing any information I have, as is listed on page 2 of this correspondence.    As it is required of me, If after producing the documents you have requested, I locate additional responsive documents, I will promptly forward them to you.

With reference to your request to produce any workorders, service requests, work tasks or invoices, I do have approximately 5 boxes of workorders/service requests/invoices from 2015 to 2018 which are in storage on Staten Island, NY.

While I understand that subpoenas are legal requirements and I want to follow all laws, I unfortunately must object to the burden and expense of complying with your subpoena regarding delivery and/or copying all these documents.    I am a 73-year-old retired woman and do not have the strength nor the resources to move around these boxes, let alone go through them and copy everything for you.    I would be happy to make those boxes available to you to copy yourself, as long as they are promptly returned to me in their original condition since AVP needs to preserve those records.

Please let me know if we can agree on this process.    I am hoping that you will understand so that we can find a way to cooperate on this matter.

Laura Mazur
Laura Mazur

# A-340

---

## *DOCUMENTS TO BE PRODUCED*

---

1. All contracts or agreements between AVP and Starbucks
   *AVP: Providing agreement from 2012*

2. All instructions for requests Starbucks communicated to AVP concerning the services that AVP provided to Starbucks
   *AVP: Providing signed Starbucks Supplier Code of Conduct*

3. All instructions or requests AVP communicated to Starbucks concerning the services that AVP provided to Starbucks
   *AVP: Unable to locate any written communications at this time. Should any be located, we will provide to Mr. Field*

4. All documents concerning the terms of service between AVP and Starbucks
   *AVP: Providing signed Starbucks Supplier Code of Conduct and Providing agreement 2012*

5. All work orders, service requests or work tasks issued or received by a AVP on the Starbucks account
   *AVP: Documents are being made available to Mr. Field, Esq to inspect and or copy*

6. Any insurance policies issued to AVP in connection with the services provided to Starbucks
   *AVP: Providing copies of COI 2013 to 2018*

7. All inspection reports or audits issued by a AVP concerning the stores
   *AVP: Providing access to Mr. Field, Esq. to any reports/audits that may be in storage*

8. All invoices or bills issued by AVP to Starbucks
   *AVP: Providing access to Mr. Field, Esq. to any invoices that may be in storage*

9. AVP's personnel files or employment files maintained on D'Auria and Shwiner
   *AVP: Unable to locate any personnel/employment files at this time. Should any be located, will provide to Mr. Field*

10. AVP's employee Handbook in effect during the period from 2015 to 2018
    *AVP: Unable to produce employee Handbook- unable to locate.*

11. Any formal or informal discipline or counseling issued by AVP to D'auria or Shwiner
    *AVP: There was never any formal or informal disciplinary action or counseling issued by AVP to D'auria or Shwiner*

12. Any complaints that AVP received concerning D'auria or Shwiner
    *AVP: There was never any complaints received by AVP concerning D'Auria or Shwiner*

1

Case 21-2531, Document 27, 01/21/2022, 3248030, Page52 of 311

---

*DOCUMENTS TO BE PRODUCED*

---

13. AVP's job description for operations director or any other positions held by Shwiner at AVP
    *AVP: Job description for operations director or any other positions held by Shwiner at AVP (including but not limited to):*

    - Account Manager for Starbucks Account Responsible for overseeing scheduling for regular service calls, emergency service call distribution, correspondence/communication, invoicing, providing education meetings at request of Starbucks to Facility Managers, District Managers and any other Management Team deemed necessary by Starbucks.
    - Monitoring pest tech route and that workorders are successfully completed
    - Monitor and ensuring NYS and NYC regulatory compliance and safety standards/procedures are met or exceeded
    - Responding to AVP customer concerns, questions and/or troubleshooting
    - Conduct interior and exterior troubleshooting onsite inspections (with and without customers) to identify and document pest activity and conducive conditions and implement Plan of Action to resolve issues
    - Inspecting and evaluating the performance of Pest Technicians
    - Facilitating continual training of Pest Technicians
    - Conduct and lead ongoing training meetings, contribute to training plans and participate in field training for both AVP technicians and AVP Customers.
    - Works closely with technicians for continuous improvement and business retention.

14. AVP's job description for pest control technician or any other positions held by D'Auria at AVP
    *AVP: Job description for pest control technician or any other positions held by D'Auria at AVP (including but not limited to):*

    - Responsible for servicing, communication and assist with scheduling (regular and emergency service calls) for Starbucks Account
    - Responsible for using a variety of pest control methods, providing a strong line of communication to Store Managers and Facility Service Managers documenting and identifying, document and communicate pest activity, repairs required to control or prohibit pest activity, identify, document and communicate conditions conducive to pest activity and/or a condition creating a potential NYC DOH violation.
    - Developing strategies to solve and prevent pest problems in Starbucks locations
    - Practice and implement proper IPM (Integrated pest management) strategies
    - Maintain and keep organized company vehicle.
    - Maintaining knowledge and implementation of applicable laws, rules, and regulations governing pesticide application in (including documenting illegal pesticide use). This also includes knowing the biology and morphology of a variety of pests and vermin
    - Attend continued educations classes/seminars to obtain proper NYSDEC credits necessary to keep PCO license current

1                    UNITED STATES DISTRICT COURT

2                  SOUTHERN DISTRICT OF NEW YORK

3                         -  -  -
     RAFAEL FOX, et al.,        ) CIVIL DIVISION
4                               )
              Plaintiffs,       ) NO. 1:19-CV-04650-AJH-SN
5                               )
                                )
6                               ) REMOTE VIDEO CONFERENCE
                                ) DEPOSITION OF
7       -vs-                    ) LESLIE FABLE
                                )
8                               ) Filed on Behalf of the
                                ) Plaintiffs
9                               )
     STARBUCKS CORPORATION,     ) Counsel of Record For
10                              ) This Party:
              Defendant.        )
11                              ) Ariel Graff, Esq.
                                ) Filosa Graff
12                              ) 111 John Street
                                ) Suite 2510
13                              ) New York, NY 10038

14

15

16

17                            -  -  -

18

19                    CONFIDENTIAL TRANSCRIPT

20

21

22     REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED
       WITHOUT AUTHORIZATION FROM THE CERTIFYING
23     AGENCY

24

25

```
 1        BY MR. GRAFF:

 2             Q.    Thank you.

 3                   As a district manager in Tribeca,

 4        did you hire any store managers?

 5             A.    No.

 6             Q.    Did you fire any store managers?

 7             A.    Yes.

 8             Q.    How many?

 9             A.    One.

10             Q.    What store?

11             A.    West Broadway and Leonard.

12             Q.    And who was the manager who you

13        fired at that location?

14             A.    William Banfield.

15             Q.    Do you know how he spells his last

16        name?

17             A.    B-A-N- -- no, I -- I'm going to

18        try -- F-I-E-L-D is what -- it might be a

19        different spelling.

20             Q.    Was he in place as a store manager

21        at that location when you became district

22        manager?

23             A.    Yes.

24             Q.    Well, when -- was it your decision

25        ultimately to terminate Mr. Banfield?
```

September 29, 2020                              38

1          A.     No, it was a partnership through an

2     investigation for time manipulation.

3          Q.     When did you first become aware of

4     anything to do with potential time manipulation

5     at Mr. Banfield's store?

6          A.     During a pre-planned in visit, I was

7     going through his daily records book and

8     checking his system, and I noticed that there

9     were some inconsistencies with the times that

10    it was -- he was paying to his partners.

11         Q.     I want to kind of dig into that a

12    lot more, but first, just for terminology, what

13    is the daily records book that you're referring

14    to?

15         A.     That's the book that we use for --

16    partners can punch in it.  It's almost like a

17    store manager readiness book.  They -- they --

18    they capture milks, milk count, temperatures

19    and any daily activity would be captured in

20    that book.  Any paid outs, paid-in receipts,

21    all goes inside of the daily record book.

22         Q.     When you refer to paid in and outs

23    receipts, would that cover things like

24    purchases with the store P-Card?  Is that part

25    of the same daily book?

```
 1          A.    It would be a part of the same daily

 2    book.  Mostly you'll see electronic tips in

 3    that book.  That's what we use it for most of

 4    the time.  Mileage.  If someone is going to

 5    drive from one store to the next, they would

 6    capture milage as well in here.

 7          Q.    And is the daily book that you're

 8    referring to entirely on paper or is there some

 9    part of it that's electronic?

10          A.    It's on paper.

11          Q.    So you explained that you were going

12    through the daily book at Mr. Banfield's store,

13    what part of it or sections of it were you

14    reviewing specifically when something came to

15    your attention as suspicious?

16          A.    I was using the daily records book

17    in accordance to his actual time card -- I can

18    log into the store managers, in that store,

19    their time card.  If a partner would capture,

20    hey, I worked on Monday, September 28th, from

21    you 12:00 to 4:00, it should reflect in the

22    system.

23                I don't remember exactly what jumped

24    out, but it was something at the time and it --

25    it was a flag that I had to look into some
```

September 29, 2020                                40

```
 1    more.

 2         Q.    Was the time clock manipulation to

 3    increase the hours worked or paid for to

 4    Mr. Banfield or did it affect other employees

 5    in his store?

 6         A.    It affected other employees within

 7    that store.

 8         Q.    So when something first caught your

 9    eye in the daily book and comparing it to the

10    electronic time records, what's the next thing

11    that happened in the process?

12         A.    I reached out to my partner

13    resources manager at the time.  I don't

14    remember his name, he's -- he's no longer with

15    the company.  And I also reached out to, I

16    believe it was the -- I don't remember, the

17    analyst from the fraud teams name, for some

18    support looking into punches.

19         Q.    When you reached out to those two

20    individuals, did you call them or write to them

21    or something else?

22         A.    I called them.

23         Q.    Did you take any notes on those

24    calls?

25         A.    I don't remember.
```

```
 1        Q.    What, if anything, did the partner

 2    resource manager say when you called him or

 3    her?

 4        A.    He advised -- he advised me to reach

 5    out to the contact at the time -- don't

 6    remember her name -- from the fraud team, and I

 7    reached out to her and, you know, asked that

 8    she, you know, just look into punches, then we

 9    started an investigation from that place as she

10    looked into the punches.

11            When she looked into the punches, I

12    sat with William a couple of times to interview

13    him around the -- what, you know, what -- what

14    happened, and then we -- we kind of went from

15    there.

16        Q.    And another question just on

17    terminology.  You referred to the fraud team,

18    that -- that's a new term for me.

19            What is your understanding of what

20    the fraud team is, if you could explain it?

21        A.    I -- I say the fraud team because

22    that's what I remember.  This -- this -- this

23    team, I would have to look for the correct

24    name, but they do deal with register

25    manipulation, anything to deal with time cards,
```

```
 1          A.    No.

 2          Q.    Were you part of any meeting where a

 3     decision was made to -- as to how to respond to

 4     the findings?

 5          A.    Can you clarify that?

 6          Q.    I'll withdraw that question.

 7                After sharing your findings with the

 8     partner resources manager and providing a

 9     summary or a recap to regional director

10     Ms. Ruffin, what's the next thing that

11     happened?

12          A.    William Banfield was then separated

13     from Starbucks.

14          Q.    As far as you know, who decided to

15     separate him?

16          A.    The facts.

17          Q.    Who was the decisionmaker who

18     ultimately decided to respond to the fact

19     findings with termination?

20          A.    You know, it was a partnership

21     between myself, the district manager, the

22     partner resource manager, and the regional

23     director.

24          Q.    To your understanding as a district

25     manager in the Tribeca region, did you have the
```

```
 1      investigation into William's clock

 2      manipulation?

 3           A.    That was it.

 4           Q.    As far as you know, is there a

 5      particular department or position at Starbucks

 6      that would generally be responsible for

 7      reconciling any wage manipulation that impacted

 8      partners?

 9           A.    No.

10           Q.    Is there any particular department

11      or position that you're aware of at Starbucks

12      that is responsible for any kind of backpay

13      corrections generally for partners?

14           A.    No, no department I know, no.

15           Q.    Who replaced William as store

16      manager at the West Broadway and Leonard

17      location?

18           A.    Rafael Fox.

19           Q.    Were you aware of who Mr. Fox was

20      prior to Mr. Banfield's termination?

21           A.    Yes.

22           Q.    When did you first encounter

23      Mr. Fox?

24           A.    When I became the district manager

25      for Tribeca.
```

```
 1            Q.    Was he a store manager in your

 2      district?

 3            A.    Yes.

 4            Q.    What store did he manage at that

 5      time?

 6            A.    The location on Broadway and Canal.

 7            Q.    Did you have interaction with

 8      Mr. Fox and the store that he managed when you

 9      were district manager in Tribeca?

10            A.    Yes.

11            Q.    Could you describe the nature of any

12      kind of regular contact that you would have

13      with him as part of your job?  That is, would

14      you visit him on a regular schedule?  Would you

15      see him at fixed meeting points?

16            A.    Yes, all of the above.  It would be

17      observing coach visits, district huddles,

18      planning with intent meeting and, you know, any

19      partner development conversation that happens a

20      couple of times a year.

21                  Yeah, for the most part, that's --

22      that's what the visits would look like.  If I

23      didn't mention, also, observing coach visits.

24      I think I just shared that, that that's our

25      regular cadence we, as a district manager,
```

```
 1        would get to stores once or twice a month.

 2             Q.    How long -- if you can't answer as a

 3        fixed number, then just let me know.  But

 4        generally, how long would store visits be when

 5        you were the district manager and Mr. Fox was

 6        the manager at Broadway and Canal?

 7             A.    I don't know.

 8             Q.    Would there be a checklist or any

 9        fixed agenda that you would go through on your

10        regular visits?

11             A.    It would depend on the nature of the

12        visit.

13             Q.    Did you come to form any opinion of

14        Mr. Fox's performance as manager based on your

15        encounters with him at the Broadway and Canal

16        store?

17             A.    He was a manager.  No, no personal

18        opinions, no.

19             Q.    Did you ever have any conflict or

20        problems with Mr. Fox?

21             A.    No.

22             Q.    Were you involved in the decision to

23        relocate Mr. Fox from Broadway and to Canal --

24        Broadway and Canal to West Broadway and Leonard

25        as the replacement for William Banfield?
```

```
 1          A.    Can you ask the question again?

 2          Q.    Were you involved in picking Mr. Fox

 3    to replace Mr. Banfield?

 4          A.    I was involved, yes.

 5          Q.    What was your involvement in that?

 6          A.    Bringing his name up to the table

 7    during the partner planning meeting with my

 8    regional director.

 9          Q.    Was it just you and Ms. Ruffin, the

10    regional director in that meeting?

11          A.    No.

12          Q.    Who else was a part of that meeting?

13          A.    The rest of the area, all the

14    district managers.

15          Q.    And how many district managers were

16    there in her area?

17          A.    I don't remember at the time.

18          Q.    Would you be able to say if it was

19    more or less than a dozen?

20          A.    Less than a dozen.

21          Q.    When you say that you mentioned his

22    name in the context of one of those meetings,

23    what, if anything, did you say about Mr. Fox?

24          A.    The store -- that location needed a

25    store manager, the district I took over, most
```

```
 1      of our store managers were newer-in-role.  We

 2      go after two year stability.  Rafael worked in

 3      the Broadway and Canal location at the time, I

 4      want to say, very close to 20 years.

 5              So when we were looking for a store

 6      manager would suit to at least with stability

 7      within a space, Rafael was one of the first

 8      options and Rafael also needed a change of

 9      venue.  He's been in that -- that store for a

10      very long time.  Yeah.

11      Q.    Could you explain a little bit more

12      why the length of his tenure in that store

13      leads you to believe that he needed a change of

14      venue?

15              MS. GOLDSTEIN:  Objection.

16              THE WITNESS:  Yeah.  A store

17      manager in a -- let's speak about, you know,

18      Rafael in a store.  Rafael is -- his

19      performance was just middle of the pack.  He

20      wasn't leading the way and, you know, I felt

21      like I just -- just through walkthroughs and

22      partner planning visits.  He was very

23      comfortable in his store and he needed a change

24      of venue.

25      BY MR. GRAFF:
```

```
 1         Q.    Does Starbucks have any formal

 2    policy or written guideline about desiring to

 3    shift store managers around ever few years to

 4    different change of venue?  Is that something

 5    that's an affirmative practice that you're

 6    aware of?

 7                   MS. GOLDSTEIN:  Objection.

 8                   THE WITNESS:  No.

 9    BY MR. GRAFF:

10         Q.    Apart from mentioning Mr. Fox's name

11    in a district meeting, what else, if any,

12    involvement did you have in the decision to

13    transfer him to the Broadway and West

14    Leonard -- West Broadway and Leonard location?

15         A.    There was nothing else.

16         Q.    Do you know who's decision it was?

17    Like, who made the final decision to transfer

18    him?

19         A.    Yes, it was the regional director,

20    Carla Ruffin.  She would sign off on a decision

21    like that that's moving a store manager from

22    one location to the next.

23         Q.    Did you see or are you aware of any

24    E-mails concerning the decision to transfer

25    Mr. Fox to that location?
```

```
 1     had done?

 2                         MS. GOLDSTEIN:  Objection.

 3                         THE WITNESS:  I don't know.

 4     BY MR. GRAFF:

 5          Q.    Okay.  As a district manager --

 6     withdrawn.

 7               Are you still a district manager for

 8     the Tribeca region?

 9          A.    No.  I left Tribeca in 2017.

10          Q.    What's the region that you were

11     transferred to next?

12          A.    I am in District 2040.  I'm still in

13     Area 146, Region 7.

14          Q.    Got it.

15               And does District 2040 have a

16     geographic name or title?

17          A.    Yes, it's Brooklyn East.  It's

18     Downtown Brooklyn in the Greenpoint area.

19          Q.    Was it your decision to transfer

20     from that -- that Tribeca to Brooklyn East in

21     2017?

22          A.    No, it was a -- you know, I want to

23     say it was a -- more so of a promotion to the

24     Brooklyn area.  We were opening a community

25     store, I was raised in Brooklyn, and it just --
```

September 29, 2020                          76

```
 1    it worked.
 2         Q.    When you say "promotion," are you
 3    referring to it just from your personal
 4    preference --
 5         A.    Yes.
 6         Q.    -- vantage?  Okay.
 7         A.    Yes.
 8         Q.    Did you have any role in selecting
 9    the individual to replace you as district
10    manager of the Tribeca district?
11         A.    No.
12         Q.    Do you know who selected you -- who
13    was selected to replace you?
14         A.    Who was selected to replace me?
15         Q.    Or who replaced?
16         A.    Yes, Tim Hutchinson.
17         Q.    Is Tim Hutchinson somebody who you
18    had encountered previously during your
19    employment?
20         A.    No.  He was a peer of mine, but no.
21         Q.    You said that "he was a peer of
22    yours," what do you mean by that?
23         A.    We were both district managers.
24         Q.    In your experience at Starbucks, is
25    the term "peer" something that's used by others
```

 1    that you've noticed to refer to peer district

 2    managers specifically?  Is that like a special

 3    term in the Starbucks lingo?

 4         A.    No.

 5         Q.    Okay.

 6         A.    I could -- I could have said he was

 7    a partner of mine.

 8         Q.    Okay.

 9         A.    But he was just in a different

10    district.

11         Q.    Got it.

12         A.    We worked in the same area, that's

13    why I said the word "peer," because we -- we

14    shared the same area.

15         Q.    That's very helpful.  Thank you.

16         A.    Yep.

17         Q.    Do you have any information about

18    why it was that Tim Hutchinson in particular

19    was chosen to replace you?

20         A.    No.

21         Q.    Did you have any involvement in

22    transitioning him into to the Tribeca district?

23         A.    Yes.

24         Q.    Could you explain what that process

25    was?

```
 1                      - TIM HUTCHINSON -

 2      UNITED STATES DISTRICT COURT

 3      SOUTHERN DISTRICT OF NEW YORK

 4      -------------------------------X

 5      FOX, ET AL.,

 6                      Plaintiffs,

 7                  v.              CIVIL CASE NO.

 8                          1:19-CV-04650-AJN-SN

 9

10      STARBUCKS CORPORATION,

11                      Defendant.

12      -------------------------------X

13      DATE:  September 1, 2020

14      TIME:  10:00 A.M.

15

16                  VIDEOCONFERENCE DEPOSITION OF TIM

17      HUTCHINSON, pursuant to Notice, before Hope

18      Menaker, a Shorthand Reporter and Notary Public of

19      the State of New York.

20

21

22

23

24

25
```

September 01, 2020                              37

```
 1                    - TIM HUTCHINSON -

 2    I was going to be running two of them, not that I

 3    knew it at the time.

 4         Q.     Could you describe generally what

 5    your duties and responsibilities were as a

 6    district manager in the SoHo district?

 7         A.     I'm the full P&L owner responsible

 8    for managing that business with a business owner

 9    mindset.

10               I was responsible for the day-to-day

11    operations, the people and partners in those

12    stores, the concerns they had, customer issues,

13    safety.  That was the bulk of my -- my

14    responsibility.

15               We also had responsibility to our

16    peers and to our regional director.

17         Q.     Were your duties as a district

18    manager in SoHo substantially the same as the

19    duties in TriBeCa?

20         A.     They were largely the same, yes.

21         Q.     At what point in time did you

22    transition from SoHo to TriBeCa?

23         A.     Either late November or early

24    December of 2017.

25         Q.     Do you have an understanding of what
```

September 01, 2020                                    38

```
 1                    - TIM HUTCHINSON -

 2    occasioned your transferring at that time?

 3         A.    My transfer was more a byproduct of

 4    someone else's transfer.  We were opening a new

 5    store in Brooklyn, a community store.  There was a

 6    district manager at the time running TriBeCa who

 7    grew up in that area, so there was strong intent

 8    on having a district manager in that community

 9    store and the district surrounding it with someone

10    who grew up in that area and was familiar with it.

11              So moving that district manager

12    created a -- a kind of a domino of three district

13    managers changing districts.

14         Q.    Who preceded you as district manager

15    in the SoHo district?

16         A.    Oh, I can't remember her name.

17    Raina.  Her first name was Raina.  I can't

18    remember her last name.

19         Q.    Do you have an understanding of why

20    it was that her position became available at the

21    time that you were made district manager at that

22    district?

23         A.    She accepted another position in the

24    organization.

25         Q.    Who did you report to as your
```

September 01, 2020                                    39

```
                         - TIM HUTCHINSON -

 1       immediate supervisor in the SoHo district?

 2            A.    Carla Ruffin.

 3            Q.    Was she the -- withdrawn.

 4                  What was Ms. Ruffin's title at the

 5       time you reported to her?

 6            A.    Regional director.

 7            Q.    Was she the regional director for a

 8       specific region?

 9            A.    Yes.

10            Q.    What region?

11            A.    Again, it had an official

12       designation.  I'm not sure what that number is,

13       but she oversaw Staten Island, Brooklyn, and

14       Downtown Manhattan.

15            Q.    Did you have any other direct

16       supervisors, apart from Ms. Ruffin at SoHo?

17            A.    No.

18            Q.    Who did you report to as your

19       immediate supervisor in TriBeCa?

20            A.    Initially and for most of the time I

21       was there, it was still Carl Ruffin until she

22       retired.

23            Q.    Following her retirement, who did you

24       begin to report to?
```

```
1                    - TIM HUTCHINSON -

2      going on with them, what had gone on recently, the

3      state of the partners.

4           Q.    As far as you know, were the partners

5      whose pay was negatively impacted by Will repaid

6      whatever monies they were owed by Starbucks?

7                 MS. GOLDSTEIN:  Objection.

8           A.    My understanding is yes.

9           Q.    To your understanding, had all of the

10     employees in Will's former store who were owed any

11     money already been paid what they were owed at the

12     time that you became district manager in TriBeCa?

13                MS. GOLDSTEIN: Objection.

14          A.    To my understanding, yes.

15          Q.    Did you ever speak with Mr. Fox about

16     anything concerning unpaid wages that might be

17     owed to employees who used to work in that store?

18          A.    Please say that again.

19                MR. GRAFF:  Could the court reporter

20          read it back.

21                (The question requested was read back

22          by the reporter.)

23          A.    We had a discussion about -- not --

24     not unpaid wages, no.

25          Q.    Did Mr. Fable or anyone else indicate
```

September 01, 2020                                        59

```
 1                  - TIM HUTCHINSON -

 2      to you, what individuals had overseen any

 3      investigation into time clock or wage manipulation

 4      by former manager Will?

 5                  MS. GOLDSTEIN: Objection.

 6           A.     To my recollection, Les indicated to

 7      me that he had -- he had done a fair amount of the

 8      investigation and he probably involved some

 9      additional resources and also leveraged Rafael Fox

10      as well.

11           Q.     In what sense did he leverage Rafael

12      Fox, as you understand it?

13           A.     You would have to ask Less.  I know

14      that -- I don't know anything specifically because

15      it was all apparently done by the time I got

16      there.

17           Q.     What was it that Les said to you

18      about Rafael Fox concerning this issue?

19           A.     That all of it had been taken care

20      of.  I was told that there had been an issue.  It

21      had been thoroughly researched and it had all been

22      taken care of and resolved.

23           Q.     Did you ever see any documentation

24      concerning the resolution of any wage issues

25      involving Will?
```

September 01, 2020                                    64

```
 1                    - TIM HUTCHINSON -

 2         Q.     Other than Less and Rafael, did you

 3    have any communication about that subject with

 4    anyone else?

 5         A.     Not that incident.  The subject

 6    itself, time clock manipulation, is something

 7    that's often spoken about as part of the job.

 8         Q.     When you mentioned a moment ago that

 9    you might have communicated about it with Rafael

10    Fox, do you actually remember that you did have a

11    communication with him or you're putting it out

12    there as a possibility, but you're not sure?

13         A.     No, I did have a conversation with

14    Rafael.

15         Q.     Where were you located when you had

16    that conversation?

17         A.     I was in the store, West Broadway and

18    Leonard.

19         Q.     Why were you in the store at that

20    time?

21         A.     I don't remember the purpose.  I

22    don't remember if I came there because Rafael

23    asked me or if I was there on a store visit.  It

24    was -- it was a part of my job.  I don't remember

25    specifically, though.
```

September 01, 2020                                       65

```
 1                     - TIM HUTCHINSON -

 2          Q.     And what was it that Rafael said to

 3     you in that communication?

 4          A.     Rafael had brought to my attention

 5     that he was concerned that there were additional

 6     people who had not been paid correctly based on

 7     research that he had done beyond research that was

 8     done for this incident we've been talking about.

 9          Q.     Did he provide you with any details

10     or documentation of his research?

11          A.     I was -- I was in the store with him

12     for quite a while and he walked me through

13     the -- the time -- or the time and attendance

14     software at the time, presumably the same as is

15     represented in those exhibits.  He was walking me

16     through exception reports.  He had a lot of -- a

17     lot of documentation that he had printed out,

18     notes that he had taken.  I don't remember

19     specifically, but we spent quite a bit of time

20     walking through it.

21          Q.     When you say "quite a bit of time,"

22     could you approximate in minutes or hours?

23          A.     Maybe two hours.

24          Q.     Do you remember the approximate date

25     when you had that discussion with Mr. Fox?
```

September 01, 2020                                    66

```
 1                    - TIM HUTCHINSON -

 2         A.     I don't.  I don't have the

 3    approximate date.  It would have been in the first

 4    30 to 60 days that he and I worked together

 5    because we really only worked together for maybe

 6    three months give or take, but it was -- it

 7    was -- it was very early on.  It was probably in

 8    the first 30 days, the first couple of visits I

 9    did to the store.

10         Q.     How did you respond to Mr. Fox when

11    he presented you with this evidence from his

12    research?

13                MS. GOLDSTEIN:  Objection.

14         A.     Well, it got my attention.  It was

15    concerning.  Any time that somebody's pay is

16    missing, it -- it's concerning so I had a lot of

17    questions.  I wanted to make -- I wanted to

18    understand what he had done and how he arrived at

19    some of the concerns he was expressing.

20         Q.     Did you get responsive answers and

21    information to your questions?

22         A.     It was difficult getting answers

23    because the system the -- the issues that Rafael

24    was bringing to my attention weren't with

25    employees of that store; they were with people who
```

September 01, 2020                                    67

```
1                  - TIM HUTCHINSON -

2      had worked at that store as borrowed employees

3      going back quite some time period.  It was -- I

4      don't remember exactly, but it -- it was a long

5      time period that he had looked at and the -- the

6      reports he was pulling were -- they were flagging

7      time clock issues.

8                   And again sitting and understanding

9      these things -- the reports were showing errors in

10     time clocks, so somebody clocking out and

11     forgetting to clock back in on break or somebody

12     forgetting to click in or out at all, which is not

13     terribly uncommon; but the -- the question that

14     couldn't be answered was does this indicate the

15     person wasn't paid properly because these -- these

16     people were employees of other stores and those

17     issues are normally resolved by their home stores

18     and when that occurs you don't have visibility to

19     it in the borrowed store system.  He was -- he was

20     generating reporting and using that system for

21     something that it really wasn't designed for.

22     That kind of transparency isn't designed for a

23     gatekeeping function; it's designed so that we can

24     share partners.  But resolving pay issues were

25     always done at home stores.  But I was concerned;
```

September 01, 2020                                68

```
 1                  - TIM HUTCHINSON -

 2      I was concerned.

 3          Q.     Did you direct Mr. Fox to take any

 4      further action of any sort after your meeting?

 5          A.     No.  I ex -- expressly asked

 6      him -- I, you know, thanked him for the work that

 7      he had done, but encouraged him to focus his time,

 8      effort, energy on the role that he was occupying

 9      as a store manager; and that -- that I would do

10      some additional research on my own to make sure

11      that I was thinking about it correctly, but

12      ultimately what he was showing me were time clock

13      errors that wouldn't at all show they were fixed.

14      These were normal things that were done.

15                  Had it been just the employees in

16      that store and there were issues, then

17      that's one thing; but these were people who

18      weren't -- weren't a part of that store.  So just

19      because they had a time clock issue in that store

20      doesn't mean there was any issue with their pay

21      and you would have no visibility to know whether

22      or not it had been taken care of and they'd been

23      paid properly.

24          Q.     After meeting with Mr. Fox what, if

25      any, further action did you take to look into what
```

September 01, 2020                           69

```
 1                   - TIM HUTCHINSON -

 2      he had showed you?

 3           A.    So I went back into the resource

 4      manual we had for the system to make sure that my

 5      understanding was correct and then -- I don't

 6      remember who I asked, but it was one of my peers

 7      and it really was -- I didn't seek them out for

 8      the purpose; we were together either for a meeting

 9      or something and I -- I just wanted to clarify my

10      understanding which was hey, a store manager

11      showed me in the system these time clock errors to

12      borrowed employees but it was going way back, like

13      that doesn't mean that they weren't paid correctly

14      and if they been resolved it wouldn't show in the

15      system; and that was confirmed to me and I just

16      moved past it at that point because the -- the

17      system just really wasn't designed for that.

18           Q.    Who is the peer with whom you had

19      that communication that you just described?

20           A.    I don't even remember.  I don't

21      recall.

22           Q.    Did you discuss Mr. Fox's report and

23      investigation with Carla Ruffin?

24           A.    No, I - -it was a nonissue for me at

25      that point.
```

September 01, 2020                                    106

```
 1                  - TIM HUTCHINSON -

 2          A.    I would never speak about -- as an

 3      agent of the company, if someone called me about a

 4      reference for somebody I worked with prior I

 5      wouldn't speak about work performance.  I wouldn't

 6      speak about anything work related.

 7          Q.    What sort of thing would you speak

 8      about that would fall within that category of a

 9      permissible personal reference?

10          A.    Depends on what I was asked.  I would

11      answer the questions that were asked of me.

12          Q.    You can put aside the document.

13                Earlier we had talked about the

14      concern that Mr. Fox raised with you and you had

15      met in the store and gone over documentation about

16      potentially unpaid wages to certain workers.  Do

17      you recall that discussion?

18          A.    I recall the discussion yes.

19          Q.    I know you couldn't quite remember

20      definitely who you may or may not have spoken with

21      about that issue.  My question now is:  Is it

22      possible that you at any point discussed it with

23      Tina McDonald?

24          A.    No.

25          Q.    Is it a possibility you would have
```

```
1                    - TIM HUTCHINSON -

2      had some communication about it with Carla Ruffin?

3             A.     No.

4             Q.     Do you remember who you did have a

5      communication with about that?

6             A.     No.  It was a peer.  It was a peer;

7      somebody that was familiar with the system that

8      could confirm my understanding, just to make sure

9      I wasn't missing something.

10            Q.     At this point since it's been a few

11     hours since it first came up, are you able to

12     recall the identity of the peer specifically?

13            A.     No.

14            Q.     Can you recall any identifying

15     details about that peer?

16            A.     No, I don't know that I even

17     mentioned specifically it was Rafael that had

18     brought it to me.

19            Q.     You don't remember either way?

20            A.     I couldn't say one way or another.  I

21     really was just asking for confirmation of my

22     understanding that the system showing flags of

23     time clock errors and its meaning and, really, I

24     just spoke about the system.  I don't recall

25     details, but was a nonissue.
```

```
 1                    - TIM HUTCHINSON -

 2          Q.     Did you at some point become aware

 3    that a complaint had been filed concerning Fair

 4    Workweek practice at Mr. Fox's --

 5          A.     Yes.  Sorry.

 6          Q.     -- store?

 7          A.     Yes, sir, I did.

 8          Q.     How did you first become aware that?

 9          A.     I can't really remember truthfully.

10    I -- I don't remember if I got a call from Carla

11    or if notification showed up in the store.  I

12    don't -- I don't remember how I first learned it.

13          Q.     Do you remember at what point in time

14    you first learned of it?

15          A.     No.  I mean -- sometime between early

16    December, 2017 and February, 2018.  I -- I don't

17    really recall.

18          Q.     What, if anything, is the first

19    involvement that you can remember having in

20    connection with that complaint?

21          A.     I don't really remember my first

22    involvement.  The first thing I recall after

23    becoming aware of the complaint was becoming aware

24    that some audits were being done in my stores.

25          Q.     Who was conducting those audits?
```

```
 1                    - TIM HUTCHINSON -

 2          A.     I believe it was Tina McDonald.

 3          Q.     Did you participate with Tina

 4     McDonald at all in her --

 5          A.     No, I didn't.

 6          Q.     Did you know who it was who was

 7     conducting those audits at your stores?

 8          A.     Yes.

 9          Q.     Was that Tina McDonald?

10          A.     Yes.

11          Q.     To the best of your knowledge, what

12     was Tina McDonald actually doing?

13          A.     She was reviewing our compliance

14     practices and knowledge and engagement of the

15     store managers related to the recent change in New

16     York Labor Law.

17          Q.     What stores specifically was she

18     auditing -- or a different question, was she

19     auditing all of the stores in your district?

20          A.     I wasn't aware at the time of all the

21     stores she had audited or was going to audit.  I

22     remember two stores for sure, but there could have

23     been more and I don't know if she did more after

24     that.

25          Q.     Which two stores do you remember?
```

September 01, 2020                                    110

```
 1                   - TIM HUTCHINSON -

 2         A.    The store on 32 Avenue of Americas

 3    and West Broadway and Leonard.

 4         Q.    I think we already identified West

 5    Broadway and Leonard as the store that Mr. Fox was

 6    manager for.  Who was the manager at the 32 Avenue

 7    of the Americas store?

 8         A.    Kamilla Dorner Jeffers.

 9         Q.    As far as you know, did Ms. McDonald

10    Donald audit those two stores that you do remember

11    at or around the same time?

12         A.    I believe those were done at about

13    the same time and maybe more.  I -- I don't recall

14    specifically.

15         Q.    Do you recall at what point in time

16    those audits took place?

17         A.    I don't.

18         Q.    Did Ms. McDonald interview you at all

19    in connection with her audits?

20         A.    She didn't interview me.  I wasn't --

21    honestly, I wasn't even aware that they were going

22    to happen.  I became aware after they were

23    happening and had happened.

24         Q.    Who made you aware?

25         A.    The store manager would send me a
```

September 01, 2020                                   111

```
 1                  - TIM HUTCHINSON -

 2     message and say hey, Tina was here or just in

 3     conversation said oh, by the way, Tina was here.

 4     I found out the day that she was out doing the

 5     audits and I don't remember specifics.  I probably

 6     reached out to her and told her to let me know if

 7     she needs anything or if she wanted any assistance

 8     from me, but I don't remember specifically the

 9     communication.  I wasn't really a part of the

10     audits.

11          Q.    Did you ever visit any stores

12     together with Tina in connection with those

13     audits?

14          A.    Not during that time period.  We had

15     spent time in the field on other occasions.

16          Q.    Just to be clear; when you say not at

17     that time period, did you at any time period

18     participate with Ms. McDonald in connection with

19     the audits on Fair Workweek compliance?

20          A.    No.

21          Q.    Were you ever provided any

22     information about the findings of Ms. McDonald's

23     audits?

24          A.    I was -- I'm trying to remember.  I

25     was given general feedback about the compliance
```

September 01, 2020                                            112

```
 1                    - TIM HUTCHINSON -

 2      and the one thing that really I remember that

 3      stands out to me, I mean, there were no stores

 4      perfect, but there were significant concerns

 5      primarily with West Broadway and Leonard both in

 6      the findings of the audit as well as Rafael's

 7      knowledge, forthrightness, participation with the

 8      audit; but I was not given specific examples or

 9      details at that time.

10          Q.     Were you ever given further details

11      about the audit and its conclusions specifically

12      as to West Broadway and Leonard or Mr. Fox's role

13      in the audit?

14          A.     No, sir.

15          Q.     As best you remember, I know you have

16      only a general understanding, is there anything

17      else that was concluded with respect to Mr. Fox or

18      his store that you haven't already referred to

19      today or described?

20          A.     No.

21          Q.     Were you given any metrics or hard

22      data as to compliance issues in particular stores?

23               MS. GOLDSTEIN:  Objection.

24          A.     No.

25          Q.     Did you decide to terminate Mr. Fox's
```

September 01, 2020                              113

```
 1                      - TIM HUTCHINSON -

 2       employment?

 3            A.    That decision was not made by me.

 4            Q.    So far as you know, who made that

 5       decision?

 6            A.    I don't know everyone that was

 7       involved or a part of that decision-making.  I was

 8       instructed to deliver the separation.

 9            Q.    Who instructed you to do that?

10            A.    I don't remember specifically.  It

11       would have come either from Carla or from our

12       partner resources director, Rachel.

13            Q.    And what was it that they directed

14       you to do or deliver in connection with the

15       separation?

16            A.    They said based on the results of

17       whatever investigation audits, the decision had

18       been made to separate Rafael.  The separation

19       notice had been drafted and it was being sent to

20       me to deliver and separate his employment.

21            Q.    Did you have any reaction at all when

22       you were given that instruction?

23                  MS. GOLDSTEIN:  Objection.

24            A.    I don't -- I don't want to comment on

25       my reaction.  I can't remember specifically what
```

Case 21-2531, Document 27, 01/31/2022, 3248030, Page89 of 311

A-378

```
 1                      - TIM HUTCHINSON -

 2      given to you?

 3           A.     Not that I recall.

 4           Q.     Did you have any questions about how

 5      to go about the process of effectuating the

 6      termination once you had the notice in hand?

 7           A.     I don't think I had any questions.  I

 8      followed our standard protocol.

 9           Q.     And how did you go about effectuating

10      the termination?

11           A.     I reached out to a peer to come and

12      accompany me as a witness, which was a normal

13      practice.  I had been a witness at another store

14      manager's separation.  I printed -- the separation

15      notice itself gives you certain documents to print

16      and tells you exactly what to say.  I -- I

17      followed that exact procedure.

18           Q.     How long did the separation meeting

19      take?

20           A.     I don't remember specifics, but it

21      wasn't that long.  Maybe fifteen --

22           Q.     When --

23           A.     Maybe fifteen minutes to thirty

24      minutes, maybe.

25           Q.     Where did the meeting take place?
```

September 01, 2020                                116

```
 1                  - TIM HUTCHINSON -

 2        A.    In the back room of the West Broadway

 3    and Leonard store.

 4        Q.    Who was that peer who you brought as

 5    a witness?

 6        A.    Another district manager, Amanda

 7    Perstac.

 8        Q.    Was there any particular reason why

 9    you selected her?

10        A.    I don't remember why I selected her

11    at the time.  I -- I don't remember.  Actually,

12    she was -- at the time, she was the district

13    manager for the district that was adjoining mine

14    so geographically she would have probably been the

15    closest.

16        Q.    Was it your choice to have Amanda

17    Perstac as a witness or did somebody instruct you

18    to have her?

19              MS. GOLDSTEIN:  Objection.

20        A.    No, that was me.  That was my choice.

21        Q.    Did you at any point in time ever

22    receive any more detailed information concerning

23    the finding of any audits into Fair Workweek

24    compliance in your district?

25              MS. GOLDSTEIN: Objection.
```

September 01, 2020                                    135

```
 1                    - TIM HUTCHINSON -

 2         p.m.

 3                 MS. GOLDSTEIN:  Sounds good.

 4                 THE WITNESS:  Okay.

 5                 (Whereupon, there was a brief recess

 6         in the proceedings.)

 7         Q.    Mr. Hutchinson, did you communicate

 8    with anyone other than counsel during the break?

 9         A.    No.

10         Q.    Do you read anything during the

11    break?

12         A.    No.

13         Q.    During your tenure as a district

14    manager in New York, did you ever make the

15    decision yourself to terminate any store manager?

16         A.    I did not.

17         Q.    Did you ever provide input into the

18    decision to terminate a store manager?

19         A.    I did not provide input on any store

20    manager who was separated.

21         Q.    Is it your understanding that you

22    would be eligible for reemployment at Starbucks

23    were you to seek to become reemployed there?

24                 MS. GOLDSTEIN:  Objection.

25         A.    I don't know that I'm allowed to
```

Rachel Kelly
September 02, 2020                                          1

1                    - RACHEL KELLY -

2      UNITED STATES DISTRICT COURT

3      SOUTHERN DISTRICT OF NEW YORK

4      -------------------------------X

5      RAFAEL FOX, ET AL.,

6                    V.           CIVIL CASE NO.

7                          1:19-CV-04650-AJN-SN

8      STARBUCKS CORPORATION,

9                    Defendant.

10     -------------------------------X

11     DATE:  SEPTEMBER 2, 2020

12     TIME:  11:15 A.M.

13

14            VIDEOCONFERENCE DEPOSITION OF RACHEL

15     KELLY, pursuant to Notice, before Hope Menaker, a

16     Shorthand Reporter and Notary Public of the State

17     of New York.

18

19

20

21

22

23

24

25

Case 21-2531, Document 27, 01/31/2022, 3248030, Page93 of 311

Rachel Kelly
September 02, 2020                              36

```
 1                   - RACHEL KELLY

 2     where it was split into the division.

 3          Q.    What -- sorry, I thought you were

 4     done.  I didn't mean to cut you off.  Please

 5     continue.

 6          A.    I don't -- I was going to say I don't

 7     recall the exact date.

 8          Q.    When you were Director of Partner

 9     Resources, what positions, if any, reported to you

10     as their direct supervisor?

11          A.    So Partner Resources Managers and the

12     HR Compliance Specialist Senior.

13          Q.    What sort of training, if any, did

14     you undergo in connection with becoming Director

15     of Partner Operations the first time in September

16     2016?

17               MR. MOY:  Objection.

18          A.    So based on my recollection, I was

19     assigned Partner Resources Director mentor.  I was

20     given a training plan where I would, you know,

21     meet with other HR representatives in the company

22     to learn about their roles and how we would work

23     together.

24               There was, you know, ongoing

25     trainings that we had as a selective group for
```

```
 1                    - RACHEL KELLY

 2     worked under you when you were Director of Partner

 3     Resources in New York?

 4          A.     In the entire time or at one time

 5     directly reporting to me?

 6          Q.     At a given time, how many positions

 7     were there?

 8          A.     At a given time, two to three.

 9          Q.     Were they split up amongst the

10     geographic zones?

11          A.     Correct.

12          Q.     Other than human resources managers,

13     who else, if anybody, reported to you as their

14     immediate supervisor when you were Director

15     Partner Resources in New York?

16          A.     The senior HR compliance specialist.

17          Q.     Was there more than one such

18     individual during your tenure there?

19          A.     Yes.

20          Q.     Was there more than one at a time?

21          A.     No.

22          Q.     Who were the individuals who held

23     that position?

24          A.     Tina McDonald and Monica Maddock.

25          Q.     During what period of time did Monica
```

Case 21-2531, Document 27, 01/31/2022, 3248030, Page95 of 311

Rachel Kelly
September 02, 2020                                    40

```
 1                   - RACHEL KELLY

 2    Maddock hold the job?

 3         A.     February 2019 to present.

 4         Q.     During what period of time did Tina

 5    McDonald hold the job?

 6         A.     November 20, 2017.  And we did have a

 7    bit of a transition period from -- Tina was

 8    promoted to a Partner Resources Manager, so there

 9    was a time lapse in between Tina's promotion to

10    the time that Monica went into position.  So I

11    can't remember the exact dates of Tina's

12    promotion, but she held the position up until

13    Monica took it.

14         Q.     Did somebody hold that position

15    immediately prior to Tina McDonald?

16         A.     In New York Metro?

17         Q.     Yes.

18         A.     No.

19         Q.     Do you have an understanding of why

20    it was that a decision was made to hire somebody

21    for that position in New York Metro?

22              MR. MOY:  Objection.

23         A.     Yes.

24         Q.     Can you explain.

25         A.     Yes.  So the person was put into --
```

```
 1                     - RACHEL KELLY

 2     the decision was made as to support the

 3     implementation and execution of the Fair Workweek

 4     legislation that was due to come about in November

 5     2017.

 6           Q.    Apart from Ms. McDonald's role in

 7     connection with that legislation, did she have any

 8     other duties or responsibilities in connection

 9     with her role as Partner Resources -- excuse me,

10     as a Senior HR Compliance Specialist?

11           A.    That would be the primary function of

12     her role.  Some of the other things that she did

13     would be to work on -- or consulting on, you know,

14     tools, processes to support that, or other systems

15     that would be in support of that legislation and

16     then, you know, document, collection and retention

17     in support of that, and then training in support

18     of the legislation.

19           Q.    Does Ms. Monica Maddock have the same

20     role and responsibilities as Tina McDonald did

21     when she held the position?

22           A.    Yes.

23           Q.    Has anything else been incorporated

24     into the duties of the Senior HR Compliance

25     Specialist apart from Fair Workweek?
```

Case 21-2531, Document 27, 01/31/2022, 3248030, Page97 of 311

Rachel Kelly
September 02, 2020                              58

```
 1                      - RACHEL KELLY

 2     are other, you know, specific things as in like

 3     partner care, partner safety, wage and hour, you

 4     know, Fair Workweek in certain situations.

 5           Q.     As far as you know during his

 6     employment, did Rafael Fox make any complaints

 7     that bared on health and safety issues?

 8           A.     I was informed of that at, you

 9     know -- obviously it's a part of this case, so I

10     am aware of it.  He raised a concern.

11           Q.     As of the points in time when Mr. Fox

12     separated from his employment, were you aware if

13     he had at any point during his tenure raised

14     complaints about matters of health or safety?

15           A.     No.

16           Q.     As of the time he separated from

17     employment, were you aware of whether Mr. Fox had

18     raised complaints or concerns about wages being

19     unpaid for certain employees?

20           A.     At the time of his separation?

21           Q.     Yes.

22           A.     Was that -- no, I was informed after

23     the separation.

24           Q.     What store did Rafael Fox manage at

25     the time of his separation?
```

Case 21-2531, Document 27, 01/31/2022, 3248030, Page98 of 311

Rachel Kelly
September 02, 2020                              59

```
 1                    - RACHEL KELLY

 2        A.     If I recall correctly, West Broadway

 3   and Leonard.

 4        Q.     Who preceded him as manager of that

 5   store?

 6        A.     I'm sorry, I don't recall the

 7   partner's first name, or full name.  I believe the

 8   partner's first name was William.

 9        Q.     Do you have any information about the

10   circumstances of William's leaving his role as

11   manager of that store?

12        A.     (No audible response.)

13        Q.     Could you describe what you know

14   about that subject?

15        A.     Yeah.  It's my understanding that

16   William was separated for violations of wage and

17   hour.  And that as Rafael came in, he was asked to

18   make adjustments, I believe, to correct those

19   inaccuracies of wage and hour.  That's my

20   understanding of the situation.

21        Q.     Who was the District Manager at the

22   time that Will was separated?

23        A.     It's my understanding that it was Les

24   Sable, but I also believe that there was a

25   transition between Les and Tim like right around
```

```
 1                    - RACHEL KELLY

 2     former manager Will?

 3              MR. MOY:  Objection.

 4         A.    So -- so the District Manager is

 5     involved in the investigation itself.  I'm not

 6     sure who Les worked with from Partner Resources in

 7     that particular investigation.  Again, it would

 8     have either been Partner Resources Manager or

 9     someone within the PRSC.

10         Q.    Were the partners who were owed money

11     due to whatever misconduct by Will compensated for

12     any losses that he caused them?

13         A.    It is my understanding that yes, they

14     were all compensated.

15         Q.    Were they compensated prior to Rafael

16     Fox becoming Store Manager of that location?

17         A.    Again, it's my understanding that

18     Rafael was asked by Les to make those corrections

19     to ensure that they were paid accurate.  Again,

20     that's my understanding.

21         Q.    What is the source of information for

22     that understanding, your source of information?

23         A.    Yeah.  Conversations with Les and

24     conversations with Tim.

25         Q.    What, if anything, did you discuss
```

```
1                      - RACHEL KELLY

2      see there's two entries 9-18, and they have the

3      description "supplies pest"?

4           A.    Uh-huh.

5           Q.    Just for the record, could you say a

6      word?

7           A.    Yes.

8           Q.    Do you see in the first it says,

9      supply pest lines, the amount is 24.30-something?

10          A.    Yes.

11          Q.    We can put aside that document.  Was

12     it your decision to hire Tina McDonald for a new

13     position in the district as senior compliance

14     manager?

15          A.    Yes.  In the region.  Not in the

16     district, but in the region, yeah.

17          Q.    Was it your decision to create that

18     position in the district in the region?

19          A.    No.

20          Q.    Who decided to create that position?

21          A.    My predecessor had requested that the

22     position is funded, and got the approval to do so.

23          Q.    And did you then make the first hire

24     into the position?

25          A.    I did.
```

```
 1                    - RACHEL KELLY

 2        Q.    What was the process for identifying

 3   and then selecting among candidates?

 4        A.    Sure.  So this position was certainly

 5   going to be one of importance, and so the first

 6   step that I did was shared the job overview,

 7   expectations of the role, and just some guidelines

 8   of what we were looking to have this person do in

 9   support of the Fair Workweek legislation that was

10   upcoming.  I shared that with the Regional

11   Directors in the region and the Partner Resource

12   Managers, and certainly Robyn and Tracy, the RBT,

13   and our recruiting team to just talk about who

14   might be a really good candidate for the position.

15             We identified this was going to be an

16   internal partner that would move into the role

17   because of the nature of the job and the

18   importance of understanding our Starbucks

19   processes and protocols as it would relate to the

20   expectations of the job.

21             So I shared that with the regional

22   leaders, asked them to think about individuals on

23   their respective teams, talk to their District

24   Managers and identify who might be interested in

25   the role and who they would assess based on
```

Rachel Reilly
September 02, 2020                                            114

```
 1                    - RACHEL KELLY

 2    performance, interest, knowledge of operational

 3    protocol, et cetera, who might be a good candidate

 4    to interview for the position.

 5                From there, two Regional Directors

 6    put forward two candidates.  One was an Anaiad

 7    Espinosa, and the other was Tina McDonald.  I

 8    asked Robyn to conduct the interviews with me,

 9    given that this person would interface heavily

10    with the two of us and certainly my respective

11    teams.  We interviewed both candidates together,

12    and I made the final decision to offer the job to

13    Tina.

14        Q.    When you referred a moment ago to

15    Robyn, are you referring, just for the record, to

16    the woman you identified as Starbucks in-house

17    counsel Robyn Ruderman?

18        A.    That is correct.

19        Q.    And you and she jointly interviewed

20    and selected Tina?

21        A.    We interviewed Tina together.  I made

22    the selection of Tina.

23        Q.    Which Regional Director put forward

24    Tina McDonald as a candidate?

25        A.    Ron Shuler.
```

Rachel Kelly
September 02, 2020                                         119

```
 1                    - RACHEL KELLY

 2          Q.     Did you read anything?

 3          A.     No.

 4          Q.     Who devised the training program for

 5    employees at Starbucks in New York in connection

 6    with the Fair Workweek Law?

 7                 MR. MOY:  Objection.

 8          A.     Can you clarify just a little bit in

 9    more detail what you're looking for as it relates

10    to training program.

11          Q.     Sure.  Was training provided to Store

12    Managers at Starbucks in New York concerning the

13    Fair Workweek Law?

14          A.     Yes.

15          Q.     Can you describe what that training

16    involved?

17          A.     Sure.  We had a series of both formal

18    and informal training sessions.  You know, I'll

19    talk about what we did leading up to the

20    implementation of the law, and then that's

21    certainly sustaining training efforts as well.  So

22    as I shared, I joined the New York Metro team the

23    first week of October in 2017, and the previous --

24    my predecessor had outlined some expectations for

25    training.
```

Rachel Kelly
September 02, 2020                                    120

```
 1                    - RACHEL KELLY

 2                 So we followed through with those and

 3       then we added some supplemental things.  So the

 4       first training session that was provided was at

 5       the Store Manager summit in the areas that would

 6       be applicable for the predictability, or for the

 7       Fair Workweek legislation.  So we had three areas

 8       that had stores within the five boroughs of New

 9       York.  So area 76, which was Ron Shuler's area;

10       Area 146, which was Carla Ruffin's, area 82 which

11       was Kate McShane's, and then, and then a portion

12       of area 75 which was Alexis Vertucci.  There were

13       three districts.

14                 The first training session that I was

15       involved in, like I said, was at the -- for

16       managers' summit.  We brought in someone from

17       Seattle to lead this training for the Store

18       Managers.  These summits were held over the course

19       of two weeks between October the 10th and the

20       17th.  All Store Managers and District Managers

21       were in attendance as well as some of the regional

22       leadership team, support partners, business

23       partners, et cetera.

24                 The training session that was given

25       to Store Managers at that summit was approximately
```

```
 1                   - RACHEL KELLY

 2      a 90-minute session.  It was led by Sandy Ellison,

 3      as I shared, the person that came in from Seattle;

 4      and she walked the Store Managers through our Fair

 5      Workweek training guide.  In addition to that, we

 6      shared barista needs to know, a Store Manager

 7      needs to know, and a District Manager needs to

 8      know, and introduced what would be the schedule

 9      change log that would come to fruition once the

10      law went into place.

11                   So that was the first occasion for

12      training.  For formal training, I should say.

13      Sorry, go ahead.

14           Q.     That first occasion, were the

15      training materials distributed or provided to the

16      Store Managers to keep?

17           A.     They were.

18           Q.     Were they handed out on paper at the

19      training or something else?

20           A.     I don't know if it was handed out.  I

21      think they were placed on like the tables of the

22      participants, but it was on paper.

23           Q.     Date-wise I believe you already

24      specified the range of time that this first

25      training occurred.  What is the next phase of
```

Case 21-2531, Document 27, 01/14/2022, 3248030, Page106 of 311

Rachel Kelly
September 02, 2020                                          122

```
 1                  - RACHEL KELLY

 2      training that happened?

 3           A.     Yes.  So from there, in an ongoing

 4      basis as we learned more about how we were going

 5      to implement the processes at Starbucks or how --

 6      you know, as we were learning details on what we

 7      were anticipating from a legislation standpoint,

 8      we would provide updates to the regional

 9      leadership team at the weekly huddles.  So this

10      was the Regional Directors, our Partner Resources

11      Manager, the RBT, and we just provide updates on

12      an ongoing basis to keep everybody in tune to what

13      was coming and what the plans were.

14                  We were anticipating the detailed

15      regulations of the -- excuse me, that there would

16      be legislation to come out a little so sooner than

17      they did.  So we had put forth a plan to train the

18      managers throughout the month of November, but we

19      weren't ready to do that because we didn't have

20      the detailed regulations, and many of our

21      processes were going to be dependent on that.

22                  So we continued to work on the

23      documents in preparation, and the next training

24      sessions that we held were November 14th through

25      November 17th.  This, again, was an opportunity
```

Rachel Kelly
September 02, 2020                                     123

```
1                  - RACHEL KELLY

2      for us to train all of the Store Managers, all of

3      the District Managers, and all of the Regional

4      Directors in greater detail with the training

5      guide.  And that had more of the additional

6      processes in place and new documents to share with

7      them at that training.

8                  So that was a two-hour session, and

9      we generally broke it up to about two districts at

10     a time, and they were facilitated in partnership

11     between the Partner Resources Managers, myself, I

12     believe Robyn shared and did some co-facilitation

13     at times and answered questions, and we conducted

14     those through the course of that week.

15                 On November the 17th, which was the

16     conclusion of that week, we compiled all of the

17     outstanding questions that arose during those

18     training sessions.  Things that we may not have

19     been able to answer in the moment or still wanted

20     to provide, like get clarity and calibrate on.  So

21     we compiled those as a Partner Resources team and

22     had a chance to work through those.  On November

23     17th, I followed up with an e-mail to the

24     regional -- I'm sorry, the District Managers and

25     the Regional Directors just outlining some of the
```

Rachel Kelly

September 02, 2020                               124

```
 1                    - RACHEL KELLY

 2      key things that we covered in the training in

 3      anticipation of the law going live on November the

 4      24th, and reinforcing some of the standards that

 5      were shared in those training sessions.  So more

 6      of an inform reinforcement of the time training

 7      that we provided.

 8                    That following Monday, on November

 9      the 20, we again just reviewed some of the

10      training materials with the regional leadership

11      team, talked through some those Q and A, and just

12      really talked about, you know, if there are any

13      needs or anything else that we wanted to put in

14      place leading up to the go live date.

15                    Then from there, the Fair Workweek

16      legislation went live on November the 24th.  So

17      the day that it went live, I sent a message to the

18      applicable stores, the District Managers, the

19      regional leadership team, again outlining key

20      components of the legislation, some of the key

21      points around our expectations, the processes, and

22      certainly opening the door that if they had

23      questions, to reach out to their leader, their

24      Partner Resources Manager.

25                    And then from there, the following
```

September 02, 2020                                125

```
 1                    - RACHEL KELLY
 2    week -- or I'm sorry, that was the go live date.
 3    The following week we opened it up to office
 4    hours, so each R&D lead had set up a working
 5    partnership with their PRM to, you know,
 6    communicate out and just hold some time on their
 7    calendar the following week to be available if
 8    questions were to come up.  And then, you know, I
 9    would say there are many updates, written
10    communication, reminders that were sent out via
11    e-mail either through myself or Tina.
12                    We also held a following -- we held a
13    make-up session to that training the first week of
14    December for anybody that might have missed that
15    Store Manager training that I had shared.  And
16    then from there, we would continue to, on a weekly
17    basis, provide the team with hypothetical -- when
18    I say team, I'm sorry, more specifically provide
19    Store Managers, District Managers, Regional
20    Directors either reinforcement to some of the
21    standards, updates if they were applicable,
22    scenarios, really teaching and guiding them on how
23    to handle situations as they arose.
24                    And then from there we did periodic
25    trainings, updates.  Specifically, you know, Tina
```

Rachel Kelly
September 02, 2020                                   126

```
 1                      - RACHEL KELLY

 2     would join huddles the RDs would have with their

 3     District Managers.  Tina would join huddles that

 4     DMs had with their Store Managers.  We would be

 5     out in the Field in stores actually going through

 6     and kind of checking the information and providing

 7     on-the-spot coaching and helping the teaching

 8     coach in more of a one-or-one or two-on-one basis.

 9     And certainly available all the time in regards to

10     questions.  And then we had kind of a sustainment

11     training plan from there.

12                    So hopefully that gives you a little

13     bit of an introduction of what we did to prepare

14     the team, but I can certainly provide

15     clarification if needed.

16          Q.    Did you ever go in person to Rafael

17     Fox's store for any purpose?

18          A.    I did not.

19          Q.    Who would -- created the written

20     training materials that you mentioned?

21          A.    So the Fair Workweek training guide

22     was created prior to me stepping into position.

23     So I don't know who collaborated to put that

24     together specifically.  Sandy Ellison, the person

25     that flew in from Seattle to lead the training,
```

Rachel Kelly
September 02, 2020                                           130

```
 1                    - RACHEL KELLY

 2    questions, but not in a formal way that I think

 3    you're asking about.

 4         Q.    You mentioned the date when the Fair

 5    Workweek Law I think you said went live on

 6    November 24, 2017; is that the correct date?

 7         A.    That is correct.

 8         Q.    Leading up to that time, did

 9    Starbucks have a plan in place to conduct audits

10    to assess compliance with the Fair Workweek Law by

11    stores upon the law taking effect?

12              MR. MOY:   Objection.

13         A.    Can you just clarify what you mean by

14    "audit."

15         Q.    Was this any mechanism planned

16    whereby you were planning to somehow ascertain

17    whether stores were complying fully with the new

18    regulations?

19         A.    Sure.  So there's a couple of ways

20    that we verify.  One is to physically go into the

21    stores and talk to the partners, talk to the

22    leaders, and physically check whether or not the

23    standards were in place; and that would be a part

24    of the DM's role and responsibility.  We talked

25    about the importance of leading this at a high
```

```
1                      - RACHEL KELLY

2      level and really all of us taking ownership

3      because of the importance in creating a great work

4      environment for our partners and taking that

5      collective ownership around this.

6              So we also talked about, you know,

7      RDs making sure they understood Partner Resources

8      Managers so that Tina certainly as a compliance

9      specialist so that they could go in and they could

10     check in with partners, follow up to the things

11     that we were putting in place.  So that was one.

12              Secondarily, we did put together an

13     audit in that Tina as part of her role would have

14     a consistent mechanism for evaluating the

15     standard, the processes and the protocols around

16     the Fair Workweek legislation and other components

17     tied to that; and so that was a formal audit that

18     she had in place.

19              From there, eventually we started to

20     recognize that that could be valuable for District

21     Managers as well.  So the DMs were given the audit

22     also to leverage, and the expectation for the

23     audit from a DM standpoint was that they would do

24     that periodically throughout the year based on

25     their cadence with their stores.
```

```
 1                    - RACHEL KELLY

 2                And I think those are probably the

 3        three main ways that we talked about kind of

 4        auditing issues better or validating that things

 5        were happening in our stores.

 6                And then we hadn't gotten to this

 7        yet, but we do a quarterly document collection in

 8        the region for the documents that are associated

 9        with the Fair Workweek legislation.  So once those

10        documents come in, we actually audit the documents

11        from there, and then provide feedback back to the

12        leaders so that they can go back into the stores,

13        circle back to the partners, the leaders, and

14        follow up in greater detail.  Those are some of

15        the mechanisms we had in place for validation and

16        follow-up.

17             Q.    When did the audits by Tina McDonald,

18        which were in the list that you just explained,

19        when did those audits begin?

20             A.    Yeah.  So we had more of an informal

21        audit, you know, that Tina did, right, where she

22        would go in and she would check the standards; and

23        then, as I said, eventually we had put the formal

24        audit in place.  So Tina started in her role on

25        November the 20th.  The law went live on the 24th,
```

Rachel Kelly
September 02, 2020                                            136

```
 1                    - RACHEL KELLY

 2         A.     So specifically the more formal

 3    audit.  So are you asking if she conducted a

 4    formal -- yeah, can you provide me a little more

 5    detail on what you're looking for there.

 6         Q.     Sure.  You said that there was a

 7    point in time when she began conducting more

 8    systematic audit mechanisms.  My question now is

 9    whether that point in time came prior to Mr. Fox's

10    separation or if it started after he was

11    separated?

12         A.     I -- I don't recall exactly.  I would

13    say it was around that time.  I don't recall

14    specifically if was right before, right after.

15         Q.     Is it fair to say that you're aware

16    of a complaint that was made about Mr. Fox related

17    to Fair Workweek compliance to the Department of

18    Consumer Affairs?

19         A.     Yes.

20         Q.     When did you first become aware of

21    the fact that that complaint had been lodged?

22         A.     I believe it was on January the 10th

23    of 2018.

24         Q.     Had Ms. McDonald begun conducting her

25    more formalized audits as of that date?
```

Rachel Kelly
September 02, 2020                                137

```
 1                     - RACHEL KELLY

 2                 MR. MOY:  Objection.

 3         A.    No.

 4         Q.    What, if any, involvement did you

 5    have in handling the complaint after you became

 6    aware of it?

 7         A.    Well, so once I was -- once I was

 8    made aware of it, I directed Tina and Brad to go

 9    to the store, to Rafael's store specifically to

10    look into the Fair Workweek standards and the

11    concerns.  I can't remember if we had the exact

12    concerns.  I don't recall what the partner shared

13    as their specific concern, but I know it went to

14    the Department of Consumer Affairs.  We were

15    informed, and I directed them to go in really to

16    evaluate the compliance around the Fair Workweek

17    standards.

18         Q.    Were you aware at that time of the

19    identity of the person who lodged the complaint?

20         A.    I don't believe so.  I don't -- I

21    don't recall knowing the name of the partner that

22    made the complaint.

23         Q.    Did you at some point in time come to

24    learn the name of the partner who made the

25    complaint?
```

Rachel Reilly
September 02, 2020                                    140

```
 1                    - RACHEL KELLY

 2     notes created the created by the Department of

 3     Consumer Affairs in connection with the interviews

 4     of Starbucks partners?

 5          A.    Not that I recall.

 6          Q.    You had mentioned I think that you

 7     became aware of the complaint on January 10th, and

 8     that you directed Tina McDonald and Brad Jennison

 9     to go to the store.  Do you know what date they

10     did that?

11          A.    I believe that was on -- I believe

12     they did that the following day, on January the

13     11th.

14          Q.    Did they report back to you after

15     they visited his store?

16          A.    They did.

17          Q.    Did they provide you with any written

18     summary of their visit?

19          A.    I -- yes.  And Robyn Ruderman was

20     also copied, and I do believe it was titled as

21     attorney-client privileged.

22               MR. GRAFF:  Now, for the record, to

23          the extent there is any nonprivileged

24          document of that sort, we'd request

25          production of all in writing as with other
```

```
 1                    - RACHEL KELLY

 2         requests during the deposition.

 3                    MR. MOY:  Off the record.

 4                    (Whereupon, a brief discussion was

 5         held off record.)

 6         Q.    Ms. Kelly, did Tina McDonald send you

 7    any communication detailing the facts that she

 8    gathered and observed while visiting Mr. Fox's

 9    store on January 11th?

10                    MR. MOY:  Objecting.

11         A.    Yes.

12         Q.    Was the e-mail that she sent you with

13    those facts also copied to legal counsel?

14         A.    Yes.

15         Q.    As best you recall, what were the

16    facts that Tina communicated to you based on her

17    visit on January 11th?

18         A.    So based on my recollection of her

19    visit to Rafael's store on January 11th, she had

20    identified that there were four schedules that

21    were posted under the -- posted late, so with less

22    than 14 days' notice.  She had also identified

23    that Rafael had hired a person into Starbucks

24    externally, and the internal partners that had

25    reached out who were interested in those hours,
```

Case 21-2531, Document 27, 01/21/2022, 3248030, Page118 of 311

```
 1                  - RACHEL KELLY

 2     that Rafael did not get back to them, did not

 3     respond to them.

 4               She also shared that predictability

 5     pay was not paid where it was to be incurred as

 6     aligned with those late schedules that I had

 7     previously mentioned.  And she also gave an

 8     example where Rafael had reached out to her and

 9     asked a specific question regarding a partner on

10     whether or not they were owed predictability pay;

11     and that she directed him to pay the partner.  But

12     upon visiting the store, had identified that he

13     never did pay that partner.  Sorry, go ahead.

14          Q.    Are all of these findings --

15          A.    So --

16          Q.    I'm sorry.  If you're not done

17     answering, please finish your answer.  I'm not

18     trying to speak over you.

19          A.    Yeah, no worries.  Yeah, there were

20     some additional requests -- additional components

21     as well.

22               She also stated that Rafael didn't

23     appear to be forthcoming around his violations of

24     the predictability pay.  When she was reviewing

25     the logs, the schedule change logs specifically,
```

Rachel Kelly
September 02, 2020                                    143

```
 1                    - RACHEL KELLY
 2      Rafael had been completing those logs as the Store
 3      Manager.  And she also noted that there was -- a
 4      partner consent was missing on a number of
 5      occasions as she reviewed those logs.
 6                    I know they also had some
 7      conversation and she talked with Rafael, but I --
 8      I wasn't there, so I can't speak to the specifics
 9      of those dialogues, but that was really the
10      overview of what she reported back.
11           Q.    And this is all information she
12      reported back based on her first visit on January
13      11th?
14           A.    The -- I'm not exactly sure when the
15      conversations happened with Rafael.  The
16      components that I shared around the late
17      schedules, the log and him not getting back to the
18      partners, and the question that he had asked, yes.
19      She did respond, yes she did share that.
20           Q.    Did Ms. McDonald make more than one
21      site inspection to Mr. Fox's store?
22           A.    I believe so.
23           Q.    When was the second such visit?
24           A.    I believe she went back the following
25      week, if I recall correctly.
```

Rachel Kelly
September 02, 2020                                              144

```
 1                      - RACHEL KELLY

 2          Q.    If I suggest that it might have been

 3     the 16th, does that ring a bell or you're not

 4     sure?

 5                MR. MOY:  Objection.

 6          A.    I believe it was the following week.

 7     I don't recall the exact day.

 8          Q.    In substance, what did Tina

 9     communicate to you about whatever new information

10     she discovered on that second visit?

11          A.    Yeah.  So I think in the second visit

12     it was more details around her findings, and I

13     believe that was -- I would be guessing.  I

14     believe that's when she shared more about her

15     conversations with Rafael.

16          Q.    Who was the associate who

17     Ms. McDonald had directed him to pay but hadn't

18     been paid?

19          A.    I don't recall that person's name,

20     I'm sorry.

21          Q.    Do you believe their name would be

22     documented in any of your written communications

23     with Ms. McDonald or others about this

24     investigation?

25                MR. MOY:  Objection.
```

Rachel Kelly
September 02, 2020                                      145

```
 1                   - RACHEL KELLY

 2         A.    Yes.

 3         Q.    One of the items you had mentioned

 4   was in connection with Mr. Fox allegedly not

 5   getting back to certain internal partners who

 6   wanted certain available positions.  Was it your

 7   understanding that there were any timely

 8   communications from partners who would have been

 9   eligible to take this position -- that position?

10         A.    It is my understanding that yes,

11   there were partners that had reached out and

12   expressed interest to Rafael.

13         Q.    Is there a period of time after

14   posting within which managers are required to

15   express interest if they're interested?

16         A.    If managers are or partners?  We're

17   talking about hourly partners.

18         Q.    Partners.

19         A.    So we're required to post the

20   opening, the recurring shift for three days in all

21   the stores in the respective borough.  There's not

22   a legal requirement on how long you have to wait

23   thereafter before you can make a hire.  However,

24   it is noted that preferential preference should be

25   given to internal partners who express interest
```

```
 1                    - RACHEL KELLY

 2     over hiring externally.  So it would be dependent

 3     on individual situations and the timing of that

 4     situation.

 5          Q.    Is it your understanding that there

 6     were partners who within the three-day posting

 7     period expressed interest and Mr. Fox did not

 8     respond?

 9          A.    So that wasn't my intention to

10     express that, if that was how you interpreted it.

11          Q.    I'm not --

12          A.    The posting -- okay.  The posting is

13     required to be up for three days so that partners

14     within the respective borough have an opportunity

15     to see it.  It's not expected that they are

16     required to reach out within that three-day time

17     frame, within a reasonable time frame.

18          Q.    Did you have any interaction with

19     Mr. Fox in connection with his hiring of an

20     outside person?

21          A.    I did via e-mail.

22          Q.    Can you describe the interaction.

23          A.    Yes.  So based on based on my

24     recollection, there were a couple of instances

25     that Rafael had e-mailed either asking questions
```

Rachel Kelly
September 02, 2020                                        151

```
 1                    - RACHEL KELLY

 2    subsequent visit, as far as you know, was she

 3    accompanied by anyone?

 4         A.    I don't recall either way.  Sorry, I

 5    don't recall.

 6         Q.    You had referred earlier to

 7    Ms. McDonald telling you about how there had been

 8    a prior e-mail and she had directed Mr. Fox to pay

 9    a partner, and she later determined the partner

10    hadn't been paid.

11         A.    Uh-huh.  That's correct.

12         Q.    Apart from that prior direction that

13    had been given prior to Tina's visits, did

14    Ms. McDonald tell you that she had directed

15    Mr. Fox to take any actions during either of her

16    visits?

17         A.    Can you clarify what you're looking

18    for in taking any actions?

19         Q.    Did Ms. McDonald direct Mr. Fox to

20    take any action to correct whatever problems she

21    identified?

22         A.    I wasn't there, so I don't know what

23    kind of information she shared with him at the

24    time.

25         Q.    Is it your understanding that Mr. Fox
```

```
 1                  - RACHEL KELLY

 2    with Tina.

 3         Q.    Did he share any information that was

 4    new or different than what Tina had already shared

 5    with you?

 6         A.    No.

 7         Q.    After Tina McDonald's second visit to

 8    Mr. Fox's store, which you said took place the

 9    week after January 11th, what is the next step or

10    thing that happened in the investigation process?

11         A.    Yeah.  I know the sequencing of the

12    details might just -- you know, I just want to put

13    that out there.  We also validated that Rafael

14    attended training, because this was a new law that

15    went into place.  We wanted to make sure that he

16    had, in fact, attended the training and had the

17    knowledge of the standards and of the expectations

18    that were set forth to Store Managers.  Brad did

19    validate that Rafael attended training on November

20    the 14th.

21              We also had Tina visit some other

22    locations in the district just to get an

23    understanding of, you know, how the standards and

24    expectations were being implemented across that

25    portfolio of stores, did a spot check in a couple
```

Rachel Kelly
September 02, 2020                                        155

```
 1                    - RACHEL KELLY

 2     of other locations within Tim's district.  And

 3     then, you know, I know there were certainly

 4     detailed follow-up conversations to, you know,

 5     validate.  I know Tina did a number of document

 6     collections so that we could report back to the

 7     Department of Consumer Affairs.

 8                    And so we really worked to put the

 9     information together in regards to responding to

10     that complaint.  And at some point it's my

11     understanding that Tina and/or Tim talked with

12     Rafael about these things that they had found in

13     the store really to get his perspective and to

14     understand hike what happened with some of these

15     instances.

16          Q.    I'd like to focus on the last thing

17     you just referred to, that at some point -- did

18     you say Tina McDonald or Tim Hutchinson met with

19     Rafael or did they meet together?

20          A.    I said Tim and -- Tina and/or Tim.  I

21     believe that Tina had conversations with Rafael.

22     I believe that Tim had conversations and there may

23     have been times where they did that together.

24     That's my understanding.

25          Q.    And what is the source or basis for
```

```
 1                    - RACHEL KELLY

 2      your belief and understanding that those

 3      conversations with Tina and Brad for Rafael's

 4      response to these things took place?

 5           A.    Could you repeat the question.

 6           Q.    Why is it --

 7           A.    Why is it that --

 8           Q.    -- those conversations happened as a

 9      matter of fact in the manner that you described

10      them?

11           A.    When we had further dialogue, they

12      noted specific -- sorry, Tina noted specific

13      things that Rafael had shared with her around

14      his -- some of these things that we had talked

15      about, right, the predictability pay or paying

16      partners and things like that.  The log.  So that

17      led me to the conclusion that Tina had a

18      conversation with him; and I believe that Tim also

19      did during the course of this time as well.

20           Q.    Did you ever review any documentation

21      describing those conversations?

22           A.    No.

23           Q.    During any of those discussions that

24      you believe happened involving Ms. McDonald, is it

25      your understanding that she directed Mr. Fox to
```

Rachel Kelly
September 02, 2020                                      157

```
 1                      - RACHEL KELLY

 2      take any particular action with respect to the

 3      items that she had found?

 4                  MR. MOY:  Objection.

 5           A.    I am not aware of any direction that

 6      Tina gave to Rafael in reference to the particular

 7      item.

 8           Q.    You had mentioned that Ms. McDonald

 9      also visited some other stores in the area.  How

10      many other stores did she visit?

11           A.    If I recall correctly, I believe it

12      was four.  Three or four.

13           Q.    And did she conduct those visits of

14      all three or four stores prior to Mr. Fox's

15      separation?

16           A.    Yes.

17           Q.    Do you remember specifically which

18      any of the four stores were?  Which stores they

19      were?

20           A.    I'm sorry, I don't.

21           Q.    Did Ms. McDonald provide any --

22      withdrawn.

23                  When Ms. McDonald visited those

24      stores, did she conduct a similar compliance audit

25      to what she had done on her visit to Mr. Fox's
```

Rachel Kelly

September 02, 2020                                    158

```
 1                    - RACHEL KELLY

 2      store?

 3                MR. MOY:  Objection.

 4          A.    I wasn't present, so I don't know

 5      specifically her approach.  She did report back on

 6      similar items as it relates to compliance.

 7          Q.    Could you describe in a little bit

 8      more detail what it is that she reported to you

 9      based on her visits to the other stores?

10          A.    Sure.  I don't recall the exact

11      details of each location.  She reported back

12      around store schedules, scheduling change logs,

13      postings of the shifts, the available shifts.

14      Schedules, as I said, predictability payments, and

15      I think general knowledge, the standards and

16      expectations.  This is what I recall.

17          Q.    Did Ms. McDonald communicate to you

18      that each of the stores that she had visited had

19      some of those problems?

20                MR. MOY:  Objection.

21          A.    I don't recall if each store had some

22      of those problems and how it was allocated amongst

23      the different stores.  There were definitely

24      opportunities around the execution of the

25      standards in some of the other locations that she
```

```
 1                  - RACHEL KELLY

 2     think it reiterated the importance of us to

 3     continue to visit stores on an ongoing basis; and

 4     provide that coaching and the shoulder-to-shoulder

 5     leadership to ensure that we got compliance and

 6     that we're addressing it as appropriate and

 7     understanding trends and themes that are

 8     happening.

 9                  MR. GRAFF:  I would just note briefly

10          for the record, I had some communication with

11          your colleague Rebecca Goldstein, Gary,

12          yesterday.  She had indicated there were

13          documents concerning the findings of

14          Ms. McDonald's audits of other stores that

15          had not been produced yet and would shortly

16          be produced.  I'm only noting that I haven't

17          received those, and this might be the point

18          in the deposition when I would have to

19          question the witness with the benefit of

20          those documents.

21     Q.     Back to questions, Ms. Kelly.

22                  MR. MOY:  One thing for the record.

23          Insofar as there are any other audits, you

24          can certainly ask the witness about those.

25     Q.     Ms. Kelly, was it your understanding
```

Rachel Reilly
September 02, 2020                                    162

```
1                    - RACHEL KELLY

2      that any of the compliance issues that

3      Ms. McDonald identified at Mr. Fox's stores

4      resulted in any partners being owed money?

5           A.     You said in Mr. Fox's stores.  In his

6      store?

7           Q.     In his store, yes.

8           A.     That is correct.  It is my

9      understanding that we did owe partners money.

10          Q.     Did Ms. McDonald pay them that money

11     upon identifying the problems?

12                 MR. MOY:  Objection.

13          A.     I don't know exactly who inputted the

14     pay adjustments to ensure that the partners were

15     paid.

16          Q.     At what point in time were the

17     partners paid?

18                 MR. MOY:  Objection.

19          A.     I don't have the exact date.  I would

20     say shortly thereafter, we concluded our

21     investigation.

22          Q.     Were the partners paid prior to

23     Mr. Fox's separation?

24                 MR. MOY:  Objection.

25          A.     I don't have that information, and
```

Rachel Reilly
September 02, 2020                          167

```
 1                    - RACHEL KELLY

 2      had found in the stores, and our standards, and

 3      how to ensure they could consistently comply with

 4      the Fair Workweek legislation.

 5           Q.    And apart from that verbal coaching,

 6      are you aware of any other disciplinary

 7      consequence imposed on any of those managers?

 8                 MR. MOY:  Objection.

 9           A.    Again, Tim would be the person that

10      would deliver disciplinary action, so you would

11      need to either speak with him about that or

12      someone else.  I wasn't involved in that.

13           Q.    Were you involved in identifying,

14      compiling information to provide to the Department

15      of Consumer Affairs in connection with its

16      investigation?

17                 MR. MOY:  Objection.  What

18           investigation, please?

19                 MR. GRAFF:  Of the Fair Workweek

20           complaint that we've been talking about.

21           A.    So just so I understand the question,

22      you're asking if I was involved in compiling

23      documents for the Department of Consumer Affairs

24      complaint that came out of Rafael's store against

25      him?
```

```
 1                    - RACHEL KELLY

 2          Q.    Yes.

 3          A.    That's the question?  Okay.

 4                I would say I had limited

 5    involvement.  Tina was really the primary person

 6    that was gathering the documents that were needed

 7    for it and, you know, I certainly saw some of them

 8    as we prepared to make our submission.  I was more

 9    involved in the general approach and how we would

10    respond, the timeline, making sure we had the

11    information available.  Tina really was the

12    primary person who produced the documents and put

13    them together in partnership with legal counsel.

14          Q.    As far as you know, was information

15    concerning Ms. McDonald's inspection of stores

16    other than Mr. Fox's provided to the DCA?

17          A.    Could you repeat the question.

18          Q.    As far as you know, were the

19    materials provided to the DCA limited solely to

20    Mr. Fox's store or did they include information

21    about the Fair Workweek noncompliance at other

22    stores as well?

23                MR. MOY:  Objection.

24          A.    So it's my understanding that the

25    complaint revolved around the person, and so it
```

Rachel Reilly
September 02, 2020                                            169

```
 1                   - RACHEL KELLY

 2     would be dependent on whether or not the person

 3     worked in other locations.

 4          Q.     As far as you know, did the

 5     Department of Consumer Affairs give any sort of

 6     direction as to what disciplinary consequence, if

 7     any, should be imposed on Mr. Fox?

 8          A.     Could you repeat the question.

 9          Q.     Did the Department of Consumer

10     Affairs make any recommendation or suggestion

11     concerning what form of discipline would be

12     appropriate for Mr. Fox?

13          A.     Not to my knowledge.

14          Q.     At some point in time, did

15     Ms. McDonald complete her investigation?

16          A.     Yes.

17          Q.     Do you remember what date Mr. Fox was

18     terminated?

19          A.     I believe it was February the 8th of

20     2018.

21          Q.     How long prior to the date of

22     termination did Ms. McDonald complete her

23     investigation?

24                 MR. MOY:  Objection.

25          A.     I don't know the exact date she
```

Rachel Kelly
September 02, 2020                                    170

```
 1                   - RACHEL KELLY

 2     completed her investigation.

 3          Q.     What was the next step in the process

 4     after Ms. McDonald had completed her fact finding

 5     investigation?

 6                 MR. MOY:  Objection.

 7          A.     So for charity, her investigation for

 8     the Department of Consumer Affairs complaint or

 9     Rafael's?

10          Q.     Thank you, that's an important

11     clarification.  I understood that Ms. McDonald

12     investigated Rafael's store and found certain

13     noncompliance issues, and that she reported those

14     issues to you, and that at some point she

15     completed the process of fact finding as to

16     Mr. Fox's store.  What is the next step in the

17     process that culminated in his termination?

18                 MR. MOY:  Objection.

19          A.     So as it -- so as it relates

20     specifically to Rafael, when we had culminated the

21     facts and information that we believe we needed to

22     the discuss the next step of corrective action

23     based on the findings, we did have a meeting to

24     discuss what was found as it relates to Rafael

25     specifically, as it relates to Fair Workweek
```

Rachel Kelly
September 02, 2020                                             171

```
 1                    - RACHEL KELLY

 2    compliance and his leadership in that regard.

 3         Q.    When you say that "we had a meeting,"

 4    who participated in that meeting?

 5         A.    Thank you for asking.  I apologize

 6    for not being clear.  It was myself, it was Brad

 7    Jennison, it was Tina McDonald, it was Carla

 8    Ruffin, and Robyn Ruderman was present as legal

 9    counsel.

10         Q.    When did that meeting take place?

11         A.    I don't recall the exact date.  I

12    apologize.  I didn't have it noted in my

13    notations, so I apologize.

14         Q.    Where did the meeting take place?

15    Were any of the participants physically gathered?

16         A.    In the New York regional office.

17         Q.    Were all of the individuals who you

18    identified as participants physically present for

19    the meeting?

20         A.    I believe -- I'd be guessing.  I

21    believe Brad may have joined by phone.

22         Q.    Who made the final decision to

23    terminate Mr. Fox?

24         A.    Carla Ruffin.

25         Q.    During that final meeting, did
```

Rachel Kelly
September 02, 2020                                              172

```
 1                  - RACHEL KELLY

 2    Ms. McDonald provide any documents or records from

 3    her investigation for anybody to review as part of

 4    the meeting?

 5         A.    I recall her having them available.

 6    I don't recall specifically the documents, if they

 7    were reviewed or not.

 8         Q.    Was --

 9         A.    At that meeting.  At that meeting.

10    Sorry.

11         Q.    Was there a draft or already written

12    termination letter for Mr. Fox at that meeting?

13         A.    No.

14         Q.    Was somebody directed to draft such a

15    letter?

16         A.    So once the decision was made that

17    Rafael was going to be separated, the direction

18    was that Brad, the partner -- Brad Jennison, the

19    Partner Resources Manager, would work in

20    partnership with Carla to draft the separation

21    notice.  That was the direction at that time.

22         Q.    What were the reasons for terminating

23    Mr. Fox?

24         A.    Yeah.  So the reasons for

25    termination, for separation, he was separated as
```

Rachel Reilly
September 02, 2020                                    173

```
 1                    - RACHEL KELLY

 2     an involuntary separation for policy violation,

 3     other; and the details of that separation and led

 4     to the decision for separation would be as

 5     follows:  First, Rafael failed to post four

 6     schedules with the appropriate time expectations

 7     of three weeks' notice.  As a result of that

 8     investigation, we had identified that.  And

 9     subsequently, based on those schedules, there were

10     partners who were owed predictability pay that

11     Rafael had not paid.

12               Secondly, Rafael was -- was

13     completing the schedule change log on behalf of

14     other partners; and so it's our standard that

15     partners sign off and consent to the schedule

16     changes and that we have that documented.  There's

17     business initiated changes and there's partner

18     initiated changes, and so the partner's consent in

19     those logs, excuse me, is a critical component in

20     identifying that.

21               Thirdly, Rafael was hooking to hire,

22     and he had partners express interest in wanting

23     the hours that he had available.  Rafael made the

24     decision to hire externally without meeting with

25     the interim partners or getting back to them as
```

Case 21-2531, Document 27, 01/24/2022, 3248030, Page138 of 311

A-427

```
 1                    - RACHEL KELLY

 2     they expressed interest in the hours that he had

 3     available in his store.  And in addition to that,

 4     during points of the investigation, others have

 5     had interactions with Rafael where they didn't

 6     feel he was being transparent, and that he wasn't

 7     being forthcoming with information.  And

 8     specifically by signing logs on behalf of his

 9     partners, not paying predictability pay when he is

10     given direction to by Tina, the compliance

11     specialist, that was a big concern for us, and

12     that really spoke to his integrity and it breached

13     the leadership trust in that he would actually

14     read these standards and the law in his store in a

15     way that we could trust.

16                    And so the combination of all of the

17     violations in the Fair Workweek, his lack of

18     transparency in parts of the investigation, and

19     ultimately that integrity piece where he wasn't,

20     you know, completing activities in a way that we

21     would expect of a Store Manager, the combination

22     of all of those violations is what led to the

23     decision for separation for Rafael.

24          Q.    In the absence of that final what you

25     call transparency and integrity piece, would he
```

Rachel Kelly
September 02, 2020                                          175

```
 1                    - RACHEL KELLY

 2    have been terminated for the other violations that

 3    you described?

 4              MR. MOY:  Objection.

 5         A.    It would be difficult for me to

 6    speculate the outcome.  In a lot of these

 7    situations and circumstances, we're evaluating the

 8    standard, we're evaluating the legal implications,

 9    the impact on the work environment and to other

10    partners, the brand.  So it would be difficult for

11    me to speculate.  While I noted earlier there were

12    other opportunities in other stores, the managers

13    were more forthcoming in taking actions to make

14    corrections and open to coaching.

15              Rafael, it was a big differentiator

16    with him in that he wasn't following the guidance

17    that he was being given, and that puts our partner

18    experience at risk in our stores, and quite

19    frankly the brand.

20         Q.    Other than Ms. McDonald, were there

21    any other individuals who provided you information

22    supporting the conclusions about transparency and

23    integrity?

24         A.    Yes.

25         Q.    Who else?
```

```
 1                    - RACHEL KELLY

 2        A.    Carla shared an example of when she

 3   had visited the store and she had asked about

 4   posted schedules, because to my understanding,

 5   again, I wasn't present, but based on what she

 6   shared, there wasn't a date printed on the

 7   schedule.  And when she had some conversation with

 8   him about it, it's my understanding that she

 9   didn't feel as though he was being transparent.

10              Our schedules automatically print a

11   date on them, so I'm not sure how it came about in

12   that particular instance and the details around

13   it, but Carla felt as though Rafael was not

14   transparent and that there was an integrity

15   concern there.

16        Q.    Beside that concern that Ms. Ruffin

17   had encountered personally, she personally

18   discovered the date from the schedules and

19   interacted with Mr. Fox and reached her

20   conclusions from his responses?

21              MR. MOY:  Objection.

22        A.    Again, this was her personal

23   experience that she had shared with me.  So I

24   don't have any other information other than that.

25        Q.    I just wanted to confirm that it was
```

Rachel Kelly
September 02, 2020                                    177

```
1                    - RACHEL KELLY

2    her firsthand experience and not anecdotal.

3         A.    Yes, that's correct.

4         Q.    Other than Ms. McDonald and

5    Ms. Ruffin as you just described, did any other

6    individuals provide any other information going to

7    the conclusions of lack of transparency and

8    integrity?

9         A.    No, only Tina and Carla.

10        Q.    Did Ms. McDonald inform you or

11   communicate in any way that she had a

12   communication with Mr. Fox concerning Hot Shots?

13        A.    During that meeting?

14        Q.    Ever.

15        A.    After Rafael's separation and after

16   this case was brought forward, she did share that

17   with me.

18        Q.    During that meeting.  Does that mean

19   she didn't share it at that time?

20        A.    She did not.

21        Q.    During that meeting, did anybody make

22   reference to Mr. Fox's involvement in any respect

23   in correcting wage issues at the West Broadway and

24   Leonard store in connection with time log

25   manipulation?
```

Rachel Kelly
September 02, 2020                                          178

```
 1                    - RACHEL KELLY

 2        A.     No.

 3        Q.     Did you have any input into the

 4   language of the notice of separation?

 5        A.     I -- so I just want to kind of back

 6   up.  So earlier I said that the direction was

 7   given that Brad would work in partnership with

 8   Carla to craft the separation notice.  Brad was

 9   taking time off the following week.  Lisa Welch,

10   who was his peer PRM in the region reached out to

11   me to help get some insight on the information

12   that would support the separation document.

13            That is an attorney-client privileged

14   communication, so I just want to note that in that

15   I did provide the facts as I saw them, and it was

16   still waiting on legal advisement from Robyn

17   Ruderman, who was also included in that.  So I did

18   outline -- I'm sorry, were you going to ask a

19   question?

20        Q.     No.

21        A.     I did outline the violations as we

22   had discussed from the meeting.  The first spoke

23   to the Starbucks standard of not having schedules

24   posted within three weeks.  Then I went into the

25   legal violations, starting with the schedules that
```

Rachel Kelly
September 02, 2020                                    181

```
 1                     - RACHEL KELLY

 2    would also presume that Amanda Perstack was

 3    present.

 4         Q.    Did Tim Hutchinson participate in the

 5    meeting at which it was decided to terminate

 6    Mr. Fox's employment?

 7         A.    He did not.

 8         Q.    Did anyone provide Mr. Hutchinson

 9    with any information apart from what's stated in

10    the termination letter concerning the basis for

11    Mr. Fox's termination?

12              MR. MOY:  Objection.

13         A.    I did not, and I do not know for

14    certainty if anyone else did or what was shared

15    specifically with Tim Hutchinson.

16         Q.    Do you have any information about the

17    substance of what occurred during the termination

18    meeting?

19         A.    No.

20         Q.    Generally when a Store Manager is

21    involuntarily separated, is there a standard exit

22    interview or some kind of outgoing process that's

23    followed?

24              MR. MOY:  Objection.

25         A.    No.
```

September 02, 2020                          183

```
 1                    - RACHEL KELLY

 2      issued written warnings.  I don't know with

 3      certainty all of those people that have been

 4      issued written warnings.  A written warning is a

 5      level of disciplinary action that wouldn't

 6      necessarily come to my level or that I would have

 7      consistent visibility to.  So I wouldn't be able

 8      to provide a complete list of people who have

 9      received a written warning as it relates to the

10      Fair Workweek legislation.

11           Q.    Were any Store Managers in New York

12      other than Mr. Fox terminated in connection with

13      noncompliance with Fair Workweek requirements?

14           A.    Yes.

15           Q.    How many other managers were

16      terminated?

17           A.    Including Rafael, in the first year

18      there were nine managers including Rafael.

19           Q.    You may have already indicated, but

20      approximately how many stores in New York were

21      subject to the Fair Workweek Law?

22                 MR. MOY:  Objection.

23           A.    I believe on or about that time,

24      there were approximately 315 stores.

25           Q.    Were you involved in the decision to
```

Rachel Kelly
September 02, 2020                                                    185

```
 1                    - RACHEL KELLY

 2              So I don't know that I could provide

 3        a specific answer around the details and if there

 4        were any other factors that came into the

 5        decision.

 6        Q.     When is the first time that a Store

 7        Manager was terminated in connection with Fair

 8        Workweek compliance after Mr. Fox?

 9              MR. MOY:  Objection.

10        A.     On March the 1st of 2018.

11        Q.     And when is the most recent time?

12        A.     I wouldn't be able to speak to that

13        because I'm no longer overseeing that region.

14        Q.     Do you recall the locations of any of

15        the eight stores where the managers were

16        terminated?

17        A.     I don't recall the exact stores, but

18        I recall that in -- since they were nine including

19        Rafael's, six of those nine were in area 76, which

20        was Ron Shuler's area.  Two of those were in Kate

21        McShane's area, which is area 82; and Rafael was

22        the one in area 146.

23        Q.     To the best of your memory, have you

24        ever met Jill Shwiner?

25        A.     No.  Well, we haven't met personally,
```

Rachel Reilly
September 02, 2020                                    201

```
 1                 - RACHEL KELLY

 2        Q.     Was his new employment with a

 3   different employer?

 4        A.     Yes.

 5        Q.     Is Brad Jennison eligible for rehire

 6   if he were to apply for Starbucks?

 7        A.     Did you say eligible or ineligible?

 8        Q.     Eligible.

 9        A.     Brad is eligible for rehire based on

10   my recollection, yes.

11        Q.     You had mentioned earlier that at

12   some point after the termination meeting,

13   Ms. McDonald communicated something to you about a

14   communication she'd had with Mr. Fox concerning

15   Hot Shots.  Do you recall what I'm referring to?

16        A.     Yes.  And I just want to provide

17   clarity.  It was after the separation of Rafael.

18   It wasn't after the investigation.  After the

19   separation of Rafael.

20        Q.     Okay.  What did Ms. McDonald

21   communicate to you at that time?

22        A.     It was my understanding that Rafael

23   shared with Tina that he had a concern about

24   managers or other stores having Hot Shots in their

25   stores, and that they were not an approved item
```

Rachel Kelly
September 02, 2020                                    204

```
1                        - RACHEL KELLY

2              break so that I can prepare.  Before we do

3              take a break, however, I do want to formally

4              request the opportunity for the witness to

5              review the transcript according to Rule 30E

6              of the Federal Rules of Civil Procedure.

7                        MR. GRAFF:  Noted.

8                        MR. MOY:  So can we reconvene around

9              6:53?

10                       MR. GRAFF:  Sure.

11                       MR. MOY:  Thank you all.

12                       (Whereupon, there was a brief recess

13             in the proceedings.)

14             Q.     Ms. Kelly, did you communicate with

15       anyone other than counsel during the break?

16             A.     No.

17             Q.     Did you read anything?

18             A.     No.

19             Q.     Before the break, we've been talking

20       about a communication you had with Ms. McDonald in

21       which she relayed to you a communication she'd had

22       with Mr. Fox concerning his concern about Hot

23       Shots.  At what in time was that communication

24       between you and Ms. McDonald?

25             A.     Once I was informed of that in the
```

Rachel Reilly
September 02, 2020                                                 205

```
 1                      - RACHEL KELLY

 2      case, when it was raised in the case, I asked Tina

 3      about it.  So the communication happened after I

 4      was informed of this legal case.

 5              Q.    And the lawsuit, as we saw in the

 6      last exhibit, was filed May 21, 2019.  Was it

 7      after that date that you had the communication

 8      with Ms. McDonald?

 9              A.    Yes, I believe so.

10              Q.    Without getting into any of the

11      substance, there had been a meeting between the

12      parties before the lawsuit was filed that included

13      you as a participant.  Do you recall the event I'm

14      referring to?

15              A.    I do.  So --

16              Q.    Did the communication with

17      Ms. McDonald happen before or after that meeting?

18              A.    Yes.  So I would like to correct what

19      I shared.  Once I was aware of the concerns that

20      were brought in the legal case, so I don't know

21      the exact terminology, and I apologize, as I said

22      before, I didn't have the exact date, I believe --

23      I believe I was aware, yes, before we -- I would

24      be guessing at this point.  I don't recall for

25      sure.  Once I was informed through one of the
```

Rachel Reilly
September 02, 2020                                          206

```
 1                    - RACHEL KELLY

 2   legal conversations about this case or legal

 3   documents about this case, I asked Tina about it.

 4        Q.    Just in terms of points of time.  At

 5   a certain point in time prior to the lawsuit, I

 6   sent a letter to counsel for the company.  Was

 7   your communication with Tina before or after that

 8   letter, if you know?

 9              MR. MOY:  Objection.

10        A.    Again, I don't recall the exact

11   timing, and I don't know the date of that letter.

12   Yeah.

13        Q.    I first wrote to the company around

14   October 2017.  You know if the communication with

15   Tina was before or after that date?

16              MR. MOY:  Objection.  Ari, just

17         clarify the year.

18        Q.    October 2018.

19        A.    Yeah.  So I don't recall

20   specifically.  It would have been in relation to

21   this case, you know, the first instance that it

22   was put in writing to us that Rafael had made that

23   concern as part of this legal case.

24        Q.    Thank you.  I have nothing else at

25   this time, but I may have some more questions
```

```
 1                    - RACHEL KELLY

 2     separation is noted in our system as involuntary

 3     deficient performance.  I believe as terms of his

 4     agreement, it is voluntary in lieu of separation.

 5          Q.     And again, this is -- I just want to

 6     clarify.  Is it your testimony that

 7     Mr. Hutchinson's separation pursuant to the

 8     separation agreement is considered a voluntary

 9     separation?

10               MR. GRAFF:  Objection.

11          A.     That is correct.

12          Q.     Moving on with respect to

13     Mr. Hutchinson, do you recall that during the

14     course of this deposition, Mr. Graph asked

15     questions about your conversation with Les Sable

16     and Mr. Hutchinson concerning Mr. Fox's alleged

17     reports of underpayment of wages?

18          A.     Yes, I do.

19          Q.     When did this conversation occur with

20     Mr. -- with Mr. Sable and Mr. Hutchinson?

21          A.     It was after the separation of Rafael

22     Fox when we were informed that this concern was

23     raised by Rafael, again, through these legal --

24     through this legal case.

25          Q.     Sitting here today, do you recall
```

```
 1                   - RACHEL KELLY

 2      whether this conversation with Mr. Sable and/or

 3      Mr. Hutchinson occurred before or after the

 4      commencement of litigation by Mr. Fox?

 5                   MR. GRAFF:  Objection.

 6           A.      So specifically when you mean

 7      commencement, can you share what you mean by that.

 8           Q.      Well, as you testified earlier today,

 9      Mr. Fox filed a complaint for legal action

10      concerning his termination of employment, correct?

11           A.      That is correct.

12           Q.      And you also testified a few moments

13      ago that you had conversations with Mr. Sable

14      and/or Mr. Hutchinson concerning Mr. Fox's reports

15      of alleged underpayment of wages; is that correct?

16           A.      That's correct.

17           Q.      I understand that based on your

18      testimony, the conversations with Mr. Sable and/or

19      Mr. Hutchinson occurred after Mr. Fox's separation

20      from Starbucks; however, my question now is did

21      your conversation or conversations with Mr. Sable

22      and/or Mr. Hutchinson occur before or after this

23      litigation relating to the complaint filed by

24      Mr. Fox?

25                   MR. GRAFF:  Objection.
```

Rachel Kelly
September 02, 2020                                    210

```
 1                       - RACHEL KELLY

 2        A.     After.

 3               (Whereupon, there was a brief recess

 4        in the proceedings.)

 5        Q.     Did you have knowledge at the time of

 6   Mr. Fox's termination whether he had concerns

 7   about alleged underpayment of wages to store

 8   employees?

 9               MR. GRAFF:  I said objection.

10        A.     No.

11        Q.     Ms. Kelly, sitting here today, do you

12   recall whether your conversations with Mr. Sable

13   and/or Mr. Hutchinson about Mr. Fox's reports

14   concerning alleged underpayment of wages occurred

15   before or after Mr. Graff sent a prelitigation

16   letter to Starbucks, if you are aware of any such

17   letter to Starbucks?

18               MR. GRAFF:  Objection.

19        A.     Based on my knowledge, after.

20        Q.     Similarly, sitting here today, do you

21   recall whether this conversation that you had with

22   Mr. Hutchinson and/or Mr. Sable concerning

23   Mr. Fox's report of alleged underpayment of wages

24   occurred before or after Mr. Fox filed a legal

25   action at issue in this case?
```

Rachel Kelly
September 02, 2020                                          211

```
1                     - RACHEL KELLY

2                MR. GRAFF:  Objection.

3       A.    So I just want to be clear that I

4    understand the question.  So in between the first

5    time that the demand letter was sent and a formal

6    filing of the legal case; am I understanding that

7    correctly?

8       Q.    Correct.

9       A.    Again, based on my recollection, I do

10   believe it was within that time frame.

11      Q.    It was somewhere in between?

12      A.    So after the -- if it was outlined in

13   the demand letter, whenever the first time it was

14   outlined in writing and I was made aware of it, I

15   would have subsequently had the conversation

16   thereafter.

17      Q.    Do you recall having knowledge of

18   such a demand letter sent by Mr. Graph on behalf

19   of the plaintiffs in this case?

20                MR. GRAFF:  Objection, vague as to

21        time.

22      A.    It would have been in conversation

23   with legal counsel.  So based on my recollection,

24   I do believe, unless there another document or

25   something that was shared before I was informed.
```

```
 1                    - RACHEL KELLY

 2    that there was a wage and hour issue reported by

 3    Mr. Fox?

 4              MR. GRAFF:  Objection.

 5         A.    I don't have that information.  I

 6    don't know when Carla was made aware.

 7         Q.    What is the basis for your

 8    understanding that Ms. Ruffin was aware that there

 9    was a wage and hour issue reported by Mr. Fox?

10         A.    I don't -- I don't recall for certain

11    information around when Carla was made aware of

12    that.

13         Q.    Well, sitting here today, do you

14    recall Ms. Ruffin ever reporting to you around the

15    time of Mr. Fox's termination that Mr. Fox

16    reported an alleged underpayment of wages to other

17    Starbucks employees?

18         A.    No, Carla never reported it to me.

19         Q.    I'm going to refer you to a line of

20    questioning by Mr. Graff regarding the discipline

21    of Starbucks employees.  There is verbal and

22    written discipline, correct?

23         A.    Correct.

24         Q.    You are not aware of -- you as

25    partner -- sorry.  You as the Director of Partner
```

A-444

Rachel Kelly
September 02, 2020                                    214

```
 1                    - RACHEL KELLY

 2    Resources for the New York Metro region was not

 3    aware of every single instance of a verbal

 4    discipline, correct?

 5         A.    That is correct.

 6         Q.    As the Director of Partner Resources,

 7    were you aware of every single instance of a

 8    written warning?

 9         A.    No.

10         Q.    Were you expected to be aware of

11    every single instance of a verbal or written

12    warning involving a Starbucks employee?

13         A.    No.  No.

14         Q.    Were you ever made aware of any

15    specific Starbucks employee who was found to have

16    authorized the use of Hot Shots?

17         A.    No.

18         Q.    Prior to this litigation, were you

19    ever made aware of any specific Starbucks

20    employees who was found to have used Hot Shots?

21         A.    No.

22         Q.    And to clarify, sitting here today, I

23    mean, just to clarify.  At the time of Fox's

24    termination, were you aware of any reports of

25    underpayment of wages or the use of Hot Shots by
```

Rachel Reilly
September 02, 2020                                    215

```
 1                    - RACHEL KELLY

 2     Mr. Fox?

 3          A.    No.

 4          Q.    Were there any other Store Managers

 5     who were under investigation by the New York City

 6     Department of Consumer Affairs around the time of

 7     Mr. Fox's termination?

 8               MR. GRAFF:  Objection.

 9          A.    Not that I recall.

10          Q.    No further questions.

11               MR. GRAFF:  I have just a couple of

12          follow-ups.

13     EXAMINATION BY MR. GRAFF:

14          Q.    Ms. Kelly, is there any sort of

15     document at Starbucks like a corrective action

16     matrix or some sort of chart that describes

17     different categories of infractions and correlates

18     them to particular types of appropriate

19     discipline?

20          A.    We do -- we do have what's called a

21     virtual coach, and this is a tool that you can go

22     on and work through different scenarios, and it

23     could provide a recommendation or examples; and it

24     also would outline instances where they would

25     recommend you reach out to either a local Partner
```

August 27, 2020                                              64

```
 1                    - TINA McDONALD -
                        Tina McDonald
                       August 27, 2020
 2          Q.     Did you ever have occasion to

 3     terminate any employees when you were a store

 4     manager?

 5          A.     Yes, I did terminate.

 6          Q.     How many approximately?

 7          A.     I can't -- I can't really recall a

 8     specific number, to be fully honest over that many

 9     course of years, honestly.

10          Q.     Other than termination what, if any,

11     other forms of corrective or disciplinary action

12     did you have the authority to take as the store

13     manager?

14          A.     As a store manager you're responsible

15     for coaching, which could be a conversation with a

16     partner.  Coaching could also come in the form it

17     could be documented, so it could be on an actual

18     corrective action form of you documenting a

19     partner's policy violation.

20          Q.     Any other forms of discipline?

21          A.     Aside from corrective action as far

22     as in the documentation form, as well as --

23          Q.     Yes, under --

24          A.     Go ahead, I'm sorry.

25          Q.     I didn't want to speak over you.
```

August 27, 2020                                    65

```
 1            - TINA McDONALD -
                  Tina McDonald
                 August 27, 2020
 2    Please continue.

 3         A.    I just want to clarify.  So you're

 4    saying outside of documenting policy violations or

 5    having coaching conversations and as far as

 6    separations, besides that?

 7         Q.    Yes, let me clarify.  Other than

 8    termination, verbal coaching, written

 9    documentation of coaching, are there any other

10    disciplinary measures or types of things that you

11    could do to correct performance problems in your

12    store?

13         A.    No.  Those would be the standard

14    processes as far as coaching, forms of corrective

15    action, or/and it could be, depending on what it

16    is, including separation.

17         Q.    Did you receive training into how to

18    determine what degree of discipline should be

19    meted out for any particular offense?

20            MR. MOY:  Objection.

21         A.    Can you clarify more about that,

22    please?

23         Q.    How was it that you came to know

24    whether a particular conduct should be met with

25    termination versus a verbal coaching versus a
```

U.S. LEGAL SUPPORT
(877) 479-2484

August 27, 2020                                    66

```
 1                    - TINA McDONALD -
                          Tina McDonald
                         August 27, 2020
 2       documented written coaching; how did you know

 3       which to pick?

 4                  MR. MOY:  Objection.

 5           A.    So at Starbucks they provide you

 6       with -- we have a partner resources, partner

 7       contact system that we're able to call in to

 8       receive guidance in regard to disciplinary actions

 9       with partners to ensure that we're fair and

10       consistent and what's the precedent, because they

11       have information to how similar violations are

12       being handled across the U.S. business.

13           Q.    Do you believe that consistency in

14       that respect is important?

15                  MR. MOY:  Objection.

16           A.    I think I'm going to need you to

17       expound a little bit more on that specific

18       question.

19           Q.    Why do you believe that

20       Starbucks -- withdrawn.

21                  For what purpose do you believe that

22       Starbucks maintains processes designed to try to

23       keep consistency in the form of discipline meted

24       out for similar conduct in different incidents?

25                  MR. MOY:  Objection.
```

U.S. LEGAL SUPPORT
(877) 479-2484

```
                        - TINA McDONALD -
```
Tina McDonald
August 27, 2020                                    67

```
 1                      - TINA McDONALD -

 2         A.    That -- well, to be honest, I cannot

 3    speak to why let's say the -- I can't speak to all

 4    the decisions that are made.  I just -- cause

 5    that's not necessarily my area of expertise in

 6    regard to every decision that is made that comes

 7    down, so I can't definitively give you an answer

 8    on that.  You know, I just know that, you know, as

 9    far as our company values it's important for us to

10    be fair and consistent.

11         Q.    In connection with hiring employees

12    for either of your stores, if an employee had been

13    terminated from their immediate prior employer for

14    the same or similar reasons to your being

15    terminated at Best Buy, would that have

16    categorically disqualified such an employee from

17    being hired by you?

18              MR. MOY:  Objection.

19         A.    What exactly -- can you be more clear

20    on what exactly you're asking me?

21         Q.    Sure.  If you're considering a

22    candidate to be say a barista and you found out

23    that they had been terminated from their past job

24    of many years, would you still consider them

25    eligible as a candidate?
```

Tina McDonald
August 27, 2020                                   69

```
 1              - TINA McDONALD -

 2         I'm going to instruct the witness not to

 3         answer.  This is getting to the point of

 4         being harassing, outside the scope of this

 5         deposition.  Move on.

 6              MR. GRAFF:  I disagree.  If I can get

 7         an answer to this question, I would be able

 8         to move on.  There's a question pending.

 9              MR. MOY:  There is -- she's

10         already -- you've already asked her about

11         this issue.  Unless you can actually tie it

12         to an issue in this case, this is going far

13         outside the scope of the deposition.  I'm

14         going to allow the witness to answer, but

15         going forward I'm going to be shutting down

16         this rabbit hole because this is getting

17         ridiculous.

18              MR. GRAFF:  Reject to your

19         characterizations, but you can guide yourself

20         as you wish.  If the witness could answer

21         this question, please.

22    A.       Okay, could you repeat the question.

23              MR. GRAFF:  Could the court reporter

24         read back my last question, please.

25              (The question requested was read back
```

August 27, 2020                                                    1

```
1                      - TINA McDONALD -

2      UNITED STATES DISTRICT COURT

3      SOUTHERN DISTRICT OF NEW YORK

4      -------------------------------X

5      FOX, ET AL.,

6                  V.              CIVIL CASE NO.

7                              1:19-CV-04650-AJN-SN

8

9      STARBUCKS CORPORATION,

10                 Defendant.

11     -------------------------------X

12     DATE:  August 27, 2020

13     TIME:  10:00 A.M.

14

15            VIDEOCONFERENCE DEPOSITION OF TINA

16     McDONALD, pursuant to Notice, before Hope Menaker,

17     a Shorthand Reporter and Notary Public of the

18     State of New York.

19

20

21

22

23

24

25
```

Case 21-2531, Document 27, 01/21/2022, 3248030, Page163 of 311

A-452

Tina McDonald
August 27, 2020                                                    109

- TINA McDONALD -

1                    August 27, 2020

                  - TINA McDONALD -

2        Q.    Did your compensation change at all

3    in connection with your transferring from 75th to

4    69th and First?

5        A.    Yes, it did.

6        Q.    In what way did it change?

7        A.    I received an increase.

8        Q.    What was your salary after you

9    transferred?

10       A.    That I don't recall, specifically

11   what my salary became after transferring there.

12       Q.    Do you know what your total

13   annualized compensation was subsequent to your

14   transferring?

15            MR. MOY:  Objection.

16       A.    That -- I honestly don't recall that

17   far back, what it was.

18       Q.    How did you come about obtaining the

19   first human resources or partner resources

20   position that you attained?

21            MR. MOY:  Objection.

22       Q.    I'll ask a different question.  What

23   job did you take after you stopped being a manager

24   at 69th and First?

25       A.    I took the role of the senior HR

Case 21-2531, Document 27, 01/21/2022, 3248030, Page164 of 311

**A-453**

August 27, 2020                              110
Tina McDonald

                    August 27, 2020
1                    - TINA McDONALD -

2       compliance specialist.

3            Q.     Was that in November, 2017?

4            A.     That was in November, 2017.  Yes,

5       that's correct.

6            Q.     Did you apply for that position?

7            A.     I did apply for that position.

8            Q.     What prompted you to apply?

9            A.     I was made aware of the opportunity.

10           Q.     How did you go about applying?

11           A.     I communicated my interest to my

12      district manager.

13           Q.     How did you become aware that there

14      was an available position?

15           A.     If I recall correctly, my district

16      manager made me aware.

17           Q.     What did you have to do to apply?

18           A.     I had to go through an interview

19      process.  I had to submit a resume.

20           Q.     Anything else?

21           A.     At this time, I can't recall

22      anything.  I just remember the interview process

23      and the resume.

24           Q.     Who interviewed you, what was the

25      interview process?

Tina McDonald
August 27, 2020                                        112

```
1                    - TINA McDONALD -

2          the communication was intended to seek legal

3          advice or, in fact, resulted in legal advice?

4                   MR. MOY:  I think it all depends on

5          the context.

6                   MR. GRAFF:  Okay.

7          Q.    Ms. McDonald, did anyone explain to

8     you in the context of your interview why legal

9     counsel was participating?

10         A.    Yes, I believe it was explained.

11    Possibly, yeah.

12         Q.    What was the explanation, if you can

13    recall it?

14         A.    As I recall it was because

15    this -- the role of the HR senior compliance

16    specialist was in relation to a new legislation

17    that was going to be coming into effect.  The Fair

18    Workweek legislation was centered around

19    scheduling compliance and had different legal

20    components to it.

21         Q.    How were you informed that they were

22    offering you the position?

23         A.    I was contacted by Rachel Kelly.

24         Q.    At any point, did you receive a

25    written job description for your new position?
```

Tina McDonald
August 27, 2020                                           113

```
 1                    - TINA McDONALD -

 2         A.      Yes, I did.

 3         Q.      Was that before you started in the

 4    position or something else?

 5         A.      That was -- I can't recall.

 6         Q.      Upon becoming senior compliance

 7    specialist, who was your immediate supervisor?

 8         A.      I reported into Rachel Kelly.

 9         Q.      Did you report to anyone else

10    directly or indirectly?

11         A.      No.

12         Q.      As senior compliance specialist, did

13    anyone report to you as their supervisor?

14         A.      No.

15         Q.      As far as you know, were you the only

16    senior compliance specialist in New York at the

17    time that you held that position or is it

18    something that there were multiple individuals in

19    that capacity?

20         A.      To my knowledge, I was the first

21    senior compliance specialist.

22         Q.      During what period of months or years

23    did you hold that position?

24         A.      From November, 2017 to November,

25    2018.
```

Tina McDonald
August 27, 2020                                    114

```
                       August 27, 2020
 1                   - TINA McDONALD -

 2        Q.      Did you receive a raise when you

 3    became the senior compliance specialist relative

 4    to being a store manager?

 5        A.      No, I did not receive a raise1.

 6        Q.      Do you have an understanding of why

 7    it was that -- withdrawn.

 8             Could you describe your duties and

 9    responsibilities as a senior compliance

10    specialist?

11        A.      As a senior compliance specialist I

12    was responsible for supporting compliance with the

13    Fair Workweek legislation and what that entailed

14    was assuring that schedules are posted with 14

15    days' notice to partners; partners had access -- a

16    greater access to hours through available shift

17    posting; partners were paid schedule change

18    premiums in line with their schedule changes that

19    they maybe had received; partners were required to

20    receive an 11-hour rest between shifts.

21             And so that was something

22    additionally that I had to be responsible for, as

23    well as ensuring that partners completed a good

24    faith estimate form when they had availability

25    changes or were, upon hire, to support
```

Tina McDonald
August 27, 2020                                    115
Tina McDonald
August 27, 2020

```
 1              - TINA McDONALD -

 2    transparency around the amount of hours they

 3    should expect; all with the intent of providing

 4    predictable work schedule to partners.

 5         Q.    What was the geographic area of your

 6    responsibility as senior compliance specialist?

 7         A.    It encompassed the five boroughs

 8    which was Manhattan, Staten Island, Brooklyn, the

 9    Bronx, and Queens.

10         Q.    Did you undergo any formal training

11    in connection with becoming the senior compliance

12    specialist?

13         A.    I went through training at the

14    regional office around the law itself and what it

15    entailed.

16         Q.    Over what period of days or weeks did

17    you have that training?

18         A.    That was a one-day training.

19         Q.    Did you receive any other training in

20    connection with becoming a senior compliance

21    specialist?

22         A.    No, it was more -- no, not a formal

23    training.

24         Q.    Who conducted the training at the

25    regional office that day?
```

Tina McDonald
August 27, 2020                                        116

```
 1                  - TINA McDONALD -

 2         A.    That was conducted -- to the best of

 3    my recollection, I remember the partner resource

 4    managers at the time.

 5         Q.    As the store -- withdrawn.

 6               As the senior compliance specialist,

 7    did you conduct training for any other employees?

 8         A.    As a senior compliance specialist,

 9    yes, I did.

10         Q.    What other employees did you train?

11         A.    I trained store managers on the Fair

12    Workweek legislation.

13         Q.    In what context did that training

14    happen; did you go from store to store?

15         A.    It was -- okay, it all depended.

16    Well, there would be times where we would conduct

17    trainings in the regional office in a large group

18    setting as well as me visiting stores one on one

19    for training.

20         Q.    What training were store managers

21    supposed to receive in total, what amount of

22    training in connection with the Fair Workweek Law?

23               MR. MOY:  Objection.

24         A.    I'm not aware of a specific amount.

25    I don't recall saying that there was a specific
```

Tina McDonald
August 27, 2020                                        126

August 27, 2020

1              - TINA McDONALD -

2      specifically at particular stores?

3           A.     Anything I was doing was within the

4      scope of the Fair Workweek legislation.  So, for

5      example, schedules needed to be posted for

6      partners with 14 days' notice, so it's going into

7      a store and validating is that happening.

8                 Schedule change logs was a part of

9      the Fair Workweek legislation as well, so going

10     into a store and seeing is the schedule change

11     logs in place.

12                Partners also have to complete a good

13     faith estimate form, and so going into a store and

14     going through a partners' files to see, do all

15     partners have a good faith estimate form on file;

16     or in the case of the available shift posting, is

17     it visibly posted in the location as well as the

18     posters required to be visibly in the back of

19     house letting partners know they're entitled to a

20     predictable work schedule.

21          Q.     When did Fair Workweek regulations go

22     into effect?

23          A.     I believe it was November -- I'm

24     thinking November -- it started out, I believe, on

25     a Friday initially, maybe November 24th, but I

Tina McDonald
August 27, 2020

1                    - TINA McDONALD -

2     believe we really put it into effect on the 25th

3     or 27th.

4          Q.    Of what year?

5          A.    2017.

6          Q.    When you would do store visits, did

7     you typically take notes?

8          A.    Yes, I would typically take notes.

9          Q.    Would you be filling in a particular

10    form or something else?

11         A.    No, I wasn't -- it wasn't a

12    particular form.

13         Q.    Did you have a regular practice for

14    what you would do with your notes after creating

15    them?

16              MR. MOY:  Objection.

17         A.    I guess this was -- is this with the

18    assumption that I had a particular practice in

19    place?

20         Q.    Yes, I'm asking if you did have a

21    practice.

22         A.    Okay.  Yes, I did have a practice in

23    place.

24         Q.    Where would you typically put your

25    notes after you wrote them?

Tina McDonald
August 27, 2020                                          152

```
 1                    - TINA McDONALD -

 2          you may proceed, and thank you for the time.

 3          Q.    Ms. McDonald, other than counsel did

 4   you communicate with anyone during this last

 5   period of break?

 6          A.    No, I did not.

 7          Q.    Did you read anything during the last

 8   break?

 9          A.    No, I did not.

10          Q.    Are you familiar with the product

11   called Hot Shot No-Pest Strip?

12          A.    I am familiar with it now.

13          Q.    Are you aware that its main active

14   ingredient is something called DDVP?

15          A.    No.

16          Q.    When did you first become aware of

17   what Hot Shots are?

18          A.    I would say learning about it in the

19   news.

20          Q.    What position did you hold at

21   Starbucks when you first became aware of what Hot

22   Shots are?

23          A.    Partner resources manager.

24          Q.    And what was it in the news that you

25   read that made you aware of Hot Shots?
```

August 27, 2020                                    153

```
1                    - TINA McDONALD -

2         A.    I'm trying recall.  I think there was

3    an article in regards to this matter and that's

4    what -- cause I had never known what a Hot Shot

5    was before or seen it.

6         Q.    Had you ever -- strike that.

7               Do you have any information about the

8    use of Hot Shots in Starbucks stores in New York?

9         A.    No.  I don't have information aside

10   from knowing that we're not allowed to use

11   anything of -- I know we can't -- they can't be

12   used.  They're not supposed to be utilized in

13   stores.

14        Q.    Have you heard from anybody, whether

15   it's rumor or proven, about any Starbucks store

16   using Hot Shots?

17        A.    No.  I'm not aware of any stores

18   using Hot Shots.

19        Q.    When you were a store manager did you

20   ever receive any correspondence, e-mail

21   correspondence, from district managers about Hot

22   Shots and not using them?

23        A.    I can't recall specifically in

24   regards to that.

25        Q.    Did you ever hear any Starbucks
```

A-463

August 27, 2020                                        154

```
 1                 - TINA McDONALD -

 2    employee refer to DDVP ever?

 3         A.    No, I've never heard of that.

 4         Q.    As far as you know, has Starbucks

 5    ever conducted an investigation into the potential

 6    use of Hot Shots or DDVP in Starbucks stores?

 7         A.    Not to my knowledge or recollection.

 8         Q.    To the best of your understanding,

 9    why is it that Hot Shots are not allowed for use

10    in Starbucks stores?

11              MR. MOY:  Objection.

12         A.    Well, I don't -- you're saying to the

13    best of my recollection or --

14         Q.    If it's unclear, I'll ask the

15    question differently.

16              Did anybody ever explain to you why

17    it is that Hot Shots should not be used in

18    Starbucks stores?

19         A.    I -- I guess I don't recall having a

20    conversation specifically around Hot Shots.

21         Q.    Do you recall having a conversation

22    around the use of any other particular pesticide

23    in Starbucks stores?

24         A.    I recall just being aware naturally

25    as a store manager that that's not allowed, to use
```

August 27, 2020                                  155

```
1                    - TINA McDONALD -

2      any outside source to address pests.

3           Q.     Is it your understanding that there's

4      any health or safety concern related to the use of

5      Hot Shots in Starbucks stores if they were used?

6           A.     I'm not -- because I'm not super

7      familiar with it, I don't know the -- the

8      implications of utilizing it as far as what

9      is the impact on a person from having it in their

10     vicinity.  I'm not well-versed to speak on that.

11          Q.     What was it that you read about this

12     case that made you aware of Hot Shots; do you

13     remember what specifically you had read about

14     them?

15          A.     No, I honestly can't remember

16     specifics to it.  It was like a really long time

17     ago.

18          Q.     When you read about Hot Shots in an

19     article about this case, did you ask anybody else

20     any questions about it?

21          A.     Actually, no.

22          Q.     Did you ever discuss anything that

23     you read about this case in any publication other

24     than with counsel?

25          A.     No.
```

Tina McDonald
August 27, 2020                                    156

```
1                    - TINA McDONALD -

2         Q.     Did Mr. Fox ever complain to you

3    about the use of Hot Shots or DDVP at Starbucks?

4         A.     Complain to me -- what do you mean by

5    that?

6         Q.     Did he ever express concern to you

7    that he perceived there to be a problem concerning

8    the use of Hot Shots in Starbucks in New York?

9         A.     I can't remember verbatim what he

10   shared specifically, but -- yeah, I can't remember

11   verbatim what he said specifically.  I just -- I

12   know we had a conversation and it was not in

13   relation to compliance and I directed him to his

14   district manager.

15        Q.     Was it an in-person conversation that

16   you're referring to?

17        A.     Yes.

18        Q.     Where did the conversation take

19   place?

20        A.     From my recollection, it was in the

21   back of house of his store.

22        Q.     What store?

23        A.     West Broadway and Leonard.

24        Q.     Did Mr. Fox tell you that he was

25   concerned about Hot Shots or DDVP at any
```

```
 1                   - TINA McDONALD -

 2      particular store location?

 3           A.     I don't recall him mentioning any

 4      particular store location or any details as you

 5      just asked.

 6           Q.     Did you ask him any questions to

 7      clarify or get further information about what he

 8      was talking about?

 9           A.     I did not dig deeper into what he was

10      referring to because I was there to address

11      compliance and in regard to the Fair Workweek

12      legislation, and anything outside of that would

13      have been without -- beyond my scope of work.

14           Q.     Did you ever communicate to anyone

15      else that Mr. Fox had said something to you about

16      the use of Hot Shots or DDVP?

17           A.     No, I did not.

18           Q.     Do you believe that as of an employee

19      at Starbucks you were required to repeat his

20      complaint to anyone in particular?

21           A.     No, I don't believe that -- based on

22      the recollection of the conversation, I believe

23      that I addressed it appropriately in directing him

24      to his district manager given that as a store

25      manager if you have a concern that you need to
```

```
 1                   - TINA McDONALD -

 2      escalate, the next resource is the district

 3      manager.

 4           Q.     Did you refer him to his district

 5      manager by name or did you just say district

 6      manager?

 7           A.     I can't recall specifically if I said

 8      speak to your DM or Tim.  I can't recall

 9      specifically.

10           Q.     Was Tim Hutchinson Mr. Fox's DM at

11      that time?

12           A.     Yes, he was.

13           Q.     Do you have any information as to

14      whether Mr. Fox had raised concerns about DDVP or

15      Hot Shots to any other managers at Starbucks at

16      any times, other than the one conversation you

17      referred to?

18           A.     No, actually I -- I don't have any

19      awareness of that.

20           Q.     What, if anything, did Starbucks do

21      in response to any complaints by Mr. Fox

22      concerning the alleged use of DDVP at Starbucks?

23                  MR. MOY:  Objection.

24           A.     Are you asking if Starbucks did do

25      something?
```

August 27, 2020                                          159

```
 1                    - TINA McDONALD -

 2        Q.    As far as you know, did Starbucks do

 3   anything?

 4        A.    I am not familiar with that.  That

 5   would not have been within my scope.  I'm not even

 6   aware of -- I'm not aware of any complaints is

 7   what I'm saying, so I don't have any knowledge of

 8   that.  I only had knowledge of the conversation

 9   that him and I had.  I don't have any knowledge of

10   anything outside of that involving -- you said

11   DDC, I'm not sure, and Hot Shots, I don't have any

12   knowledge of that.

13        Q.    After that conversation with Mr. Fox,

14   did anyone ever communicate anything to you about

15   Hot Shots at Starbucks at any time?

16        A.    No, we never spoke about Hot Shots at

17   Starbucks.

18        Q.    After your conversation with Mr. Fox

19   did Starbucks, to your knowledge or information,

20   change its enforcement practices with respect to

21   the use of Hot Shots in stores?

22        A.    To my knowledge, no, as the company

23   always had guidelines that required we're not able

24   to utilize anything outside from contacting a pest

25   vendor in the event of us having a concern for
```

August 27, 2020                                    160

```
 1                - TINA McDONALD -

 2      that activity.  So I don't -- I guess I don't

 3      imagine that -- to my knowledge I don't know, to

 4      be honest, you know, if something else was put in

 5      place because the rules were already in place that

 6      supported that not being utilized in stores.

 7           Q.    As far as you know, did Starbucks

 8      ever do anything to verify whether its policies

 9      were being followed with respect to the use of Hot

10      Shots in stores?

11           A.    I'm -- I'm not aware of what

12      Starbucks or -- I'm not aware of the actions they

13      would take in regard to that because that is not

14      within my scope of works.

15           Q.    I think I touched on this already,

16      but just so the record is very clear:  As far as

17      you know, did Rafael Fox ever, in words or

18      writing, express concern about the use of Hot

19      Shots or DDVP at Starbucks to anyone else apart

20      from the one conversation with you?

21           A.    Based on my recollection, no, I'm not

22      aware of any -- I'm not aware of anyone else that

23      he may have spoken to.  I'm not aware of.

24           Q.    Did you write down or memorialize in

25      any way that Rafael Fox had said something to you
```

August 27, 2020                                              174

```
1                    - TINA McDONALD -

2      may have had with Starbucks employees?

3           A.    No.

4           Q.    Did you ever read a summary or a log

5      documenting the substance of any interviews that a

6      New York City Department of Consumer Affairs

7      representative may have conducted with employees

8      concerning the complaint you referenced?

9           A.    No.  Are you assuming that I'm aware

10     of them contacting any employees?  Cause I'm not.

11          Q.    Okay.  Do you have any information

12     about the outcome of the NYDCA complaint?

13          A.    Yes.

14          Q.    To your understanding, what was the

15     outcome?

16          A.    Based on -- based on the nature of

17     the complaint, it was substantiated that we were

18     in violation of different portions of the Fair

19     Workweek legislation.

20          Q.    Did you ever read any written summary

21     or determination by the NYDCA?

22          A.    I can't recall.

23          Q.    What is the source of your

24     information about the outcome of the NYDCA

25     complaint?
```

Tina McDonald
August 27, 2020                                      175

Tina McDonald
August 27, 2020

1                  - TINA McDONALD -

2          A.    As the compliance specialist, when

3     the complaint came forward I had a responsibility

4     to go into the store at this point to look into

5     the complaint and identify if any of those -- if

6     the information was in violation of the law

7     itself, so that's really where my extent lies.

8          Q.    We had talked before about e-mail

9     communications with Mr. Fox.  Let's now go into

10    site visits.  How many times did you visit Mr.

11    Fox's store while he was an employee there?

12         A.    It's two that I can recall --

13    possibly a -- possibly a third -- maybe three.

14         Q.    When was the first occasion?

15         A.    The first occasion was after

16    receiving the New York City Department of Consumer

17    Affairs complaint.

18         Q.    Do you recall approximately the date?

19         A.    I don't recall the specific date.  I

20    just know it was -- it was like in January.

21         Q.    When you went to visit the store on

22    that occasion, were you already familiar with the

23    details of the NYDCA complaint?

24         A.    I had seen the complaint, the actual

25    form, yes.

Tina McDonald
August 27, 2020                    176

Tina McDonald
August 27, 2020

 1              - TINA McDONALD -

 2        Q.    Did you note the identity of the

 3   employee who had made the complaint?

 4        A.    You mean note them like as far as

 5   like I would be able to identify them, no.

 6        Q.    Do you know what position the

 7   employee held?

 8        A.    I know -- she may have been a

 9   barista.

10        Q.    Did you ever have any communications,

11   written or oral, with the employee who made the

12   DCA complaint?

13        A.    I can't recall specifically.

14   Possibly, yeah, but I can't recall.  I'm trying

15   to -- I can't recall specifically.

16        Q.    Do you have any information, either

17   way, as to whether Mr. Fox had previously

18   consulted with any partner resources

19   representative concerning difficulties with that

20   particular employee prior to her complaint?

21        A.    I am not aware of any actions or any

22   conversations or consultations that he may have

23   had specific to the partner.  All I was aware of

24   is that there was a complaint filed by a partner

25   and we had a responsibility to look into it.

Tina McDonald
August 27, 2020                                                          179

```
 1               - TINA McDONALD -

 2     anyone else did because, to my knowledge, I was

 3     the first compliance specialist.

 4          Q.    Did you consider starting to visit

 5     stores to assess compliance prior to this specific

 6     first visit?

 7          A.    Yes.

 8          Q.    Why didn't you start visiting stores

 9     for that purpose prior to this first visit?

10               MR. MOY:  Objection.

11          A.    I'm sorry, can you elaborate on that.

12          Q.    Why was it that the first time you

13     conducted a site visit to assess compliance with

14     predictability pay was Mr. Fox's store, rather

15     than any other stores at any prior point in time?

16               MR. MOY:  Objection.

17          A.    No, are you saying that the first

18     time I went into visit a store was with Mr. Fox?

19          Q.    What is the first store that you went

20     to visit to assess compliance with predictability

21     pay?

22          A.    So I don't remember the first store

23     that I had went to, but this was the first store

24     where we had a complaint from the Department of

25     Consumer Affairs.
```

Tina McDonald
August 27, 2020                                    181

                          Tina McDonald
                          August 27, 2020
 1                      - TINA McDONALD -

 2     that purpose prior to your visit to Mr. Fox's

 3     store?

 4          A.    I -- I honestly don't recall a

 5     specific amount.

 6          Q.    Did you document the site visits in

 7     any way?

 8          A.    I would imagine that I did, but

 9     because I really can't recall the timeline of

10     everything I can't -- you know, I can't say

11     specifically.

12          Q.    Did you identify any incidents

13     of noncompliance with any aspect of the

14     predictability pay law at the stores you visited

15     prior to Mr. Fox's store?

16          A.    The time I spent prior to -- okay,

17     what led to going to the store was a New York City

18     Department of Consumer Affairs complaint in

19     regards s to compliance.  My intent in visiting

20     stores was to get an understanding of how it was

21     being executed, given that it was a new law and

22     everybody was in the process of learning and there

23     was some things that we would naturally really

24     expect to have already been in place.  So, for

25     example, three weeks of schedules being posted,

Tina McDonald
August 27, 2020

1                    - TINA McDONALD -

2       that was already a Starbucks standard, but Fair

3       Workweek made it the law, right.  So my

4       understanding with visiting stores was to just get

5       and identify, you know, how we were showing up in

6       that regard, to provide any type of support.

7                    However, going to Mr. Fox's store was

8       specific to a New York City Department of Consumer

9       complaint filed by a partner that required us to

10      immediately look into.

11           Q.    In any site visits that you made to

12      any stores prior to Mr. Fox's store on this

13      specific occasion, did you identify any incidents

14      where you saw something not in compliance with the

15      predictability pay or Fair Workweek Law?

16           A.    I would say yes.  I never encountered

17      anywhere that is a hundred percent or there's no

18      areas to improve.

19           Q.    When you would notice such areas for

20      improvement on those early site visits what, if

21      anything, did you do?

22           A.    I would provide coaching to the store

23      manager and the district manager on how we could

24      improve in that regard.

25           Q.    Did you ever document that you had

Tina McDonald
- TINA McDONALD - August 27, 2020
August 27, 2020                                                185

```
 1                  Tina McDonald

 2      Q.     I'm asking.

 3      A.     No, no.

 4             MR. GRAFF:  Why don't we take a break

 5      for eight minutes, until 4:55 if that's okay.

 6             MR. MOY:  Yes.

 7             MR. GRAFF:  Lets' go off the record.

 8             (Whereupon, a brief discussion was

 9      held off record.)

10      Q.     Ms. McDonald, please tell me as much

11  as you remember about what occurred during the

12  first site visit to Mr. Fox's store with Mr.

13  Jennison and Mr. Hutchinson.

14      A.     Okay.  I -- I recall just going to

15  the store due to, as I said, the New York City

16  Department of Consumer Affairs complaint and

17  trying to just get an understanding of like what

18  led to the complaint and identifying if we -- if

19  there were gaps in compliance in relation to this

20  complaint, and so I think most of the time was

21  spent talking to Rafael.

22             I believe I recall at some point

23  going through a few timecards, looking at some

24  schedules.  I asked about are schedules posted on

25  time in the store, I remember that.  He shared
```

Tina McDonald
August 27, 2020                                    186

Tina McDonald
1          - TINA McDONALD - August 27, 2020

2     with me that schedules are always posted on time

3     and it was kind of like --

4          Q.    Wait, I'm sorry.  Wait one second.

5                MR. GRAFF:  I think Ms. Ruderman

6          needs to mute her phone.  There's some

7          background noise.

8                (Whereupon, a brief discussion was

9          held off record.)

10         Q.    Ms.  McDonald, do you remember where

11    you were in your last answer?

12         A.    I just remember -- yeah, I just

13    remember going in there, doing like an overview of

14    what did compliance look like in the stores, you

15    know, cause he initially shared that schedules

16    were always posted on time, but that

17    couldn't -- that couldn't really be proven.  That

18    wasn't proven I would say, based on the review.

19    Checking to see if there was schedule change logs

20    in place, available shift postings, just trying to

21    get an understanding of what led to this complaint

22    and where we were in regard to the Fair Workweek

23    legislation.

24         Q.    Did you document your findings?

25         A.    Yes.  Yes, I did.

Case 21-2531, Document 27, 01/21/2022, 3248030, Page189 of 311

**A-478**

Tina McDonald
August 27, 2020                                    187

```
          Tina McDonald
 1        - TINA McDONALD -  August 27, 2020

 2        Q.     In what form?

 3        A.     I can't -- I'm not sure if it was

 4   like an e-mail or I utilized OneNote possibly, but

 5   I did document the findings.

 6        Q.     Did both Mr. Hutchinson and Mr.

 7   Jennison participate together with you for the

 8   entirety of that visit?

 9        A.     No, I don't recall them

10   always -- they may have been in the lobby.

11        Q.     How long was that visit?

12        A.     Couple of hours.

13        Q.     Was Mr. Fox on duty at the store

14   during the visit?

15        A.     He was in the store.  Yes, he was

16   there.

17        Q.     What specifically did you determine

18   to be noncompliant with the predictability pay

19   rules on that first visit?

20        A.     On the first visit I did, we were

21   not -- we were definitely not providing 14 days'

22   notice to partners of their posted schedules.

23   Partners -- the schedule change log was there, but

24   it was the entries were questionable in regards to

25   if these schedule changes were consent or not
```

Tina McDonald
August 27, 2020                                      188

```
 1                  - TINA McDONALD -

 2   cause a lot of times -- if I recall correctly, he

 3   may have been filling out a portion of it himself.

 4   I don't necessarily recall that it was all entries

 5   by the partners and missing consent in regards to

 6   that.

 7             I can't remember if it was this visit

 8   or the second visit when I learned about the shift

 9   postings and the opportunity around that as well,

10   like that was a -- we were not in compliance in

11   regards to shift posting and how they were being

12   handled; because what started the complaint was a

13   partner was saying that their hours had been

14   reduced because we hired externally.

15             The intent on the part of the law is

16   to provide partners with a greater access to

17   hours, making them a priority before we go and

18   hire outside.  We want to give the opportunity to

19   our partners within the company first.

20        Q.    Is that last issue a provision of the

21   predictability pay law or just a Starbucks policy?

22        A.    That's part of the Fair Workweek

23   legislation, so predictability pay is a part of

24   the Fair Workweek legislation.  So everything I'm

25   talking about is in relation to the Fair Workweek
```

Tina McDonald
August 27, 2020                                              189

                              Tina McDonald
                              August 27, 2020
 1                           - TINA McDONALD -

 2      legislation.

 3                   So if schedule is not being posted

 4      with 14 days' of notice, partners experiencing

 5      schedule changes and not being compensated

 6      appropriately with the proper schedule change

 7      premiums, posting available shift postings, hiring

 8      externally before giving our partners the

 9      opportunity to get those hours, all of that falls

10      under the umbrella of the Fair Workweek

11      legislation.

12           Q.    Did you conclude, based on any of

13      your observations on that first visit, that any

14      employees were owed any monies by Starbucks in

15      connection with any of the noncompliant items that

16      you noticed?

17           A.    I can't remember if it was

18      specifically the first visit or the second visit,

19      but I do know that the timecards did not match the

20      schedule change log.

21                   So, for example, on the schedule

22      change logs there's different reason codes that

23      indicate whether a partner is supposed to receive

24      a schedule change premium or not; and so there

25      were instances where the -- it was either written

U.S. LEGAL SUPPORT
(877) 479-2484

Tina McDonald
August 27, 2020                                    190
Tina McDonald
August 27, 2020

```
 1              - TINA McDONALD -

 2    in by Rafael himself and there was no consent or

 3    where things were captured that supported a

 4    partner was supposed to be paid, but it

 5    wasn't -- you couldn't tell in the timecard.

 6    There was no actual payment, and that actually

 7    helped lead to me, as I continued to look into the

 8    concern at the location, going back to the e-mail

 9    communication in which I provided him guidance to

10    pay a partner that was not paid as well.

11        Q.    At what point in time was that

12    guidance to pay a partner that you noticed after

13    the first visit hadn't been paid?

14        A.    Recognizing -- from what I recall

15    was, was -- we -- the communication in regards to

16    the predictability pay, any questions in regard to

17    that had nothing to do with the -- the DCA

18    complaint, like that came after.

19              So at that point we're looking at --

20    it could have been a few weeks since he received

21    the guidance to pay the partner and it wasn't

22    paid.

23        Q.    Do you recall what specific issue had

24    occasioned the need to make a special payment to

25    the particular partner?
```

Tina McDonald

August 27, 2020                                    191

```
 1                    - TINA McDONALD -

 2          A.     The -- the situation, it was around,

 3   I believe, partners staying after their scheduled

 4   times because if a partner stays more than beyond

 5   fifteen minutes of their scheduled shift, they're

 6   entitled to a schedule change premium and I

 7   believe that's what it was in regard to.

 8          Q.     Did Mr. Fox reach out to you with a

 9   question about how to handle payment for that

10   partner, which resulted in your directing him to

11   make the payment that you just described?

12          A.     Yes.  Mr. Fox reached out asking in

13   this particular instant, are we required to pay

14   predictability pay.

15                 It was a question of this is what

16   happened, this is the situation, is predictability

17   pay owed to the partner.  It was in that form.

18          Q.     Do you remember the particulars of

19   the situation?

20          A.     Not specific.  I don't remember all

21   the intricate details, but I know it had to do

22   with a partner staying later than their scheduled

23   time.  So I can't remember like how much later --

24   I don't remember all of that.  I just know this

25   person had a schedule change of -- of more than
```

August 27, 2020                                  192

```
 1                   - TINA McDONALD -

 2    fifteen minutes.

 3         Q.     How did you determine that that

 4    partner had not been paid for that?

 5         A.     Looking at the timecard in the global

 6    labor scheduling system at the time.

 7         Q.     And did you check for that during the

 8    first visit or is that something you did later?

 9         A.     That was -- that was later.  I don't

10    think that was on the first visit, no, cause on

11    the first visit I wasn't -- you know, I wasn't

12    thinking anything about any e-mail

13    communication -- like none of that was relevant,

14    but the intent of going to the store was because

15    we received a complaint from the Department of the

16    Consumer Affairs to look into Rafael Fox's

17    scheduling practices in regards to the Fair

18    Workweek legislation.  That was the sole reason we

19    went to the store.  There was no other reason.

20         Q.     In connection with that first visit,

21    did you give Mr. Fox any instructions or

22    directions to do any particular things during that

23    visit?

24         A.     That first visit, I don't -- I don't

25    recall giving him a specific instruction at the
```

Tina McDonald
August 27, 2020                                        193

```
 1                    - TINA McDONALD -

 2      time because at that point we're in a discovery

 3      phase, you know; we're just trying to understand,

 4      get a pulse of how compliance is showing up in the

 5      store.  So there was no -- it wasn't like hey,

 6      Rafael, go do this now as a result, because we're

 7      in a discovery.  We're trying to figure out at

 8      this point is -- are these concerns that are being

 9      raised are they accurate, are they valid, is

10      there -- are we in compliance with the Fair

11      Workweek legislation.

12           Q.    I had understood from some prior

13      answers that you noticed that certain things were

14      not in compliance during that first visit.  During

15      that visit, did you direct Mr. Fox to correct any

16      of the specific things that you observed and

17      believed to be noncompliant?

18           A.    I'm sorry, can you repeat the

19      question.  I apologize.

20                MR. GRAFF:  Maybe the court reporter

21           could read it backs, please.

22                (The question requested was read back

23           by the reporter.)

24           Q.    I can ask the question again.  During

25      that first visit, did you tell Mr. Fox to correct
```

Tina McDonald
August 27, 2020

Tina McDonald
August 27, 2020                                           194

```
 1                - TINA McDONALD -

 2    any specific things that you believed to be not in

 3    compliance?

 4        A.     Well, there were things that you just

 5    can't correct.  So for example if your schedule is

 6    posted late, there's not going to be a correction

 7    for that; it was already posted late.  So if a

 8    schedule change log is not in place, there's not

 9    going to be -- or if the consents are missing, you

10    know, you may not be able to go and get consent,

11    especially if you filled it out yourself.  So the

12    partner did not actually write that information

13    and the store manager did.  So there are things

14    that you might not be able to correct.

15              In regards to payment of partners, I

16    don't recall us aligning or taking any action on

17    that particular day because, like I said before,

18    we were in a discovery phase and trying to

19    understand was this an isolated matter or was it

20    more to the situation, and so we had to look at it

21    objectively.  So the only one thing that -- sorry.

22        Q.     I'm sorry, I thought you were done.

23    I didn't mean to cut you off.  Please continue

24    your answer.

25        A.     Well, I would say the only -- and
```

Tina McDonald
August 27, 2020

Tina McDonald
August 27, 2020                                        195

1                 - TINA McDONALD -

2       this is a typical direction I would give any store

3       manager going into a store, where schedules are

4       not posted in -- on time is more so about ensuring

5       that moving forward that is not something that

6       continues.  Because he had shared that schedules

7       were always posted on time, but what the documents

8       said that showed different.

9              Q.    Are you done answering?

10             A.    Yes.

11             Q.    When was your second visit to Mr.

12      Fox's store?

13             A.    I -- I'm not sure of the date of the

14      second visit.  It could have been within the next

15      week or, you know, it could have been within a few

16      weeks.  Because looking into the concerns, that

17      did require me to go back to assure that

18      everything was looked at relative to the

19      complaint.

20             Q.    Did anybody accompany you on the

21      second visit?

22             A.    I believe Tim.  I believe Tim was

23      there.

24             Q.    All right, are you guessing or do you

25      remember Tim being there?

Case 21-2531, Document 27, 01/21/2022, 3248030, Page198 of 311

**A-487**

Case 1:19-cv-04650-AJN-SN   Document 99-11   Filed 01/14/21   Page 43 of 84

August 27, 2020                                    196

```
 1                    - TINA McDONALD -
                         Tina McDonald
                        August 27, 2020
 2            A.      I believe that Tim was there.

 3            Q.      Anyone else?

 4            A.      Not that I can recall.

 5            Q.      Did you notify Mr. Fox in advance

 6     that you would be making a second visit?

 7            A.      Yes, I communicated.

 8            Q.      What was your objective or agenda

 9     going into the second visit?

10            A.      The second visit was really him

11     trying understand the payment of the partners

12     based on what I had identified from the first

13     visit, cause it's the first -- it's the second

14     visit that I -- I think is where I really

15     identified that oh, you know, even after receiving

16     guidance to pay partners that wasn't applied,

17     because it required me to go back into the

18     timecards.  It not like it's something I would

19     have access to remotely.  So in order to look at

20     partners' timecards, I would have to physically be

21     in the store.

22            Q.      When you're referring to the guidance

23     to make payment to partners, is that the same

24     incident that we already talked about where he

25     asked you if payment was required in a particular
```

August 27, 2020                                          197

```
 1                  - TINA McDONALD -
                       Tina McDonald
                      August 27, 2020
 2     situation?

 3          A.      Correct.

 4          Q.      Other than that one partner and

 5     incident, did you direct Mr. Fox to make any other

 6     payments that you believed he did not make?

 7          A.      At some point payments had to be

 8     applied and I can't remember when that direction

 9     was given because after really looking into

10     everything, partners was owed a significant amount

11     of predictability pay due to the late schedules as

12     well as what was captured on the schedule change

13     log where partners had experienced a loss of hours

14     in some instances or worked additional hours and

15     were not compensated properly.

16             So it was -- so I don't know if it

17     was -- I don't recall it being directly in that

18     second incident, because I think we still needed

19     to validate how much the amount would be that we

20     needed to pay the partners.

21          Q.      Did you ever direct Mr. Fox to pay

22     any partners and find that he did not timely do

23     so, other than what you've already testified to?

24          A.      I -- well -- when we had the

25     conversation about -- we did a have a conversation
```

- TINA McDONALD -
Tina McDonald
August 27, 2020                                    198

1

2    about the initial communication of the partner not

3    being paid and during that conversation is when it

4    was -- I inferred it as him making a decision to

5    not pay, as he had shared that he didn't agree

6    with them being paid for staying the additional

7    time and he had some -- he said he was quite

8    familiar with the law based off of some personal

9    relationship with someone.  I don't know if it was

10   like a girlfriend, a friend, someone he said very

11   familiar with the law that he had a relationship

12   with and so he felt like the guidance being

13   provided, he didn't agree with it.

14        Q.    When did that discussion that you

15   were just describing take place?

16        A.    That was, I believe, on the second

17   visit, because I believe it was also the second

18   visit where I identified that he was not

19   responding to a communication around the available

20   shift postings for partners.

21        Q.    How did you identify that second

22   item?

23        A.    Well, that's a part of the Fair

24   Workweek legislation and what led to the concern

25   around the external hire -- and so we talked about

Tina McDonald
August 27, 2020                                    199

```
 1                - TINA McDONALD -
    what is the process and what does that look like
 2
    and he shared that partners did respond to the
 3
    available shift postings that he had submitted,
 4
    but he chose not to engage them because of the
 5
    fact that he feared that partners would come to
 6
    his store with their bad habits as opposed to
 7
    hiring someone externally who you're able to
 8
    groom.
 9
10        Q.    Just to be clear, is it your
    testimony that you directed Mr. Fox to make a
11
    payment to an associate that he had previously
12
    been told to make and Mr. Fox told you he was not
13
    doing that because he disagreed with your
14
    instruction?
15
16        A.    To be clear, he said the reasons he
    did not do it was because he did not agree.
17
18        Q.    How, if at all, did you respond to
    him saying he was not following your direction?
19
20        A.    Well, at that point I just informed
    him I understand his interpretation or what he
21
    thought to be accurate because everyone is
22
    entitled to their opinion, however this is the
23
    expectation.
24
25        Q.    Did you document that communication
```

A-491

Tina McDonald
August 27, 2020                                    200
Tina McDonald
August 27, 2020
1                    - TINA McDONALD -

2    with Mr. Fox at all?

3         A.    Document that communication?  I

4    don't -- I don't know if I recall documenting that

5    communication.

6         Q.    Was it your perception that Mr. Fox

7    was being insubordinate in connection with not

8    following your direction?

9         A.    Well, as a compliance specialist I'm

10   there to support and I'm the subject matter expert

11   around the Fair Workweek legislation, so I provide

12   guidance.  Him choosing not to follow the guidance

13   is just him -- you know, I don't really take it

14   personal against me specifically, but he just

15   chose not to follow the expectations in compliance

16   with the law.

17        Q.    Did you see that choice as

18   insubordinate under the circumstances?

19        A.    Under those circumstances, I would

20   say, yes, he made a choice to not follow

21   directions.

22        Q.    Did you report that event to anyone?

23        A.    I did communicate that.

24        Q.    At what point in time did you first

25   communicate that episode to anyone?

Tina McDonald
August 27, 2020                            201
Tina McDonald
August 27, 2020

1              - TINA McDONALD -

2          A.     That was event -- communicated

3     eventually in the overall recap of what was the

4     identified gaps in compliance and so, yeah --

5     that's --

6          Q.     How long after you --

7          A.     So that would be -- that was

8     communicated after visiting the store.

9          Q.     Did you take notes during your second

10    site visit?

11         A.     I believe I did take notes during the

12    second site visit as well.

13         Q.     Did you mention Mr. Fox declining to

14    follow your directions to make payment to that

15    associate in your notes?

16         A.     I can't recall that was captured

17    specifically in the notes.  It's possible.

18         Q.     Can you think of any particular

19    reason why you would not have chosen to document

20    that exchange in the notes?

21              MR. MOY:  Objection.

22         A.     I mean, that's assuming that I

23    didn't.  Right now I can't recall whether I did or

24    not or what was the approach around that

25    specifically at that time.

Tina McDonald
August 27, 2020                                        202

```
 1                    - TINA McDONALD -

 2         Q.     Why did you choose to take notes

 3    during that site visit?

 4         A.     Well, in order to be -- in order to

 5    have information in regard to what we're looking

 6    into regarding the New York City Department

 7    Consumer Affairs complaint, I would have to

 8    capture notes specific to the concern; and

 9    I -- and it may have been --

10         Q.     When you --

11         A.     Sorry, go ahead.

12         Q.     No, no, no.  I thought you were done.

13    I apologize.  Please continue and finish your

14    answer.

15         A.     No, I was just saying that I -- you

16    know, it may -- a lot of what was needed was

17    gathering the information, gathering the

18    documents.  You know, so for example with the

19    schedules, I had to gather the schedules.  He said

20    that they were all posted on time, I needed to

21    gather those schedules and validate that.  I had

22    to gather the schedule change logs to identify

23    what was captured on it.  So a lot of time was

24    spent reviewing those documents to see where we

25    were in regards to compliance.
```

Tina McDonald
- TINA McDONALD - August 27, 2020

August 27, 2020                                           203

1

2          Q.     You had mentioned earlier that

3     something with the change log made it unclear or

4     impossible to determine whether certain changes

5     had been made with the partner's consent; is that

6     correct?

7          A.     Yes, that is correct.

8          Q.     Did you at any point in time, either

9     yourself or in coordination with anybody else,

10    have inquiries of the partners to determine

11    whether they had or had not consented to changes?

12         A.     I feel like I did speak to some

13    partners, but I can't recall specifically who I

14    may have -- I may have connected with some

15    partners, but I cannot recall specifically.

16         Q.     Was it part of your investigation to

17    determine whether changes had been made without

18    partner consent?

19         A.     Yes.

20         Q.     Did you ask all of the partners about

21    all of the changes that pertained to them?

22         A.     I recall connecting with

23    the partners.  I can't remember everything

24    specifically at this time.

25                There were some -- they had some

Tina McDonald
- TINA McDONALD -
August 27, 2020                                    204

Tina McDonald
August 27, 2020

1          instances where they put reason code 2 on the

2          schedule change log which means that you're

3          supposed to pay them and he didn't; and then there

4          were -- for example with the late schedules, he

5          would post them late and that means you're

6          supposed to pay the partners.  They don't even

7          have to tell you that -- they don't have to

8          request to be paid.  We know that that's the

9          expectation and he did not.  Even though he said

10         that all the schedules were posted on time, but

11         they were not so that wasn't -- that wasn't

12         honest.

13                 So though overall I -- honestly the

14         gaps in compliance, I've never encountered a

15         situation, as I said before, where it's a hundred

16         percent there's not an opportunity to improve; but

17         in this particular situation with the store, the

18         concern and the honesty or the lack of

19         transparency was evident or the decision to not

20         compensate partners and the time worked equals

21         time paid, and so making that decision it's not

22         okay; it's just not okay.

23                 And the reality is that when it comes

24         to for example posting late schedules in a city

Tina McDonald
- TINA McDONALD - August 27, 2020

August 27, 2020                                          205

```
 1              Tina McDonald

 2     where there's legislation, that violation alone is

 3     typically a final.  However in an instance where

 4     we're posting schedules late, we're being provided

 5     guidance to pay a partner and we don't, we're not

 6     responding to the partner's communication in

 7     regards to available shift postings and we're not

 8     even following the standards, so -- and we're not

 9     being honest about it, so there's a lot of

10     concerns there; and so a partner doesn't have to

11     tell you that hey, you didn't pay me.  You know as

12     a store manager that you have to pay your

13     partners, you know the expectation is that time

14     worked equals time paid, and you posting schedules

15     with notice of less than 14 days and not paying

16     partners is not okay.

17          Q.     Are you finished with your answer?

18          A.     Yes.

19          Q.     My question had been targeting

20     something very specific.  You had earlier said

21     that there were certain entries in change logs

22     from which you could not determine if the change

23     had been initiated at the partner's request or

24     made with the partner's consent.  My question now

25     is:  Did you ever document the results of any
```

August 27, 2020                                      206

```
 1                 - TINA McDONALD -

 2     inquiries posed to those partners to confirm

 3     whether or not they had consented or initiated the

 4     changes?

 5          A.    I can't remember specifically.  What

 6     I can recall is entries where they were supposed

 7     to be paid and they weren't.

 8          Q.    What, if anything, did you do to

 9     correct the nonpayment?

10          A.    In the end to correct the nonpayment

11     for the partners we -- we identified, you know,

12     how much each partner was owed based off of the

13     late schedule, schedule change logs and we

14     processed payment for them.

15          Q.    How much money was owed to partners

16     at Mr. Fox's store in connection with

17     noncompliance with predictability pay?

18          A.    I don't remember.

19                MR. MOY:  Objection.

20          A.    I don't remember a specific dollar

21     amount.  I know it was -- I believe it was a

22     couple thousand.

23          Q.    Well, do you believe it was less than

24     $5,000?

25                MR. MOY:  Objection.
```

Tina McDonald
August 27, 2020                                       207

```
 1                - TINA McDONALD -

 2        Q.    Do you believe it was less than

 3    $5,000?

 4        A.    I'm not sure because I don't remember

 5    the specific dollar amount.  The dollar amount

 6    wouldn't be relevant to doing what's expected, so

 7    I don't -- I wasn't focused on the dollar amount

 8    as far as that being a concern.  It's more so the

 9    action behind it.

10        Q.    Were you involved at all in -- in

11    investigating whether there were compliance issues

12    regarding predictability pay at any other stores

13    in New York City?

14        A.    Yes.  I was involved in anything in

15    regard to the Fair Workweek legislation, because

16    the Fair Workweek legislation is not just about

17    predictability pay.

18        Q.    Did you conduct any sort of audit to

19    determine the existence of any noncompliance as to

20    any aspect of the Fair Workweek Law at stores

21    other than Mr. Fox's?

22        A.    Yes, I did.

23        Q.    How did you go about conducting that

24    audit; what was in involved with the audit?

25               MR. MOY:  Objection.
```

Tina McDonald
August 27, 2020

Tina McDonald
August 27, 2020                                                      217

                      - TINA McDONALD -

1    City, is that what you're asking?

2           Q.    Broader than what you did.  Was there

3    any discussion of broadening your audit or review

4    beyond the level that you accomplished?

5           A.    No, I don't recall being told that I

6    needed to go broader than what I had accomplished,

7    because I had accomplished a lot in regards to

8    visiting the amount of stores that I did within

9    the first year.

10          Q.    When ws your third site visit to Mr.

11   Fox's store?

12          A.    I can't remember that specifically

13   and I don't recall it being a long visit.  I think

14   I was just -- I just went there to get the daily

15   records book.

16          Q.    Was Mr. Fox present?

17          A.    I believe he was there because I

18   wouldn't go into his store -- I would contact him

19   before going to his store.  I would never just go

20   there without his awareness.

21          Q.    For what reason -- withdrawn.

22                Was your purpose in going to the

23   store on that occasion to collect the records

24   book?

Tina McDonald
August 27, 2020

218

Tina McDonald
August 27, 2020

```
 1                 - TINA McDONALD -

 2        A.    Yes.

 3        Q.    Did you do anything else while you

 4   were there?

 5        A.    I don't recall doing anything

 6   additional.

 7        Q.    Other than the site

 8   visits -- withdrawn.

 9              Did you have any communications

10   with operations management concerning your

11   investigation and findings regarding Fair Workweek

12   compliance in Mr. Fox's store?

13        A.    Yes, I did share my findings.

14        Q.    With whom did you share your

15   findings?

16        A.    I share my findings with my manager,

17   legal counsel, the regional director, and the

18   partner resources manager at the time.

19        Q.    Who was the regional director at the

20   time?

21        A.    Carla Ruffin.

22        Q.    Who was the partner resources manager

23   at the time?

24        A.    Bradley Jennison.

25        Q.    Did you communicate your findings to
```

Tina McDonald
August 27, 2020                                        219

Tina McDonald
August 27, 2020

```
 1                    - TINA McDONALD -

 2    any of those individuals in writing?

 3         A.    I believe I may have communicated

 4    some of the findings in writing.

 5         Q.    Did you communicate any of the

 6    findings exclusively in spoken words to any of the

 7    individuals?

 8         A.    Yeah, there's a possibility.  I'm

 9    sure it was a combination.

10         Q.    Was there any particular reason why

11    you would elect to put some of your findings in

12    writing and others only spoken?

13              MR. MOY:  Objection.

14         A.    No.  I think honestly it was -- an

15    audit was done, I was responsible for

16    communicating the findings, and that was not

17    necessarily all in e-mail format.

18         Q.    Did you ever meet with the different

19    individuals, who you've mentioned, as a group or

20    with any of them together to discuss your finding?

21         A.    I did share my findings with them as

22    a group.

23         Q.    Was that at a meeting that had been

24    convened specifically for that purpose?

25         A.    Yes.
```

Tina McDonald
August 27, 2020                                        220

```
                         Tina McDonald
                        August 27, 2020
 1                      - TINA McDONALD -

 2         Q.     Who participated in the meeting?

 3         A.     My leader, Rachel, legal counsel,

 4    Carla, Bradley.

 5         Q.     Carla Ruffin and Bradley Jennison?

 6         A.     Correct.

 7         Q.     Did you present any documentation

 8    during that meeting?

 9         A.     I -- I may have presented the e-mail

10    exchanges, the -- possibly the time details, the

11    timecards to indicate the nonpayment, the

12    schedules that were posted with notice of less

13    than 14 days, and the schedule change log.

14         Q.     When you say you might have, are you

15    guessing because those are documents you can think

16    of that might have been relevant to the subject of

17    the meeting or do you recall?

18         A.     Those -- yeah, I recall having a

19    folder with those documents.

20         Q.     Did you distribute copies of the

21    documents to any of the other attendees?

22         A.     I did not distribute copies of the

23    documents.

24         Q.     Did you pass them around the table?

25                MR. MOY:  Objection.
```

Tina McDonald
August 27, 2020                                              222

```
 1                    - TINA McDONALD -

 2     be fair to the matter and so I would just say a

 3     few weeks.

 4          Q.    Did you investigate compliance at any

 5     other Starbucks stores to the same extent as you

 6     did Mr. Fox's store?

 7                MR. MOY:  Objection.

 8          A.    Yes, I did.

 9          Q.    How long was the meeting?

10          A.    The meeting may have been about an

11     hour or less.

12          Q.    Did you take any notes during the

13     meeting?

14          A.    I -- I don't recall taking any

15     specific notes during that meeting.

16          Q.    Did anybody else that you saw take

17     notes?

18          A.    Not that I can recall specifically.

19     My focus was more on sharing the facts with the

20     group; that was my role.

21          Q.    Were all of the members of the group

22     present for the meeting from start to finish?

23          A.    I cannot definitively say yes or no.

24     I can't recall specifically.

25          Q.    On the day of that meeting, did you
```

Case 21-2531, Document 27, 01/31/2022, 3248030, Page215 of 311

A-504

```
                        Tina McDonald
                        August 27, 2020
 1                    - TINA McDONALD -

 2        off the record until 6:05 p.m.

 3              MR. MOY:  All right.

 4              (Whereupon, there was a brief recess

 5        in the proceedings.)

 6        Q.    During this last break, Ms. McDonald,

 7   did you communicate with anyone or read anything?

 8        A.    No, I did not.

 9        Q.    During the meeting that we had been

10   talking about before the break where you

11   communicated your findings to a group of people,

12   was there any determination made during the course

13   of that meeting as to how to proceed in light of

14   your findings?

15        A.    No.

16              MR. MOY:  Objection.

17        A.    I don't recall that.

18        Q.    After that meeting, did you

19   subsequently have any communications with anybody

20   at Starbucks about Mr. Fox prior to his

21   termination?

22        A.    No, not that I recall.  My role was

23   only to communicate the findings and then as far

24   as any action, employment action that that's

25   not -- that's not what was within my scope as a
```

Tina McDonald
August 27, 2020                              226

Tina McDonald
August 27, 2020
```
 1                - TINA McDONALD -

 2    compliance specialist, so I did not -- they do not

 3    involve me in those -- those type of decisions.

 4         Q.    Even if you were not involved as a

 5    decision-maker or contributor to the decision, did

 6    anybody else in the group speak to you about Mr.

 7    Fox after the meeting prior to Mr. Fox's

 8    termination?

 9         A.    I don't recall speaking about him

10    with anyone after that meeting.

11         Q.    Did you, yourself, have any further

12    contact with Mr. Fox?

13         A.    Not that I could specifically recall.

14         Q.    Is the next thing that you heard

15    concerning Mr. Fox after that meeting the article

16    that you read about the lawsuit that you referred

17    to earlier today?

18         A.    Pretty -- yes.  So after he was no

19    longer partner, then I heard about a lawsuit.

20         Q.    Were any other management employees

21    at Starbucks, as far as you know, subject to any

22    sort of disciplinary or corrective action in

23    connection with compliance with the Fair Workweek

24    Law?

25         A.    Yes.  Several managers were subjected
```

August 27, 2020                                              227

```
1                    - TINA McDONALD -
                       Tina McDonald
                      August 27, 2020
2      to accountability, up to and including separation,

3      in regard to Fair Workweek legislation.

4           Q.    How many partners other than Mr. Fox,

5      that you're aware of, were separated involuntarily

6      from their employment due to noncompliance with

7      that legislation?

8                    MR. MOY:  Objection.

9           A.    Now, this is -- now of course, you

10     know -- can you repeat the question.

11          Q.    Other than Mr. Fox, how many

12     Starbucks managers were terminated in connection

13     with noncompliance with the Fair Workweek Law?

14                   MR. MOY:  Objection.

15          A.    So just to be clear, I may not have

16     always been aware of every single separation,

17     right, to be honest with you because a concern

18     could be listened to and it could be different

19     components of the Fair Workweek legislation.

20     However in regards to that, I might be aware of it

21     maybe around eight.

22          Q.    Were you involved in investigating

23     compliance by those eight managers who were

24     ultimately separated?

25          A.    From what I'm recalling, yes -- well,
```

August 27, 2020                                        228

```
 1                    - TINA McDONALD -
                         Tina McDonald
                        August 27, 2020
 2       no, actually, not.  I believe there was maybe one

 3       or two that it fell in regards to scheduling or

 4       labor compliance, but not necessarily Fair

 5       Workweek legislation specifically.  I'm not sure.

 6            Q.    Over what period of time were the

 7       approximately eight managers who you're referring

 8       to separated from their employment?

 9            A.    Over the course of a year.

10            Q.    Were they all separated after Mr. Fox

11       was fired?

12            A.    I don't remember all the specific

13       timings of everyone.  Possibly, yes --

14            Q.    Did you --

15            A.    -- and the reason being that we

16       consistently hold partners accountable for

17       violating time worked equals time paid because of

18       the egregiousness of it.

19            Q.    To be clear, they were all separated

20       after Mr. Fox was fired?

21            A.    I'm not -- I don't know all the

22       dates, to be fully honest, because that's not -- I

23       don't make the decision in regards to that, right.

24       So there could have been something that happened

25       prior to his separation.  I'm not like a hundred
```

Tina McDonald
August 27, 2020                                        229

```
 1                     - TINA McDONALD -

 2      percent sure.  I just know that with his situation

 3      specifically, you know, it was egregious enough

 4      that it warranted separation from the company.

 5              Q.    Who decided to terminate Mr. Fox, if

 6      you know?

 7              A.    That -- a decision -- employment

 8      action decisions are made by the operators in

 9      partnership with legal.  They have to receive

10      legal guidance on that.

11              Q.    Other than the approximately eight

12      managers who you think might have been separated

13      due to noncompliance with the Fair Workweek Law,

14      are there any managers you're aware of who

15      received a lesser form of discipline?

16              A.    I've seen managers receive maybe a

17      final written warning for late schedules.

18              Q.    Are you aware of any other managers

19      who have received written coaching or warnings,

20      other than what you've testified to?

21              A.    I am aware of receiving maybe a

22      written warning if you do not post a shift, an

23      available open shift.

24              Q.    How many such written warnings were

25      issued, that you know of?
```

August 27, 2020                                    230

```
1              - TINA McDONALD -
                  Tina McDonald
                August 27, 2020
2         A.     That I can't recall specifically.

3    The level of severity is determined based on the

4    actual violation.  So for example as I shared

5    posting schedules late in a city where there's

6    a legislation, that's a final warning.

7    Typically -- and so it really depends on what the

8    actual violation is in regards to the level of

9    severity.

10             So in the case of the store managers

11   being separated for example, in the instances that

12   I recall what led to the separation was that the

13   matters were so egregious as well as the integrity

14   concern.

15        Q.     I'm posting a document that I've

16   labeled Exhibit McDonald 21.  It is a one-page

17   document bearing Bates number DEF0463.

18             Ms. McDonald, if you can, please open

19   the file.  My first question will be:  After

20   you've had a chance to look at it, do you

21   recognize this document?

22        A.     Okay.

23             (Whereupon, Exhibit 21 was marked at

24        this time.)

25        A.     Okay, I have the email in front of
```

Tina McDonald
August 27, 2020                                    233

                   August 27, 2020
 1                 - TINA McDONALD -

 2       Q.     How did you select the other stores

 3   to visit for the purpose described in this e-mail?

 4       A.     I -- I can't -- I don't remember if

 5   I'm the one who even selected the stores, to be

 6   honest.

 7       Q.     As sit here today, do you know

 8   whether there was any methodology for selecting

 9   the stores that you visited as anticipated in the

10   e-mail?

11       A.     No, because I don't -- I don't recall

12   being the person to select what locations to visit

13   cause I was -- I was a compliance specialist.

14   Bradley was the partner resources manager, so in

15   that regard I would have been following his lead

16   based on his familiarity with store managers and

17   the district.

18       Q.     Did you fill out notes on your laptop

19   in connection with each of the visits to the other

20   stores that day?

21       A.     I -- I believe I did capture notes

22   because the intent was -- the intent was to get an

23   understanding of is there -- is this just

24   specific -- is what we're seeing specific to

25   Rafael only or is this a districtwide concern.  So

Tina McDonald
August 27, 2020

1                  - TINA McDONALD -

2     ultimately it was important to be fair and

3     objective to see okay, are we seeing something

4     differently under Rafael's leadership and how

5     compliance is showing up in comparison to his

6     peers.  That was the intent.

7                  And as a result what I recall was

8     identified was that -- as I shared prior, I never

9     met a store that was a hundred percent in

10    compliance.  I think there is always an

11    opportunity to improve, so it was similar in that

12    regard that there were opportunities within the

13    district where improvement could be made in

14    regards to compliance.

15                 However, in Rafael's store the

16    violations were much more egregious.  Actually,

17    they were not egregious in the other stores at

18    all.  It was just things like, okay, we need to

19    work on this, we need to establish a better

20    cadence.

21                 However, in Rafael's store it was

22    more -- it was severe.  So we had all the late

23    schedules.  We had the lack of transparency

24    because he said he always posted the schedules on

25    time, but that was not the case.  We had schedules

Tina McDonald
August 27, 2020                                                235

```
 1                    - TINA McDONALD -

 2     that were missing.  We had schedule change logs

 3     filled out by him and missing consent.  We had the

 4     indications of partners capturing things on the

 5     log and not being paid.  That was not identified

 6     in all the other stores, thankfully.

 7          Q.     Did you identify and come to the

 8     conclusions that you've just been describing on

 9     January 16, 2018?

10          A.     I came to the conclusion that this

11     was ultimately a real concern.  I would say that,

12     yes, I did come to a conclusion this was a real

13     concern, but ultimately, you know, I still wanted

14     to, like I said, take the time because ultimately

15     we're talking about a partner, right.

16                 Rafael was a store manager.  We want

17     to make sure we do our due diligence, and look

18     into the concern objectively, make that sure that

19     there's nothing missing here.  And so, yeah, I

20     came to a conclusion that there's a real concern

21     here, yes, based off of the observations of what I

22     saw.  In comparison to the other store managers in

23     the district, there was a difference.

24          Q.     Is it your understanding that the

25     Department of Consumer Affairs conducted an
```

Tina McDonald
August 27, 2020                                                     236

```
 1                     - TINA McDONALD -

 2      investigation to assess compliance within Mr.

 3      Fox's store based on the complaints that you

 4      already mentioned?

 5           A.     Yes.  To my understanding what led to

 6      the -- what ultimately resulted -- what led to all

 7      of this was a partner filing a complaint with the

 8      DCA in regards to what was happening in the

 9      location, to my understanding.

10           Q.     Did you ever read anything about the

11      evidence that the investigator compiled?

12           A.     From the DCA?

13           Q.     Yes.

14           A.     No, I don't recall.  I don't recall

15      reading anything from the DCA.

16           Q.     Is that true all the way up until

17      this moment?

18           A.     The only thing I ever saw was the

19      complaint itself.  I can't recall -- I can't

20      recall any other documents outside of the

21      complaint form in itself, given that outside --

22      regardless of the complaint in itself, as a

23      company we still have a responsibility to look

24      into it.  So I don't think that would have changed

25      the outcome unfortunately based off of what was
```

Tina McDonald
August 27, 2020                                                     241

```
1                    - TINA McDONALD -

2         Q.     Who is Tasmin Abocci?

3         A.     A district Manager.

4         Q.     Who is Tamit Ashebir?

5         A.     A district manager.

6         Q.     The subject line on this e-mail chain

7    is "Audit Store Number Symbol 15685."  My question

8    is --

9         A.     Yes.

10        Q.     -- apart from what's summarized in

11   this e-mail, did your audit of that store extend

12   to any other findings?

13        A.     Aside from what was in -- identified

14   in this e-mail?

15        Q.     Yes.  Are there any things that your

16   audit uncovered that you didn't include in this

17   specific e-mail?

18        A.     I mean, not that I can recall

19   specifically.  I just know this manager was

20   separated as well having integrity concerns

21   similar to Rafael's.

22        Q.     Did you participate in the decision

23   to terminate this manager?

24        A.     That was -- that was -- I was not --

25   no, that decision was made by the regional
```

Tina McDonald
August 27, 2020                                            246

```
 1                    - TINA McDONALD -

 2     else at Starbucks?

 3          A.     I can't recall if I discussed this

 4     specifically.          Tina McDonald
                               August 27, 2020

 5          Q.     And is it the case, now that you've

 6     seen a couple of examples, do you recall whether

 7     you at any point in time after Mr. Fox's

 8     separation looked to see if you had text message

 9     communications with him?

10          A.     No, I don't recall looking for

11     communication with him.

12          Q.     You can put that document aside.

13                 Ms. McDonald, I just posted a

14     document labeled Exhibit McDonald 32.  It is a

15     five-page document produced by defendant bearing

16     Bates numbers Defendant 45359 through 45363.

17                 If I could direct your attention

18     first to the first two pages of the exhibit and,

19     if you could, take a look to see was there and let

20     me know when you've read it.

21          A.     Okay.

22          Q.     Once you've had a chance to look at

23     it, my question will be whether you can identify

24     what are the first two pages of this document.

25                 (Whereupon, Exhibit 32 was marked at
```

August 27, 2020                                    247

```
 1              - TINA McDONALD -

 2        this time.)

 3        A.    Okay, yes, I've -- I looked at the

 4   document.          Tina McDonald
                        August 27, 2020
 5        Q.    What are these first two pages, if

 6   you know?

 7        A.    These are basic observations

 8   of what -- these are notes captured specific to

 9   compliance and predictability pay to partners in

10   the store between the time period of November 26th

11   and January 16th.

12        Q.    What store specifically?

13        A.    Store 15751.

14        Q.    Was that Mr. Fox's store?

15        A.    That is correct.

16        Q.    Did you create this document?

17        A.    I did.

18        Q.    On the first page of the document

19   there's a number of places where it's indicating

20   that something is missing consent.  Do you see

21   those references?

22        A.    I do.    U.S. LEGAL SUPPORT
                         (877) 479-2484
23        Q.    How did you determine whether consent

24   had or had not -- withdrawn.

25              Apart from the consent not being
```

Tina McDonald
August 27, 2020                                          248

```
 1              - TINA McDONALD -

 2   listed where you expected to see it, did you do

 3   anything to determine whether consent had in fact

 4   been given by the referenced employees?

 5        A.    This was specific to the schedule

 6   change logs, so that was what was referenced to

 7   capture this document.

 8        Q.    Did you do anything to find out

 9   whether the employees, whose consent was not

10   recorded, in fact did or did not actually consent

11   to the specific changes?

12        A.    I -- I don't recall specifically

13   because ultimately when going into his

14   store -- this is about an overview of compliance

15   in the store and what -- unfortunately what came

16   out of it was --

17        Q.    If I could --

18              MR. MOY:  Don't interrupt the

19        witness.  Let her finish.

20              Go ahead, Tina.

21        A.    So I went to look and evaluate

22   compliance in the stores, so these were the

23   findings.

24              So what led to Rafael Fox's situation

25   where we are today, unfortunately was around the
```

Tina McDonald
August 27, 2020                                           249

```
 1                  - TINA McDONALD -

 2    integrity piece and the overall violations

 3    relative to compliance and so -- and just the late

 4    schedules where we know we are supposed to pay a

 5    partner.  Partners, the law -- partners are not

 6    really familiar with their rights.  So we have a

 7    responsibility as those leading them to ensure

 8    that we're in compliance.  Hence, why the store

 9    managers went through training on compliance.

10              And even outside of that, three weeks

11    of schedules were expected to be posted prior to

12    the Fair Workweek legislation and that was not

13    happening.  And then when asked about those

14    behaviors in the location, he said that he was

15    postings schedules which he was not.  He was given

16    guidance before to pay partners and he chose not

17    to, so I'm just trying to understand where we're

18    going specifically with this.

19              MR. GRAFF:  Move to strike the

20         entirety of the preceding response as not

21         responsive.

22         Q.     I'm going to ask a specific question

23    and, if you could, try to answer it specifically.

24    Did you ask --

25         A.     Sure.
```

August 27, 2020                                          250

```
 1                      - TINA McDONALD -

 2        Q.      -- any of the partners in Mr. Fox's

 3    store whether they had, in fact, consented to any

 4    of the changes that you believed may not have been

 5    consented to?

 6        A.      I can't recall.

 7        Q.      Could I ask you, please, to scroll

 8    down to the third page of this document, Bates

 9    numbered DEF45361.

10        A.      Sure.

11                Yes, okay.  I'm -- we're at the top

12    where it says "Compliance"?

13        Q.      Yes.

14        A.      Okay.

15        Q.      The date there is Thursday, January

16    11, 2018, 10:12 a.m.

17        A.      Yes.

18        Q.      Does that mean that you drafted the

19    text that appears on this page at approximately

20    that time?

21        A.      Yes, that's what that would mean.

22        Q.      Generally, what are you describing in

23    this page of the exhibit?

24        A.      This was in regards to period of rest

25    violations.  So partners are allowed -- are
```

Tina McDonald
August 27, 2020                                              251

```
 1                    - TINA McDONALD -

 2      required to have 11 hours in between shifts and so

 3      this is capturing relative to the rest between

 4      shifts report that came out.

 5           Q.      Does this pertain to Mr. Fox's store?

 6           A.      Yes, it does.

 7           Q.      Scrolling forward please to the next

 8      page, Page 4 Bates numbered 45362, the top of the

 9      page says "Questions," the date Thursday, January

10      11th at 11:57 a.m.  Did you type the text that

11      appears below that on this page?

12           A.      Yes.  Yes, I did.

13           Q.      Did you type all of the text at or

14      around 11:57 a.m. or did you write it perhaps in

15      two stages?

16           A.      I believe I captured it all at the

17      same time.

18           Q.      If you look at each paragraph, it

19      appears to be laid out as a question followed by

20      an answer.  Do you see that?

21           A.      Yes, I do.

22           Q.      Were you writing down in these notes

23      the questions and the answers as you were asking

24      and receiving them?

25           A.      Yes, that is correct.
```

Tina McDonald
August 27, 2020

U.S. LEGAL SUPPORT
(877) 479-2484

August 27, 2020                                            252

```
 1                    - TINA McDONALD -

 2          Q.     Did you have any of these questions

 3     prewritten going into whatever meeting?

 4          A.     I can't recall.

 5          Q.     Who did you pose these questions to?

 6          A.     Rafael Fox.

 7          Q.     And you recorded his answers to the

 8     questions?

 9          A.     That's correct.

10          Q.     Did you ever show him a copy of your

11     summary of this meeting for him to review and let

12     you know if he had any corrections for accuracy?

13          A.     I don't recall.

14          Q.     Can I direct your attention, please,

15     to the final page of the document, Bates numbers

16     Defendant 45363.  This page is headed or captioned

17     "Compliance Notes 15751."  Beneath that there's a

18     date, January 23, 2018 at 12:23 p.m.  Ms.

19     McDonald, did you write all of the text on this

20     page?

21          A.     Wait, which one?  I'm sorry.

22          Q.     The last page in this exhibit.

23          A.     Okay, sorry.  From January 23rd,

24     2018; is that correct?

25          Q.     That's the page, yes.
```

August 27, 2020                                                    253

```
 1                  - TINA McDONALD -

 2        A.      Yes, I did capture these notes.

 3        Q.      Did you write them all in one sitting

 4   at approximately 12:23 p.m.?

 5        A.      Yes, I believe so.  I can't recall

 6   specifically, but yes.

 7        Q.      And do these notes pertain to Mr.

 8   Fox's store?

 9        A.      Yes, they do.

10        Q.      What was the purpose of drafting this

11   page of the document?

12        A.      So the purpose was to -- it goes back

13   to the Fair Workweek legislation and analyzes what

14   the compliance -- the gaps in compliance in the

15   location.

16                So, for example with the schedules,

17   it's capturing the amount of notice provided to

18   partners and the amount of violations for each

19   category; so schedules, schedule change logs for

20   example, a period of rest violations, and the good

21   faith estimate form, all of those are part of the

22   Fair Workweek legislation and so this was -- the

23   intent was to just capture an overall view of

24   that.

25        Q.      Do you see there's a section towards
```

August 27, 2020                                        254

```
 1                  - TINA McDONALD -

 2       the bottom of the document in bold that says;

 3       "Period of Rest Violations"?

 4            A.     Yes, I do.    Tina McDonald
                                  August 27, 2020
 5            Q.     On that line it says "zero

 6       violations" and then below that there's two more

 7       sentences.  Do those sentences each describe --

 8            A.     Yes.

 9            Q.     Do those sentences describe

10       violation?

11            A.     We don't -- those are not considered

12       to be violations due to the 15-minute rule, where

13       partners are allowed a schedule change of 15

14       minutes or less without resulting in a period of

15       rest violation or a schedule change premium.

16                  MR. GRAFF:  Let's take a break off

17            the record until 7:05 p.m.

18                  THE WITNESS:  Okay.

19                  (Whereupon, there was a brief recess

20            in the proceedings.)

21            Q.     Ms. McDonald, did you communicate

22       with anyone or read anything during the break?

23            A.     No, I did not.

24            Q.     Quick question:  Going back to the

25       last page of the Exhibit 32 that we've just been
```

August 27, 2020                                        271

Tina McDonald
- TINA McDONALD - August 27, 2020

1

2        Q.    I'm going to direct your attention

3    now to another line of questions posed by Mr.

4    Graff.  Earlier Mr. Graff asked you whether Mr.

5    Fox raised the issue of the use of DDVP with you,

6    do you recall?

7        A.    Yes, I recall being asked that.

8        Q.    Did Mr. Fox raise this issue with you

9    before your investigation of Mr. Fox began?

10       A.    No.

11       Q.    Do you recall when Mr. Fox first

12   raised the issue of DDVP with you?

13       A.    The conversation happened in his

14   store after receiving the DCA complaint and I just

15   happened to be there auditing the timecards and

16   that's when he made the comment.

17       Q.    Did you perceive him to have made a

18   complaint to you about the use of DDVP at the

19   store?

20            MR. GRAFF:  Objection.

21       A.    Honestly speaking, I did not take it

22   as a complaint.  I took it as more of an asking a

23   question and I directed him to the correct

24   resource.

25       Q.    And that resource, I believe you

Tina McDonald
August 27, 2020                                272

Tina McDonald
1         - TINA McDONALD - August 27, 2020

2    mentioned earlier, was from the district manager?

3         A.    Correct, I directed him to his

4    district manager because when typically a store

5    manager has a concern, the person they should

6    escalate the concern to is their district manager

7    because they are the resource.

8         Q.    During this conversation with Mr.

9    Fox, did he suggest that the use of DDVP was

10   widespread at Starbucks stores?

11             MR. GRAFF:  Objection.

12        A.    No, I -- I don't recall him making

13   that suggestion.

14        Q.    What, if anything, do you recall

15   about what Mr. Fox said to you with respect to

16   DDVP?

17        A.    I just recall him saying that or

18   like asking about, you know, if it -- I

19   believe -- okay, I believe that he believed it was

20   being used in a specific store.  I don't recall

21   him saying widespread.  I -- I recall it more

22   about a specific location and kind of like what

23   should he do.  That's what I recall.

24        Q.    Did you refer this conversation with

25   Mr. Fox concerning DDVP to any other employee at

Tina McDonald
- TINA McDONALD -
August 27, 2020                                    273

1          - TINA McDONALD -  August 27, 2020

2    Starbucks?

3              MR. GRAFF:  Objection.

4         A.    No.  No.  After that conversation, I

5    did not -- I, honestly, did not take it as a

6    complaint or anything of that nature.  I just took

7    it as him asking a question and me directing him

8    to the resource, because when I was in his store

9    it was to look into compliance -- schedule and

10   compliance in relation to Fair Workweek

11   legislation and the DCA complaint.  That -- that

12   was within my scope of work.  Anything outside of

13   at that, you know, didn't fall within my work.

14        Q.    I have another line of questions for

15   you regarding your investigation or audit of Fox's

16   store.

17              When you commenced your audit of

18   Fox's store, were you aware of any concerns raised

19   by Fox regarding the alleged underpayment or

20   nonpayment of wages to store employees?

21              MR. GRAFF:  Objection.

22        A.    No.  No, I was not aware of any other

23   concern.  No.

24        Q.    At any point during the course of

25   your investigation or audit of Fox's store, were

Tina McDonald
August 27, 2020                                    274

1                - TINA McDONALD -

2       you aware that Fox raised any such concerns

3       regarding the alleged underpayment or nonpayment

4       of wages to store employees?

5                   MR. GRAFF:  Objection.

6            A.    No, I was not aware of that.

7            Q.    I'm going to refer you to Mr.

8       Graff's questions to you regarding employees'

9       signatures in the schedule change logs.  Does an

10      employee consent for a schedule change have to be

11      in writing?

12           A.    Yes, partners are required to consent

13      in writing.

14           Q.    If there is no handwritten consent by

15      a store partner there is no consent for compliance

16      purposes, correct?

17                  MR. GRAFF:  Objection.

18           A.    Of course -- in regards to

19      compliance, that would be considered that the

20      partner did not consent.

21           Q.    If there is no handwritten consent

22      for a schedule change that is a violation,

23      correct?

24                  MR. GRAFF:  Objection.

25           A.    Correct.

Tina McDonald
August 27, 2020                                  275

Tina McDonald
August 27, 2020

1                    - TINA McDONALD -

2        Q.    And the requirement that a store

3    employee actually consent in writing is a

4    requirement imposed by law?

5        A.    That is correct.  That is a part of

6    the Fair Workweek legislation, that partners

7    provide written consent for all schedule changes

8    outside of their already posted schedule.

9        Q.    I believe you testified earlier that

10   there were several hundred Starbucks stores,

11   correct?

12            MR. GRAFF:  Objection.

13       A.    Correct.  Yes, there are hundreds

14   of -- yup, that is accurate.

15       Q.    And do you know how many employees

16   Starbucks has?

17       A.    Thousands, thousands of employees.

18       Q.    Okay.  Sitting here today, do you

19   know how long it would take for you to call every

20   single employee for whom a store manager signed

21   rather than having the store employee sign?

22            MR. GRAFF:  Objection.

23       A.    I -- I don't know how long that would

24   take, but that -- honestly, that would have been

25   unrealistic.  As a compliance specialist

| | |
|---|---|
| **From:** | "Donna, Peter (DCA)" |
| **Date:** | Wednesday, January 2, 2019 at 10:52:15 AM Eastern Standard Time |
| **To:** | "Rafael Fox" |
| **Cc:** | |
| **Subject:** | **RE: Rafael Fox/yesterday's meeting** |

Good morning Mr. Fox,

We actually just received a signed copy of the CO this morning and it has been fully executed. It might take a week or so to register fully in the Department's records but as previously discussed, we have reached a final resolution with Starbucks.

Best regards,

-Peter

**From:** Rafael Fox [mailto:rafaelfox@gmail.com]
**Sent:** Wednesday, January 2, 2019 10:39 AM
**To:** Donna, Peter (DCA) <PDonna@dca.nyc.gov>
**Cc:** Ari Graff <agraff@filosagraff.com>
**Subject:** Re: Rafael Fox/yesterday's meeting

Good morning Investigator Donna,

I apologize for asking again, but is the final settlement completed with Starbucks, so I can FOIL request? I realize that investigations are time intensive, but we are about 52 weeks since the beginning (January 5th 2017), and when we last spoke in person 10.24.2018, you said the conclusion was approximately a month away, although I followed up by email 11.23.2018, and you replied that you are finalizing the settlement agreement, and you would inform me upon completion. Thank you so much for your time.

Sincerely,

Rafael Fox

On Mon, Nov 26, 2018 at 9:44 AM Donna, Peter (DCA) <PDonna@dca.nyc.gov> wrote:

> Good morning Mr. Fox,
>
> We are currently still in the process of finalizing the settlement agreement. Once this is completed I will follow up to inform you when it is executed.
>
> Best,
>
> -Peter

**From:** Rafael Fox [mailto:rafaelfox@gmail.com]
**Sent:** Friday, November 23, 2018 5:37 PM
**To:** Donna, Peter (DCA) <PDonna@dca.nyc.gov>; Ari Graff <agraff@filosagraff.com>
**Subject:** Re: Rafael Fox/yesterday's meeting

Hello Investigator Donna,

I am writing in regards to the investigation you conducted of Starbucks and the Fair Workweek Laws. Per our discussion on 10.24.2018, you stated that the investigation was ongoing, but that you estimated it would be completed in one month. Are you able to confirm whether your work has been completed, so I could file a FOIL request with the DCA? Thank you for your time.

Sincerely,

Rafael Fox

On Thu, Oct 25, 2018 at 11:32 AM Donna, Peter (DCA) <PDonna@dca.nyc.gov> wrote:

> Good morning Mr. Fox,
>
> Unfortunately the only information I can provide to third parties such as yourself and Mr. Graff in regards to ongoing investigations/settlements is when they are concluded. After which you are free to resubmit your FOIL request.
>
> Best,
>
> -Peter
>
>
> **From:** Rafael Fox [mailto:rafaelfox@gmail.com]
> **Sent:** Thursday, October 25, 2018 10:35 AM
> **To:** Donna, Peter (DCA) <PDonna@dca.nyc.gov>
> **Subject:** Rafael Fox/yesterday's meeting
>
> Good morning Investigator Donna,
>
> Thank you for taking time to meet with me yesterday.
>
> My lawyer, Ariel (Ari) Graff, wanted me to share with you that he is available to you if he can be of any assistance, and he would also like to be informed of the outcome, as well as provided with any information regarding the case, once it is available.
>
> Ari cooperated with your office on a matter about 18 months ago, so you and your

office may already be familiar with him. His contact information is
Agraff@filosagraff.com and (212) 203-3473.

Sincerely,

Rafael Fox
(917) 747-4423
rafaelfox@gmail.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

RAFAEL FOX, PAUL D'AURIA, and JILL
SHWINER,

                          Plaintiffs,

        vs.

STARBUCKS CORPORATION d/b/a
STARBUCKS COFFEE COMPANY,

                        Defendant.

Case No.: 19-CV-4650 (AJN)(SN)

**DECLARATION OF ARIEL Y. GRAFF**
**IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

    I, ARIEL Y. GRAFF, an attorney duly admitted to practice before this Court, hereby

declare under penalty of perjury that the following is true and correct:

    1.    I am an attorney with Filosa Graff, LLP, counsel to Plaintiffs Rafael Fox ("Mr.

Fox"), Paul D'Auria ("Mr. D'Auria") and Jill Shwiner ("Ms. Shwiner") (collectively,

"Plaintiffs"). I am fully familiar with the facts and circumstances set forth herein, and this

Declaration is true to the best of my personal knowledge. I make this Declaration to put before

the Court certain documents and testimony relevant to Plaintiffs' opposition to the motion for

summary judgment by Defendant Starbucks Corporation d/b/a Starbucks Coffee Company

("Defendant," "Starbucks," or the "Company").

    2.    Annexed hereto as "Exhibit 1" is a true and correct copy of Plaintiffs' Complaint

in this action (ECF #1).

    3.    Annexed hereto as "Exhibit 2" is a true and correct copy of the relevant pages of

the transcript of the deposition of Rafael Fox taken on August 12, 2020.

4.      Annexed hereto as "Exhibit 3" is a true and correct copy of the relevant pages of the transcript of the deposition of Paul D'Auria taken on September 9, 2020.

5.      Annexed hereto as "Exhibit 4" is a true and correct copy of the relevant pages of the transcript of the deposition of Plaintiff Jill Shwiner taken on September 11, 2020.

6.      Annexed hereto as "Exhibit 5" is a true and correct copy of the relevant pages of the transcript of the deposition of Rami Kranz taken on September 15, 2020.

7.      Annexed hereto as "Exhibit 6" is a true and correct copy of the relevant pages of the transcript of the deposition of Keith Costello taken on August 19, 2020.

8.      Annexed hereto as "Exhibit 7" is a true and correct copy of the relevant pages of the transcript of the deposition of Carla Ruffin taken on August 21, 2020.

9.      Annexed hereto as "Exhibit 8" is a true and correct copy of the relevant pages of the transcript of the deposition of Rachel Kelly taken on September 2, 2020.

10.     Annexed hereto as "Exhibit 9" is a true and correct copy of the relevant pages of the transcript of the deposition of Tim Hutchinson taken on September 1, 2020.

11.     Annexed hereto as "Exhibit 10" is a true and correct copy of the relevant pages of the transcript of the deposition of Leslie Fable taken on September 29, 2020.

12.     Annexed hereto as "Exhibit 11" is a true and correct copy of the relevant pages of the transcript of the deposition of Tina McDonald taken on August 27, 2020.

13.     Annexed hereto as "Exhibit 12" is a true and correct copy of a stipulation by Starbucks concerning a public statement that it issued on May 21, 2019 in connection with the filing of this case.

14.     Annexed hereto as "Exhibit 13" is a true and correct copy of a document produced by Defendant in discovery bearing bates number DEF45453. It is a written copy of Starbucks May 21, 2019 press statement.

15.     Annexed hereto as "Exhibit 14" is a true and correct copy of a stipulation by Starbucks concerning the non-issuance of backpay to certain employees.

16.     Annexed hereto as "Exhibit 15" is a true and correct copy of relevant pages from a Daily Record Book purchase log for a Starbucks location in New York City. It reflects a Starbucks store employee's reimbursement by Starbucks for the employee's purchase of "Hot Shot No-Pest Strip 2" in Fall 2019.

17.     Annexed hereto as "Exhibit 16" is a true and correct copy of relevant pages from a Daily Record Book purchase log for another Starbucks location in New York City. It reflects a Starbucks store employee's reimbursement by Starbucks for the employee's purchase of "Hot Shot Flying Insect Killer."

18.     Annexed hereto as "Exhibit 17" is a true and correct copy of relevant pages from a Daily Record Book purchase log for another Starbucks location in New York City. It reflects a Starbucks store employee's reimbursement by Starbucks for the employee's purchase of "CB-80" in October 2019.

19.     Annexed hereto as "Exhibit 18" is a true and correct copy of relevant pages from a Daily Record Book purchase log for another Starbucks location in New York City. It reflects a Starbucks' employee's reimbursement by Starbucks for the employee's purchase of "Hot Shot No Pest Strip" in November 2018.

20.     Annexed hereto as "Exhibit 19" is a true and correct copy of relevant pages from a Daily Record Book purchase log for another Starbucks location in New York City. It reflects a

Starbucks store employee's reimbursement by Starbucks for the employee's purchase of "Hot Shot Flying Insect Killer" in April 2019.

21.     Annexed hereto as "Exhibit 20" is a true and correct copy of relevant pages from a Daily Record Book purchase log for another Starbucks location in New York City. It reflects a Starbucks store employee's reimbursement by Starbucks for the employee's purchase of "Hot Shot Flying Insect Killer" in April 2019.

22.     Annexed hereto as "Exhibit 21" is a true and correct copy of a six-page email chain and attachment produced by Plaintiffs.

23.     Annexed hereto as "Exhibit 22" is a true and correct copy of a two-page email chain produced in discovery by Plaintiff Shwiner.

24.     Annexed hereto as "Exhibit 23" is a true and correct copy of AVP Termite and Pest Control's October 16, 2012 proposal for the provision of certain pest control services to Starbucks.

25.     Annexed hereto as "Exhibit 24" is a true and correct copy of a one-page email and with two pages of attachments produced by Defendant in discovery and bearing bates numbers DEF4962-4964.

26.     Annexed hereto as "Exhibit 25" is a true and correct copy of an email produced by Defendant in discovery, bearing subject line "Stores purchasing pest control items. FYI" and bates numbers DEF154-156.

27.     Annexed hereto as "Exhibit 26" is a true and correct copy of a one-page email four pages of attachments produced by Plaintiff Fox in discovery and bearing subject line "Time clock manipulation at West Broadway and Leonard."

28.     Annexed hereto as "Exhibit 27" is a true and correct copy of a two-page email chain produced by Plaintiffs in discovery.

29.     Annexed hereto as "Exhibit 28" is a true and correct copy of a two-page email chain produced by Plaintiffs in discovery.

30.     Annexed hereto as "Exhibit 29" is a true and correct copy of a two-page email produced by Defendant in discovery, bearing subject line "FW: Hot Shots - Fly insecticide in stores - DOH VIOLATION" and bates numbers DEF141-142.

31.     Annexed hereto as "Exhibit 30" is a true and correct copy of a two-page email produced by Defendant in discovery bearing bates numbers DEF151-152.

32.     Annexed hereto as "Exhibit 31" is a true and correct copy of a two-page email chain produced by Plaintiff Fox in discovery.

33.     Annexed hereto as "Exhibit 33" is a true and correct copy of a one-page email and embedded image produced by Plaintiff Fox in discovery.

34.     Annexed hereto as "Exhibit 34" is a true and correct copy of a two-page email produced by Plaintiff Fox in discovery bearing subject line "RE: question regarding NYC scheduling rules."

35.     Annexed hereto as "Exhibit 35" is a true and correct copy of a two-page text message exchange between Plaintiff Fox and Tina McDonald, bearing bates numbers RF_867-868.

36.     Annexed hereto as "Exhibit 36" is a true and correct copy of the Declaration of Plaintiff Rafael Fox in Opposition to Defendant's motion for summary judgment.

37.     Annexed hereto as "Exhibit 37" is a true and correct copy of a one-page text message exchange between Plaintiff Fox and Tina McDonald, bearing bates numbers RF_841.

38.     Annexed hereto as "Exhibit 38" is a true and correct copy of a two-page email exchange produced by Plaintiff Shwiner in discovery.

39.     Annexed hereto as "Exhibit 39" is a true and correct copy of a two-page email chain produced by Defendant in discovery bearing subject line "Hot shot in pastry case" and bates numbers DEF144-145.

40.     Annexed hereto as "Exhibit 40" is a true and correct copy of a two-page email chain produced by Defendant in discovery bearing subject line "Dichlorvos (No Pest Strips): and bates numbers DEF126-128.

41.     Annexed hereto as "Exhibit 41" is a true and correct copy of a two-page email chain produced by Defendant in discovery bates numbers DEF0017223-17224.

42.     Annexed hereto as "Exhibit 43" is a true and correct copy of a one-page email chain produced by Plaintiff Fox in discovery.

43.     Annexed hereto as "Exhibit 44" is a true and correct copy of a one-page document produced by Plaintiff Fox in discovery and headed "Starbucks Daily Records Book Punch Communication Log."

44.     Annexed hereto as "Exhibit 45" is a true and correct copy of a relevant page of an email produced by Plaintiff Fox in discovery.

45.     Annexed hereto as "Exhibit 48" is a true and correct copy of a relevant page from an interview log produced by the New York State Department of Consumer Affairs in response to a FOIA request by Mr. Fox, and produced in discovery by Mr. Fox bearing bates number RF_131.

46.     Annexed hereto as "Exhibit 49" is a true and correct copy of an Activity Log produced by the New York State Department of Consumer Affairs in response to a FOIA request by Mr. Fox, and produced in discovery by Mr. Fox bearing bates number RF_155-158.

47.     Annexed hereto as "Exhibit 50" is a true and correct copy of a one-page email and two related pages produced by Defendant in discovery.

48.     Annexed hereto as "Exhibit 51" is a true and correct copy of a relevant page from AVP's written response to a subpoena served by Starbucks in this action, which sought written job descriptions for Ms. Shwiner and Mr. D'Auria.

49.     Annexed hereto as "Exhibit 52" is a true and correct copy of relevant pages from Defendants Amended Responses and Objections to Plaintiffs First Set of Interrogatories in this action.


I declare under penalty of perjury, that the foregoing is true and correct.

Dated: New York, New York
      March 1, 2021                    By: _Ariel Graff_
                                  Ariel Y. Graff

                              Filosa Graff LLP
                              111 John Street, Suite 2510
                              New York, NY 10038
                              Tel: (212) 203-3473
                              agraff@filosagraff.com

                              *ATTORNEYS FOR PLAINTIFFS*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| RAFAEL FOX, PAUL D'AURIA, and JILL SHWINER, | |
| Plaintiffs, | Case No.: 19-CV-4650 |
| vs. | |
| STARBUCKS CORPORATION d/b/a STARBUCKS COFFEE COMPANY, | |
| Defendant. | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Rafael Fox ("Mr. Fox"), Paul D'Auria ("Mr. D'Auria") and Jill Shwiner ("Ms. Shwiner") (collectively, "Plaintiffs"), by and through their undersigned counsel, Filosa Graff LLP, as and for their Complaint in this action against Defendant Starbucks Corporation d/b/a Starbucks Coffee Company ("Defendant," "Starbucks" or the "Company"), hereby allege as follows:

## PRELIMINARY STATEMENT

Starbucks is an internationally iconic brand, famous for generating billions of dollars through the sale of expensive cups of coffee to countless millions of Americans and tens of thousands of New Yorkers each day. Its ability to do so depends, in part, on a brand perception steeped in a high-stakes mythology. The Company's legions of loyal consumers don't merely spend $4.50 for a latte—they pay for a meticulously orchestrated consumer "experience" that depends on Starbucks's fictionalized self-portrayal as a "model" corporate citizen and employer.

This lawsuit pulls back the curtain on that fiction. Far from being a model employer, Starbucks has for years permitted the deployment of toxic chemicals in its stores, which infused not only the food products and fixtures, but also the very air circulated throughout its retail

Case 21-2531, Document 27, 01/21/2022, 3248030, Page251 of 311

A-540

Case 1:19-cv-04650-AJN-SN   Document 105-1   Filed 03/02/21   Page 3 of 58
Case 1:19-cv-04650   Document 1   Filed 05/21/19   Page 2 of 29

locations in Manhattan. This Complaint sets forth direct, first-hand allegations and documentary proof of these practices by three former workers who, when they became aware that they were working in close proximity to this hazardous threat, refused to remain silent about Starbucks's reckless indifference to the health, safety, and well-being of its patrons and employees.

This systematic misconduct also cannot be construed as a mere oversight. Instead, Starbucks management personnel responsible for overseeing Manhattan-area stores have been provided with no fewer than a dozen different explicit written warnings from external experts in the past three years. These repeated written reports were also accompanied by an almost countless series of direct personal pleas and warnings relayed to responsible Starbucks officials, who were capable of stopping this callus betrayal of public trust, but nevertheless failed to take any meaningful corrective action.[1] As set forth below, it is also apparent that Starbucks management personnel located in (at the very least) three different corporate "Regions" — which collectively encompass hundreds of stores in the NYC-Area alone — systematically and unlawfully hid these toxic products in their stores for the past several years.

Given the lengths Starbucks has undertaken to create and perpetuate its image, it is perhaps unsurprising that Plaintiff Rafael Fox was terminated not only after issuing complaints about Starbucks's use of toxic chemicals throughout its stores, but also after he investigated, documented, and attempted to remedy systematic wage theft (often in multi-hour blocks) from the hourly wages of many of its most vulnerable employees.

Plaintiffs now seek to hold Starbucks accountable for its misconduct against its patrons, employees and workers, as further described below.

---

[1] In a particularly ironic development in light of this background, the "benevolent" overseer of Starbucks — who reaped billions of dollars in personal wealth while these practices thrived under his stewardship — has now publicly and repeatedly urged that his "success qualifies him to serve as President of the United States.

**A-541**

Case 21-2531, Document 27, 01/21/2022, 3248030, Page252 of 311

Case 1:19-cv-04650-AJN-SN   Document 105-1   Filed 03/02/21   Page 4 of 58
Case 1:19-cv-04650   Document 1   Filed 05/21/19   Page 3 of 29

## NATURE OF THE CLAIMS

1.      Plaintiffs seek declaratory, injunctive and equitable relief, as well as monetary

damages, to redress Defendant's negligence and gross negligence in exposing Plaintiffs to

hazardous chemical poisons that Defendant wrongfully concealed in their worksites at Starbucks

retail locations throughout the Borough of Manhattan, New York. Plaintiff Rafael Fox also seeks

to recover for Defendant's unlawful, retaliatory employment practices against him in violation of

New York Labor Law ("NYLL") Section 215, and Fair Labor Standards Act ("FLSA") Section

15(a)(3).

## JURISDICTION AND VENUE

2.      The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332,

as there is diversity of citizenship between Plaintiffs — residents of the State of New York (Mr.

Fox), the Commonwealth of Pennsylvania (Mr. D'Auria) and the State of Nebraska (Ms.

Shwiner) — and Defendant, a corporation with its headquarters in the State of Washington, and

this action involves a matter in controversy that exceeds the sum of $75,000, exclusive of interest

and costs.

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant

Starbucks Corporation is a corporation doing business in the State of New York and is subject to

personal jurisdiction in this district, and a substantial part of the events or omissions giving rise

to this action occurred in this district.

## PARTIES

4.      Plaintiff Rafael Fox, a former employee of Starbucks, resides in New York

County, New York. At all relevant times, Mr. Fox worked in New York City and met the

Case 21-2531, Document 27, 01/21/2022, 3248030, Page253 of 311

**A-542**

Case 1:19-cv-04650-AJN-SN Document 105-1 Filed 03/02/21 Page 5 of 58
Case 1:19-cv-04650 Document 1 Filed 05/21/19 Page 4 of 29

definition of an "employee" under all applicable statutes throughout his employment with Defendant.

5.     Plaintiff Paul D'Auria served as an outside pest control technician assigned to service Starbucks Manhattan store locations, including from in or around calendar years 1999 through 2003, as well as from 2005 through November 2009 and, most recently, from March 2013 through June 2018. Plaintiff D'Auria currently resides in Pike County, Pennsylvania.

6.     Plaintiff Jill Shwiner served as an Operations Director for the outside pest control entity that Starbucks retained to provide expert pest control services for Manhattan store locations during the same timeframes. Plaintiff Shwiner currently resides in Douglas County, Nebraska.

7.     Defendant Starbucks Corporation d/b/a Starbucks Coffee Company is a foreign business corporation organized and existing under the laws of the State of Washington with a principal place of business at 2401 Utah Avenue South, Seattle, Washington 98134. Starbucks owns and operates a global chain of coffee shops comprising over 20,000 stores in over 70 countries. At all times relevant herein, Starbucks was Mr. Fox's "employer" under all relevant statutes.

**FACTUAL ALLEGATIONS**

I.     **Plaintiffs' Professional Relationships with Starbucks in Manhattan**

   A.     **Plaintiff Rafael Fox**

8.     Mr. Fox served with distinction as a Starbucks employee and Store Manager at multiple locations in Manhattan for sixteen years — until Starbucks abruptly terminated his employment in February 2018, as further set forth below.

Case 21-2531, Document 27, 01/21/2022, 3248030, Page254 of 311

A-543

Case 1:19-cv-04650-AJN-SN   Document 105-1   Filed 03/02/21   Page 6 of 29
Case 1:19-cv-04650   Document 1   Filed 05/21/19   Page 5 of 29

9.      Mr. Fox earned a reputation for professional excellence over the course of his lengthy tenure with Starbucks, which included serving as a Store Manager at three different locations during the ten years prior to his sudden termination.

10.     His dedication to Starbucks, his co-workers and customers alike resulted in Mr. Fox's receipt of multiple awards for his performance as a Store Manager, including in the final years of his tenure.

11.     For example, while serving as Manager of the Starbucks located at 405 Broadway in Manhattan in 2016, Mr. Fox was lauded as *Starbucks Manager of the Quarter* for his Region, comprised of approximately 102 New York City-area stores.

12.     In October 2017, Mr. Fox was presented with an award for achieving the highest customer survey ratings for Store Operations and Customer Connection of any of the stores in his District, comprised of approximately 11 stores.

13.     That same month, Mr. Fox was also recognized with an award for achieving the highest score of any store in his District on a stringent, unannounced health inspection by "Ecosure," an outside vendor contracted to conduct food safety and cleanliness audits.

14.     On October 10, 2017, Mr. Fox was re-assigned to become Store Manager of the Starbucks location at 180 West Broadway, where he replaced a Store Manager who had been fired the day before.

15.     As further set forth below, Starbucks abruptly terminated Mr. Fox's employment approximately four months later in response to his complaints concerning the misuse of a toxic airborne insecticide in a neighboring Starbucks store, as well as for reporting and attempting to correct the Company's knowing underpayment of wages owed to dozens of current and former

Case 21-2531, Document 27, 01/21/2022, 3248030, Page255 of 311

A-544

Case 1:19-cv-04650-AJN-SN Document 105-1 Filed 03/02/21 Page 7 of 58
Case 1:19-cv-04650 Document 1 Filed 05/21/19 Page 6 of 29

Starbucks employees — including many of whom who had worked at the West Broadway store prior to his re-assignment as Store Manager of that location.

**B.** **Plaintiff Paul D'Auria**

16.     Mr. D'Auria worked as a licensed, certified Pest Control Technician in New York City for more than 21 years until his retirement from the industry in June 2018, as further set forth below.

17.     Throughout his career, Mr. D'Auria excelled at his work and earned a reputation for his dedication, integrity and diligence.

18.     Having contracted lymphoma associated with exposure to airborne toxins in the aftermath of the September 11 World Trade Center attack, Mr. D'Auria is also keenly aware of the risks of exposure to toxic, carcinogenic chemicals, reinforcing his already scrupulous care when handling pesticides or applying them in client facilities.

19.     From October 2000 through November 2009, Mr. D'Auria was employed as a pest management technician with AVP Termite & Pest Control of New York, Inc. ("AVP"), a pest management control services provider based in New York City.

20.     During much of that period, Starbucks contracted with AVP to provide pest management services to certain stores located in Manhattan. AVP, in turn, assigned Mr. D'Auria as the Pest Control Technician primarily responsible for servicing the Starbucks account.

21.     After leaving AVP in 2009 to work for another entity, Mr. D'Auria resumed his employment with AVP in March 2013.

22.     At that time, Starbucks contracted with AVP to provide pest management services, but the scope of AVP's work had expanded to the majority of Starbucks store locations in Manhattan.

Case 21-2531, Document 27, 01/21/2022, 3248030, Page256 of 311

A-545

Case 1:19-cv-04650-AJN-SN   Document 105-1   Filed 03/02/21   Page 8 of 58
Case 1:19-cv-04650   Document 1   Filed 05/21/19   Page 7 of 29

23.     Upon his return in March 2013, AVP again designated Mr. D'Auria as the Pest

Control Technician primarily responsible for servicing the Starbucks account. In light of the

increased number of stores, AVP assigned Mr. D'Auria to service more than 100 different

Starbucks locations in Manhattan as his exclusive, full-time account.

24.     Mr. D'Auria provided routine, regularly scheduled services at each of the

Starbucks stores located in Manhattan, and responded, on an urgent basis, to particular stores in

the event of any emergent pest control challenges.

25.     To enable him to perform his work overnight, Starbucks provided Mr. D'Auria

with keys and security codes to access each store in Manhattan.

**C.     Plaintiff Jill Shwiner**

26.     Ms. Shwiner served as a Director of Operations for AVP from in or around 1990

through late 2018.

27.     In that capacity, Ms. Shwiner was responsible for an array of administrative

duties, including, among other things, scheduling and staffing assignments for AVP's

technicians, including Mr. D'Auria.

28.     Ms. Shwiner also provided periodic training to Starbucks management personnel

in Manhattan regarding Integrated Pest Management ("IPM") best practices.

29.     She also accompanied District Managers on walk-throughs of many Starbucks

stores in Manhattan, during which she would identify maintenance and other IPM deficiencies

and recommend appropriate corrective action.

30.     Ms. Shwiner also personally responded to address emergent pest control matters

in particular Starbucks stores if Mr. D'Auria was unavailable to respond directly.

Case 21-2531, Document 27, 01/21/2022, 3248030, Page257 of 311

A-546

Case 1:19-cv-04650-AJN-SN   Document 105-1   Filed 03/02/21   Page 9 of 29
Case 1:19-cv-04650   Document 1   Filed 05/21/19   Page 8 of 58

**II.      Starbucks Willfully and Secretly Exposes Plaintiffs (and All Employees, Patrons and Visitors) to Hazardous Pesticides Hidden Throughout its Manhattan Stores**

**A.      Background**

31.      A primary factor contributing to pest infestations in food establishments such as Starbucks is the failure to maintain adequate sanitary conditions.

32.      With respect to Starbucks locations in Manhattan in particular, these failures include, by way of examples only, the failure to thoroughly clean food residue, stagnant water, and other filth that can spread throughout such facilities in the ordinary course of their operations — as well as the general rot and disrepair afflicting areas within each store that customers cannot see directly, including, for example, under and within the main coffee bar counters.

33.      As such, professional pest management technicians and public agencies urge proprietors to ensure thorough cleanliness and proper construction and maintenance of their facilities as the first and most critical steps in preventing and eliminating pest infestations.

34.      As set forth below, however, Starbucks stores located throughout Manhattan — from Battery Park to upper Manhattan — continuously failed to take necessary or adequate measures to ensure their cleanliness and instead recklessly hid hazardous pesticides throughout their stores, including in close proximity to food and food preparation areas.

35.      Moreover, this dangerous misconduct occurred systematically and with the apparent knowledge and approval of Starbucks Corporate Leadership — despite repeated warnings that such conduct was dangerous and unlawful.

**B.** **Starbucks's Pervasive Misuse of Hot Shot Brand "No-Pest" DDVP Strips**
<u>**Despite the Resulting Health Hazard to Employees and Customers**</u>

36.     Spectrum Brands Holdings ("Spectrum") produces a line of powerful insecticide

units encased in small, perforated plastic boxes and marketed as "Hot Shot No-Pest 2" strips

("No-Pest Strips"), which are commercially available in many home and garden stores or online.

37.     As described on its retail labeling:

> <u>Hot Shot No-Pest Strip utilizes controlled release technology to
> slowly diffuse a deep-penetrating vapor in enclosed spaces for up
> to 4 months. The clean, odorless vapor is evenly distributed
> throughout the enclosed treatment area, killing visible and hidden
> insects on contact and preventing new insect infestations while
> you're away.</u>

38.     In particular, each No-Pest Strip diffuses a continuous "deep penetrating vapor"

emanating from a 65-gram strip of a toxin called Dichlorvos (2,2-dichlorovinyl dimethyl

phosphate or "DDVP"), which kills insects within an approximately 1,200 cubic foot radius for

four months.

39.     Significantly, however, DDVP is hazardous to humans, and the No-Pest Strip

labeling is clear that the strips must ***<u>not</u>*** be used in occupied areas or in the vicinity of food or

food preparation areas.

40.     Among other warnings, the Hot Shot No-Pest Strip labeling provides as follows:

- **"[I]t is a violation of Federal law to use this product in a manner inconsistent with its labeling"**

- **"Do not use in the food/feed areas or food/feed processing or food/feed manufacturing or food/feed establishments"**

- **"FOR USE IN UNOCCUPIED AREAS"**

41.     The warnings also specifically state:

- **"Do not use in kitchens, restaurants or areas where food is prepared or served. Do not use in homes except for garages, attics, crawl spaces, and sheds occupied by people for less than 4 hours per day."[2]**

42.     The Center for Disease Control ("CDC") and the National Institute for

Occupational Safety and Health ("NIOSH") jointly maintain a website, which warns consumers

that the known health hazards of DDVP also include, *inter alia*:[3]

- **"Pupillary constriction, muscle cramp, excessive salivation. Sweating. Nausea. Dizziness. Labored breathing. Convulsions. Unconsciousness"**

- **Upon skin contact "MAY BE ABSORBED! Redness. Pain."**

- **"STRICT HYGIENE! AVOID EXPOSURE OF (PREGNANT) WOMEN! AVOID EXPOSURE OF ADOLESCENTS AND CHILDREN!"**

- **"IN ALL CASES CONSULT A DOCTOR!"**

- **"The effects may be delayed. Medical observation is indicated."**

43.     Lest there be any doubt about the potential seriousness and genuine risk that

accompanies exposure to DDVP, one such warning states that even short-term exposure,

> **"may cause effects on the central nervous system. Cholinesterase inhibitor. Exposure above the OEL (Occupational Exposure Limit) <u>may result in death</u>."**

(emphasis added).

---

[2]      *See* No-Pest Strip 2, Precautionary Statements, *available at* http://www.hotshot.com/products/general-insect-control/no-pest-strip.aspx

[3]      https://www.atsdr.cdc.gov/ToxProfiles/tp88-c1-b.pdf (last visited May 20, 2019); *see also* http://pmep.cce.cornell.edu/profiles/extoxnet/carbaryl-dicrotophos/dichlorvos-ext.html

44.     Starbucks has also, itself, explicitly acknowledged that DDVP is classified as "Highly Hazardous" by the World Health Organization, and Starbucks purports to have a "Zero Tolerance" policy to prevent the misuse of DDVP by its vendors and ingredient suppliers so as "to ensure that Starbucks sources sustainably grown and processed coffee."[4]

45.     As described below, despite the harmful toxicity of the DDVP contained in No-Pest Strips, Starbucks personnel continued to knowingly permit these No-Pest Strips to permeate Starbucks stores throughout Manhattan, even after being put on written notice on numerous occasions that this was a dangerous practice. As such, due to Starbucks's conduct, Mr. Fox, Mr. D'Auria and Ms. Shwiner were repeatedly – for years – exposed to DDVP.

46.     Indeed, while serving as the professional pest management control technician assigned to Starbucks Stores in Manhattan, New York — Mr. D'Auria discovered that Starbucks management personnel routinely placed numerous sets of DDVP No-Pest Strips within virtually each of the more than 100 stores that he serviced from at least early in 2015 through June 2018, and in multiple locations in each such store.

47.     Mr. D'Auria routinely photographed many of the No-Pest Strips that he discovered for purposes of documenting and reporting the dangerous misuse of this product which posed an obvious threat to his own health and safety (as he worked in close and unsafe proximity to these DDVP strips) and the health and safety of Starbucks patrons and employees alike (who are also all commonly in close and unsafe proximity to these DDVP strips).

---

[4]     *See C.A.F.E. Practices Verifier and Inspector Operations Manual v5.3*, Starbucks Coffee Company, Oct. 2017, at 68.

Case 21-2531, Document 27, 01/21/2022, 3248030, Page261 of 311

A-550

Case 1:19-cv-04650-AJN-SN Document 105-1 Filed 05/21/19 Page 12 of 23
Case 1:19-cv-04650-AJN-SN Document 1 Filed 03/02/21 Page 13 of 58

48.     By way of examples only, true and correct copies of several such photographs — labeled by location and date — are annexed hereto as <u>Appendix A</u>.[5]

49.     Among other things, the photographs reproduced in Appendix A document the presence of numerous DDVP strips methodically placed out of sight in and around the main customer areas of numerous stores, including, by way of examples only: (i) piled on or around air vents; (ii) affixed behind the coffee bar; (iii) piled in heaps along high shelves and ledges; (iv) under and along countertops; (v) in and next to pastry cabinets; (vi) in employee break areas; and (vii) in out-of-sight areas of near-permanent filth and disrepair. In each such location, the DDVP strips are hidden mere feet from unsuspecting customers and/or employees.

50.     Mr. D'Auria regularly emailed such documentation to Starbucks management and/or relayed the same to Ms. Shwiner (in her capacity as an AVP Director of Operations) for her to address with senior Starbucks management directly.

51.     Ms. Shwiner repeatedly warned Starbucks management personnel responsible for overseeing Manhattan-area stores that the No-Pest Strips must not be used in Starbucks stores because they pose a severe health hazard. She delivered such warnings both in writing and in-person, including numerous instances when she discovered No-Pest Strips while personally on-site at various Starbucks stores in Manhattan.

52.     The repeated warnings that Ms. Shwiner and Mr. D'Auria relayed to Starbucks management personnel also regularly emphasized that the root cause of the presence of fruit flies and other pests were dirty, unsanitary conditions in affected stores, which were frequently left to fester.

_____

[5]     The photographs — and descriptive captions — as set forth in <u>Appendix A</u> are expressly incorporated herein as substantive allegations of this Complaint.

53.     One of AVP's many warnings to Starbucks District Managers was sent by email on July 5, 2017. District Management thereafter forwarded AVP's email to Mr. Fox and other Manhattan area managers on July 5, 2017, with the forwarding subject line "No-Pest Strips."

54.     The email included a link to a news article headlined "CDC WARNING ON MISUSE OF PEST STRIPS,"[6] which describes the extreme hazard of using DDVP in the vicinity of humans. Among other things, the article emphasized that:

> "[M]isuse can result in ending up on your back twitching like a dying roach."

(emphasis added).

55.     It also attached a copy of the packaging label that warned of these dangers.

56.     However, Starbucks management personnel nevertheless continued to acquire and place new No-Pest Strips in stores throughout Manhattan. As such, AVP issued additional email warnings of the dangerous hazard that the misuse of DDVP invisibly inflicted upon the health of Starbucks customers and employees.

57.     Ms. Shwiner and/or Mr. D'Auria delivered such written warnings to Starbucks Regional and/or District Managers, *inter alia*, on or around: May 29, 2016; July 18, 2016; August 1, 2016; August 10, 2016; October 25, 2016; March 1, 2017; June 28, 2017; July 5, 2017; September 11, 2017; September 26, 2017; October 15, 2017; October 17, 2017; January 16, 2018; March 17, 2018; and April 18, 2018. These warnings included, but were not limited to the following:

- "[N]o pest strips were **bought by Starbucks and placed on top of cabinets** and **should be removed.**"

---

[6]     https://www.wired.com/2014/01/cdc-warning-misuse-pest-strips/

13

- **"We keep finding new Dichlorvos strips.… My tech or myself are down under cabinets working and work over and find <u>we've been working next to the strips breathing in the chemical not to mention the fact that they aren't allowed in food establishments</u>."**

- **"Recently there has been an <u>increasing amount of stores we find them in. The product label clearly states it's a violation to use this product in food establishment[s]</u>."**

- **Warning that DDVP strips are "<u>not lab[e]led for use in food establishments</u>" but have been repeatedly "<u>found in FOH under counters hanging from pipes or on floor, on top of high cabinets near vents, one was recently found inside a pastry[]case</u>."**

- **"<u>[S]tores continue to use multiple no pest strips</u>, CB80, bombs etc."**

- **"<u>These are against the law to have in food establishments. The active pesticide in strip, Dichlorvos, is toxic</u>. I am attaching a copy of the label of product."**

- **"[U]nder the pastry case at motor was a brand new pe[st] strip with DDVP which should never be used in food establishments. <u>The motor fan was probably circulating vapors throughout the store</u>."**

- **Referencing, among other things: "<u>the improper use of this product and the liability that it creates</u>" as a result of the hazard to employees and others subject to exposure in Starbucks stores.**

- **Emphasizing, among other things, that additional No-Pest Strips were discovered on consecutive days in multiple stores and urging Starbucks's Regional Quality Assurance Manager to reiterate to Store Managers that "<u>these are illegal to use[,] let alone toxic</u>."**

- **Warning of the ongoing presence of hazardous DDVP strips hidden, by way of example, "<u>in a flylight</u>" and "<u>under counter cabinets</u>."**

- **"<u>This is a serious hazard for those touching it and as well as those in the area. The use of these strips has increased. This is [a] serious environmental issue. Dichlorvos is an organophospate which affects the cholinesterase levels</u>**

14

**in the brain and it interferes with proper working of the nervous system in insects as well as humans."**

- **"[P]est strip was <u>hidden under the bagels</u>."**

- **"DDVP strip was found <u>in the pastry case</u>."**
- **Urgently warning of hazardous pesticides "<u>literally dripping down off ceiling and onto the uncovered bar/equipment below</u>."**

(emphasis added).

58. Despite this litany of repeated warnings over a period of ***years***, Starbucks's Regional Quality Assurance Manager admitted to Ms. Shwiner in October 2017 that Starbucks personnel had failed to internalize "***the importance of breaking this habit***" and instead continued to misuse DDVP in Manhattan-area stores with impunity.

59. Upon information and belief, Starbucks has *never* undertaken any meaningful corrective or disciplinary action in connection with the known, systemic misuse of DDVP by its management personnel responsible for overseeing Manhattan-area stores.

60. During this period — in the course of assisting in the closure of a Starbucks located at 471 Broadway — Mr. Fox, himself, discovered several Hot Shot-brand DDVP No-Pest Strips that had been hidden throughout the store.

61. Mr. Fox immediately reported this finding to his then-District Manager, who responded by assuring Mr. Fox that he would purportedly investigate to confirm that the No-Pest Strips had not been placed in recent years.

62. In fact, although unknown to Mr. Fox, Starbucks was at that time actively continuing to hide such toxic strips in stores throughout Manhattan, despite the increasingly urgent and categorical warnings of the severe risks to health and safety being relayed in-person and in writing by Ms. Shwiner and Mr. D'Auria.

63.     In January 2018 — approximately three months after being re-assigned to serve as Store Manager of the Starbucks located at 180 West Broadway — Mr. Fox saw a former co-worker of his who continued to work at Mr. Fox's prior Starbucks location at 405 Broadway.

64.     The co-worker informed Mr. Fox that his successor as Store Manager at that location had placed No-Pest Strips throughout the store — including near and within the pastry display (emitting toxic poisons into baked goods) and alongside the espresso machine (emitting toxic poisons into customers' beverages) as well.

65.     Fearful of the known hazard to which Starbucks employees and patrons were being unwittingly exposed, Mr. Fox reported this information to the Company's Senior Human Resource Compliance Specialist, Tina McDonald, on January 31, 2018.

66.     To Mr. Fox's profound dismay, however, McDonald responded dismissively, asserting that No-Pest Strips are "very common" and that there was no need to "overreact," nor, evidently, to take any action whatsoever to remove toxic poison contaminating food and beverages and permeating the air of Starbucks stores full of employees and customers.

67.     On February 7, 2018, Mr. Fox asked another former co-worker if the No-Pest Strips had been removed from the 405 Broadway Starbucks location. The co-worker informed him that they were still in place, hidden around all the food preparation areas of the store.

68.     Mr. Fox asked the former co-worker to take photographs so that he could escalate an urgent complaint to higher management in the interest of protecting the health and safety of Starbucks employees and customers.

69.     But before Mr. Fox could even obtain that photographic documentation, Starbucks intervened on the following day, February 8, 2018, by abruptly terminating Mr. Fox's 16-year employment as an award-winning and exemplary store manager.

16

70.     Given the temporal proximity of Mr. Fox's complaints to Starbucks's compliance representative about the misuse of No-Pest Strips at his former store — and his evidently unsatisfied response at the Compliance official's indifference to the resulting danger to health and safety of employees — it is apparent that Starbucks chose the expedient, albeit shortsighted, route of resolving Mr. Fox's complaints by firing him.

71.     This conclusion is underscored by the fact that Starbucks New York Metro Senior Management demonstrated an unwillingness to stop exposing customers and employees to that same health hazard in stores throughout Manhattan — despite receiving repeated, explicit written warnings about No-Pest Strips and other hazardously misused pesticides from Mr. D'Auria and Ms. Shwiner on numerous occasions throughout calendar years 2015, 2016, 2017, and 2018.[7]

72.     Thus, rather than addressing the root cause of fruit fly and other insect infestations in its stores — namely, the existence of festering and uncleaned filth — Starbucks instead sought to achieve the same result by systematically exposing its unsuspecting customers and employees to the known health hazards of DDVP exposure.

73.     Presumably, Starbucks personnel made the calculated decision that it was more cost-effective to use DDVP strips (and therefore expose everyone in its stores to lethal chemicals) rather than cure the underlying problem with appropriate policies and practices.

---

[7]     Starbucks's systematic disregard for the health and safety of Plaintiffs and its own employees and customers is rendered all the more willfully reckless and inexplicable in light of the Company's acknowledgment in its November 2018 10-k financial report to the United States Securities and Exchange Commission, which states, in part:

> Any report linking us to the use of unclean water, food or beverage-borne illnesses, tampering, adulteration, contamination, mislabeling or other food or beverage-safety issues could damage our brand value and severely hurt sales of our food and beverage products and possibly lead to product liability claims, litigation (including class actions) or damages.

74.     Similarly, when confronted by Mr. Fox's evident unwillingness to remain silent in the face of such callous disregard for the health of Starbucks patrons and employees, Starbucks terminated his employment so as to continue its systematic exposure of customers and employees throughout Manhattan to DDVP poison with impunity.

### C.     Starbucks Recklessly Exposes Plaintiffs to Additional Hazardous Pesticides Concealed Within Manhattan Stores

75.     Although No-Pest Strips were by far the most prevalent of the hazardous pesticides that Mr. D'Auria and Ms. Shwiner discovered they were being exposed to while servicing Starbucks locations in Manhattan, they each occasionally discovered a variety of other toxic pesticides hazardously hidden about their scheduled work locations.

76.     By way of example only, on the night of September 14, 2016, upon entering a Starbucks location on West 23rd Street in lower Manhattan, Mr. D'Auria was unexpectedly engulfed by toxic pesticides spewing forth from two "bug bombs" that store personnel had placed in the front of the store lobby — without any warning or notice to Mr. D'Auria — only moments before he arrived to perform scheduled work at that location.

77.     By way of further example only, on September 11, 2017, Mr. D'Auria was similarly shocked to be confronted by three Hot Shot brand pesticide fogger bombs actively spraying toxic insecticide into his face upon entering the Starbucks located at the intersection of 36th Street and 6th Avenue in Manhattan.

78.     By way of further example only, Ms. Shwiner, while investigating a pest concern at the Starbucks located at 250 W 57th Street, discovered that she had been crawling through a highly toxic rodenticide powder that had been careless scattered underneath the main counter areas of the store.

79.     By way of further example only, on the night of April 18, 2018 — while performing scheduled services at the Starbucks located at the intersection of Broadway and 60th Street in Manhattan — Mr. D'Auria was shocked and alarmed upon feeling an unknown liquid dripping down on him from the ceiling above the bar area of the store.

80.     Upon further inspection, Mr. D'Auria discovered that Starbucks personnel had placed a dangerous quantity of toxic D Force brand insecticide — which is not designed for use in occupied areas or in the vicinity of food or food preparation areas — that was streaming forth from the ceiling down into the bar area of the store and onto his skin and the exposed food preparation areas of the store.

81.     Published guidelines for the safe use of this type of insecticide make clear that inhalation or skin contact pose immediate, known risks that require immediate response to mitigate, even if only in part.

82.     Upon information and belief, the Starbucks personnel who placed DDVP and other pesticides in Manhattan stores as described above were *not* duly licensed or certified to do so in accordance with New York State law, and their conduct was thus grossly reckless, negligent, and contrary to law.

83.     As a lymphoma survivor, Mr. D'Auria suffered from ever-escalating fear, stress and anxiety as a result of being repeatedly and involuntarily exposed to toxic, carcinogenic pesticides that Starbucks personnel hid about his scheduled work locations without notice or warning.

84.     In the face of years of explicit, repeated warnings about the known and substantial risk to the health and safety of unsuspecting patrons, Mr. D'Auria also despaired of his ability to

Case 21-2531, Document 27, 01/21/2022, 3248030, Page269 of 311

A-558

Case 1:19-cv-04650-AJN-SN Document 105-1 Filed 03/02/21 Page 21 of 58
Case 1:19-cv-04650-AJN Document 1 Filed 05/21/19 Page 20 of 21

restrain Starbucks's systematic misuse of such toxic chemicals at Starbucks locations throughout

Manhattan.

85.     Mr. D'Auria's concerns were ultimately confirmed when Starbucks proceeded to

terminate its contract with AVP — thereby silencing his repeated reports and complaints about

the foregoing risks to health and safety — in June 2018.

86.     The timing of Starbucks's decision to terminate AVP's services came as a

particular surprise, as Starbucks had recognized AVP as its "Vendor of the Year" only a few

months prior, in February 2018.

**III.    Starbucks Prohibits Mr. Fox From Correcting the Underpayment of Earned Wages
       to Numerous Store Employees**

87.     During the first weeks following his October 2017 re-assignment to serve as Store

Manager at the Starbucks located at 180 West Broadway — and in a reflection of the diligence

that was a hallmark of his sixteen years of service — Mr. Fox sought to learn more about the

schedules and attendance records of the employees who were newly under his management at the

West Broadway location.

88.     He did so by conducting an independent audit of the Global Labor System

("GLS") time keeping records for his new store.

89.     Mr. Fox almost immediately discovered that several employees had performed

hours of work without pay in the weeks prior to his assignment to that location.

90.     Mr. Fox approached one such employee to ask if he had been aware that he was

working hours without being paid.

91.     Mr. Fox was dismayed when the employee responded that he had been afraid that

the prior manager would fire him if he had challenged the apparent non-payment of portions of

his wages.

92.     He assured the employee that he had nothing to fear and, with the employee standing beside him, Mr. Fox entered retroactive pay into the system to account for the hours of work for which the employee had never been paid.

93.     During a meeting with his District Manager the following week, Mr. Fox informed him of the issues he had discovered concerning the non-payment of wages for hours worked by numerous employees.

94.     Mr. Fox's District Manager thereafter directed him to gather further information – presumably for purposes of identifying all underpayments of wages at issue preliminary to correcting the same.

95.     As requested, Mr. Fox gathered additional information, and, on November 3, 2017, he sent an email to his District Manager with the subject line "*Time clock manipulation at West Broadway and Leonard*."

96.     Mr. Fox's email included images of manipulated time cards, and an explanation of the mechanics of the scheme to deprive employees of their earned wages.

97.     The District Manager responded by email, thanking Mr. Fox for the information, and commending him that "*it's even more clear to me now that you are the right guy for this job*."

98.     Encouraged by the positive feedback, and eager to do what he could to attempt to ensure that every employee working at his new location had been paid for all hours of work at that location, Mr. Fox undertook a more systematic audit of the GLS records.

99.     Mr. Fox reviewed time card and pay records for every employee who worked at that location for any length of time over the course of the prior three years.

Case 21-2531, Document 27, 01/21/2022, 3248030, Page271 of 311

A-560

Case 1:19-cv-04650-AJN-SN Document 105-1 Filed 03/02/21 Page 23 of 58
Case 1:19-cv-04650-SN Document 1 Filed 05/21/19 Page 22 of 23

100.     After reviewing these records for a limited sample of approximately 130 such current and former Starbucks employees, Mr. Fox identified at least 29 who had worked hours on the clock during the preceding three-year period without being paid. Those employees were spread across the West Broadway location, as well as eight other stores in the area.

101.     When Mr. Fox presented this information to the newly appointed District Manager for his district, however, the District Manager's demeanor shifted and he expressed skepticism at the apparent proof, dismissively suggested that it was a computer glitch, promised to investigate further — and prohibited Mr. Fox from inputting retro pay for any of the 29 employees pending further instructions from his Regional Director.

102.     Shortly thereafter, on February 8, 2018, Starbucks abruptly terminated Mr. Fox's employment — without ever providing payment to the 29 employees who performed hours of work without pay at the nine locations for which Mr. Fox conducted an audit.

103.     Given the temporal proximity to his complaints about unpaid wages owed to dozens of employees — together with Starbucks's demonstrated unwillingness to remedy the unlawful withholding of such wages — it is apparent that Starbucks chose the expedient, albeit shortsighted and unlawful, route of resolving Mr. Fox's complaints by firing him.

### FIRST CAUSE OF ACTION
**(Negligent Infliction of Emotional Harm)**
*On Behalf of all Plaintiffs*

104.     Plaintiffs repeat and re-allege each and every allegation of the preceding paragraphs as if fully set forth herein.

105.     The conduct of Defendant, as described above, was negligent and grossly negligent. Defendant's negligence consisted of, among other things:

Case 21-2531, Document 27, 01/21/2022, 3248030, Page272 of 311

A-561

Case 1:19-cv-04650-AJN-SN Document 105-1 Filed 03/02/21 Page 24 of 58
Case 1:19-cv-04650-SN Document 1 Filed 05/21/19 Page 23 of 23

a. recklessly, carelessly and negligently failing to provide a safe and suitable place for Plaintiffs to perform their work and duties and failing to take suitable and proper precautions to ensure the safety of Plaintiffs in their work;

b. recklessly, carelessly and negligently failing to properly advise Plaintiffs as to the hazardous and dangerous character of the undertaking in which they were engaged — due to the danger posed by hidden improperly placed and applied pesticides — of which danger and hazard the Plaintiffs then and there were wholly ignorant and unaware;

c. recklessly, carelessly and negligently and with knowledge of the hazards, directing Plaintiffs to expose themselves to such hazards without taking adequate or, in fact, any, precautions to safeguard Plaintiffs or remove or allay dangers and hazards to be encountered; and

d. recklessly, carelessly and negligently failing to provide, promulgate and/or make known to their supervisors, foremen, agents, employees and servants suitable and proper rules and regulations for their government, control and instruction in working, operating and managing the use of hazardous pesticides in their workplaces.

106.    As a direct and proximate result of Defendant's foregoing negligence and gross negligence, Plaintiffs have been caused to suffer physical harm as well as extreme personal and emotional hardship, worry, fright and fear for which they are entitled to an award of monetary damages and other relief.

107.    Defendant's conduct entitles Plaintiffs to an award of punitive damages under any and all applicable legal standards in the greatest amount possible as:

    a.   Defendant's conduct demonstrates a conscious disregard – or at the very least a grossly negligent, wanton and/or reckless disregard – of Plaintiffs' rights;

    b.   Defendant's conduct implies a criminal-like indifference to its civil obligations and constitutes a quasi-criminal level of wrongdoing;

    c.   Defendant has engaged in egregious, morally culpable conduct directed not only at Plaintiffs but at the general public;

    d.   Defendant must be specifically deterred from engaging in the alleged unlawful conduct and/or similar conduct in the future; and

    e.   Other persons and businesses must be generally deterred from engaging in the alleged unlawful conduct and/or similar conduct in the future.

**<u>SECOND CAUSE OF ACTION</u>**
**(Retaliation in Violation of NYLL § 215: Conduct Prohibited by NYLL § 200)**
***On Behalf of Plaintiff Fox***

108.    Plaintiffs repeat and re-allege each and every allegation of the preceding paragraphs as if fully set forth herein.

109.    Defendant has violated the NYLL by subjecting Plaintiff Fox to unlawful retaliation and termination of employment for his protected complaints of and opposition to Defendant's violations of the NYLL § 200.

110.    Specifically, NYLL § 200 imposes a "general duty to protect health and safety of employees" and to provide "reasonable and adequate protection to the lives, health and safety of all persons employed in [Starbucks Manhattan store locations], or lawfully frequenting such places."

111.    Mr. Fox engaged in protected activity under the NYLL when he repeatedly raised concerns about Starbucks's deployment of hidden pesticides in such locations despite the known

risk to health and safety to which employees and others were thereby systematically and continuously exposed.

112.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYLL, Plaintiff Fox has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which he is entitled to an award of monetary damages and other relief.

113.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYLL, Plaintiff Fox has suffered, and continues to suffer, mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

114.    Defendant's unlawful retaliatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff Fox's rights under the NYLL for which he is entitled to an award of punitive damages.

115.    Defendant's unlawful retaliatory conduct was not in good faith and was undertaken without reasonable grounds for believing that such conduct was not in violation of the NYLL for which Plaintiff Fox is entitled to an award of liquidated damages in the maximum amount permitted by law.

## THIRD CAUSE OF ACTION
### (Retaliation in Violation of NYLL § 215: Unlawful Wage Practices)
*On Behalf of Plaintiff Fox*

116.    Plaintiffs repeat and re-allege each and every allegation of the preceding paragraphs as if fully set forth herein.

Case 21-2531, Document 27, 01/21/2022, 3248030, Page275 of 311

**A-564**

Case 1:19-cv-04650-AJN-SN Document 105-1 Filed 05/21/19 Page 26 of 29
Case 1:19-cv-04650-AJN-SN Document 1 Filed 03/02/21 Page 27 of 58

117.    Defendant has violated the NYLL by subjecting Plaintiff Fox to unlawful retaliation for his protected complaints of and opposition to Defendant's above-outlined improper payroll practices, including the non-payment of earned wages to numerous employees.

118.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYLL, Plaintiff Fox has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which he is entitled to an award of monetary damages and other relief.

119.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYLL, Plaintiff Fox has suffered, and continues to suffer, mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

120.    Defendant's unlawful retaliatory conduct was not in good faith and was undertaken without reasonable grounds for believing that such conduct was not in violation of the NYLL, for which Plaintiff Fox is entitled to an award of liquidated damages in the maximum amount permitted by law.

### FOURTH CAUSE OF ACTION
#### (Retaliation in Violation of FLSA § 15(a)(3))
#### *On Behalf of Plaintiff Fox*

121.    Plaintiffs repeat and re-allege each and every allegation of the preceding paragraphs as if fully set forth herein.

122.    Defendant has violated the FLSA by subjecting Plaintiff Fox to unlawful retaliation for his protected complaints of and opposition to Defendant's above-outlined improper payroll practices, including the non-payment of earned wages to numerous employees.

123.     As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the FLSA, Plaintiff Fox has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which he is entitled to an award of monetary damages and other relief.

124.     As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the FLSA, Plaintiff Fox has suffered, and continues to suffer, mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

125.     Defendant's unlawful retaliatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff Fox's rights under the FLSA for which he is entitled to an award of punitive damages.

126.     Defendant's unlawful retaliatory conduct was not in good faith and was undertaken without reasonable grounds for believing that such conduct was not in violation of the FLSA for which Plaintiff Fox is entitled to an award of liquidated damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court enter judgment in their favor and against Defendant, containing the following relief:

A.     A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the United States and the State of New York;

B.     An injunction and order permanently restraining Defendant from engaging in such unlawful conduct;

C.      An order directing Defendant to place Plaintiff Fox in the position he would have occupied but for Defendant's retaliatory treatment and otherwise unlawful conduct, as well as to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect his employment and personal life;

D.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for all monetary and/or economic harm;

E.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for harm to their professional and personal reputations and loss of career fulfillment;

F.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for all non-monetary and/or compensatory harm, including but not limited to, compensation for their mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, emotional distress and physical injuries;

G.      An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiffs in an amount to be determined at trial, plus prejudgment interest;

H.      An award of punitive damages;

I.      An award of liquidated damages to Mr. Fox under the NYLL;

J.      An award of costs that Plaintiffs have incurred in this action, as well as Plaintiffs' reasonable attorneys' fees to the fullest extent permitted by law; and

K.      Such other and further relief as the Court may deem just and proper.

Case 21-2531, Document 27, 01/21/2022, 3248030, Page278 of 311

A-567

Case 1:19-cv-04650-AJN-SN Document 105-1 Filed 03/02/21 Page 30 of 30
Case 1:19-cv-04650-SN Document 1 Filed 05/21/19 Page 29 of 29

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues of fact and damages stated herein.

Dated: New York, New York
May 21, 2019

Respectfully submitted,

**FILOSA GRAFF LLP**

By:
Ariel Y. Graff
Gregory N. Filosa

111 John Street, Suite 2510
New York, NY 10038
Tel: (212) 203-3473
Fax: (212) 256-1781
agraff@filosagraff.com
gfilosa@filosagraff.com

*ATTORNEYS FOR PLAINTIFFS*



**540 Columbus Avenue (Mar. 17, 2018)**
*DDVP No-Pest Strip in Pastry Cabinet*



**55 West 46th Street (Jan. 16, 2018)**
*DDVP No-Pest Strip in Bakery Cabinet*



**1515 York (Oct. 17, 2017)**
*Pieces of DDVP No-Pest Strips Cut and Scattered in Store*



**Manhattan Store (Oct. 15, 2017)**
*DDVP No-Pest Strip Hidden in Lighting Fixture*



Manhattan Store (July 17, 2017)
*DDVP No-Pest Strip in Food Preparation Area*



Port Authority, South Wing (March 1, 2017)
*DDVP No-Pest Strip Alongside Active Fan System, Circulating Vapors*



Manhattan Store (October 1, 2016)
*DDVP No-Pest Strip Hidden Above Coffee Retail Shelf*



**Manhattan Store (August 2016)**
*DDVP No-Pest Strip Hidden Behind Signage Above Food Preparation Area*



Spring and Crosby (August 9, 2016)
*DDVP No-Pest Strip Hidden Above Menu Boards*



21st Street and 5th Avenue (August 5, 2016)



**180 West Broadway (August 4, 2016)**



**Port Authority (July 2016)**
*DDVP No-Pest Strip Above Hanging Lamp Fixture*



**Manhattan Mall (July 29, 2016)**
*DDVP No-Pest Strip Hidden in Bar Area*



**Penn Station (July 28, 2016)**
*DDVP No-Pest Strip Hidden Behind Menu Boards*



**Empire State Building (July 28, 2016)**
*DDVP No-Pest Strip Hidden Above Menu Boards*



**Penn Station (May 2016)**
*DDVP No-Pest Strips Hidden Above Store Shelving*



**Manhattan Store (Mar. 8. 2016)**
*DDVP No-Pest Strip Behind Sink*
**Velcro Strips Used to Affix Out of Sight Are Also Visible**



**340 Madison Avenue (Oct. 14, 2015)**
*DDVP No-Pest Strips Hidden Below Sinks*



**Manhattan Store (Sept. 2015)**
*DDVP No-Pest Strip Hidden Below Coffee Bar*



**Pearl and Hanover (Sept. 4, 2015)**
*DDVP No-Pest Strip on Food Preparation Counter*



**Manhattan Store (Aug. 18, 2015)**
*DDVP No-Pest Strips in Food Preparation Areas*

 

**42nd Street, between 3rd & Lexington Avenues (July 27, 2015)**
*DDVP No-Pest Strips Hidden in and Around Air Vents in Store*



**West 23rd Street (2015)**
*DDVP No-Pest Strip Hidden Behind Bar Counter Placard*



**Manhattan Store (2015)**
*DDVP No-Pest Strip Hanging Alongside Food Preparation Equipment*



**28th Street and Seventh Avenue (July 21, 2015)**
*DDVP No-Pest Strips Hidden Above Counter Shelves*



**Empire State Building (June 23, 2015)**
*DDVP No-Pest Strips Hidden Below Store Counter and Displayed*
*Openly In Store Office*



**150 Varick Street (Apr. 20, 2015)**
*DDVP No-Pest Strips Piled on Store Counter*



**Delancey (Jan. 31, 2014)**
*DDVP No-Pest Strips Hidden Above Counter Shelving*

```
                                                        Page 1
 1

 2     UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
 3     - - - - - - - - - - - - - - - - - - -x

 4     RAFAEL FOX, PAUL D'AURIA, AND JILL
       SHWINER,
 5

 6                            Plaintiffs,

 7
                                   Case No.:
 8                                 19-CV-4650

 9

10                   -against-

11

       STARBUCKS CORPORATION d/b/a STARBUCKS
12     COFFEE COMPANY,

13                            Defendant.

14     - - - - - - - - - - - - - - - - - - -x

15         DEPOSITION OF RAFAEL FOX

16         LOCATION:  Littler Mendelson

17         900 Third Avenue,
           New York, New York 10022
18

19         DATE:  August 12th, 2020.

20     - - - - - - - - - - - - -- - - - - -x

21

22

23              AMBRIA IANAZZI, RPR

24              JOB#:  182742

25
                   CONFIDENTIAL
```

Page 53

```
 1                CONFIDENTIAL
 2    it will sound incoherent, so -- but
 3    I told him just extremely cursor- --
 4    I asked if he knew about the case.
 5    He said, "yes."
 6              I said, "I don't need to
 7    fill you in, since you know."  I
 8    asked him what his experience was
 9    with Hot Shots.  He said he used
10    them at his location.  He said that
11    he purchased them in bulk at 23rd
12    Street Home Depot.  And he said
13    that --
14              I said, "did you ever get
15    in trouble for it, or, you know, did
16    anything ever come about it for it?"
17              And he said that Alloy
18    Vilabrera --
19         Q.    Said what?
20         A.    A man named Alloy
21    Vilabrera, he was -- he's had
22    different positions at Starbucks,
23    but one of the positions was quality
24    assurance manager, and Alloy told
25    him, "knock it off."
```

Page 54

1                    CONFIDENTIAL

2        Q.     Who told him to, "knock

3    it off"?

4        A.     I believe he said that

5    Alloy Vilabrera, the man we're

6    talking about now, told Maurice

7    Franklin to knock it off, but no

8    discipline.  No, you know --

9        Q.     And did Maurice knock it

10   off?

11       A.     That I don't know.  I

12   don't remember if I asked him.

13       Q.     So, you were trying to

14   get some information from him,

15   correct?

16       A.     Yes.

17       Q.     And what information did

18   he give you?

19       A.     He gave me what I told

20   you earlier.  Do you want me to

21   repeat it?

22       Q.     Mh-hm.

23       A.     Okay.  He told me that

24   that -- that as a manager, he would

25   purchase the Hot Shots at the Home

Page 55

```
 1              CONFIDENTIAL
 2   Depot on 23rd Street in Manhattan,
 3   and he would use the store credit
 4   card.
 5       Q.      What else did he tell
 6   you?
 7       A.      That's all I could
 8   remember.
 9       Q.      And how did that
10   information help you?
11       A.      Well, I was hoping that
12   my lawyer would know where -- know
13   where we could find this proof, and,
14   you know, I haven't read all the
15   legal documents that have gone back
16   and forth, but I believe Ari
17   requested the credit card records.
18       Q.      Anything else you talked
19   to Maurice about?
20       A.      No.
21       Q.      Anybody else that you
22   talked to that's not on the list
23   that we just covered?
24       A.      Yes.
25       Q.      Who else?
```

```
                                              Page 56
 1                  CONFIDENTIAL
 2        A.      Penelope Marte.
 3        Q.      Spell.
 4        A.      P-E-N-E-L-O-P-E,
 5   M-A-R-T-E.
 6        Q.      And who is Penelope?
 7        A.      She was a Starbucks
 8   manager.  Her last location was
 9   Church and Murray.
10        Q.      I'm sorry.  Say that
11   again.
12        A.      Church Street and Murray
13   Street.  And she left Starbucks
14   around 2017, maybe.
15        Q.      When did you speak to
16   her?
17        A.      Twice.  The first time I
18   spoke to her, I met her at a -- at a
19   bar, and she -- I brought my resume,
20   and she helped me with my resume,
21   and --
22        Q.      And that was in 2017?
23        A.      -- we talked about some
24   other things, too.
25        Q.      In 2017?
```